Erik F. Stidham, ISB No. 5483
Kevin C. Braley, ISB No. 6948
Jennifer M. Jensen, ISB No. 9275
HOLLAND & HART LLP
800 W. Main Street, Suite 1750
P.O. Box 2527
Boise, Idaho  83701-2527
Telephone:  (208) 342-5000
Facsimile:  (208) 343-8869
E-mail:      efstidham@hollandhart.com
              kbraley@hollandhart.com
              jmjensen@hollandhart.com

Attorneys for Plaintiffs

# UNITED STATES DISTRICT COURT

# DISTRICT OF IDAHO

| | |
|---|---|
| EDMARK AUTO, INC., an Idaho corporation; CHALFANT CORP., an Idaho corporation, <br><br> Plaintiffs, <br><br> vs. <br><br> ZURICH AMERICAN INSURANCE COMPANY, a New York corporation; and UNIVERSAL UNDERWRITERS SERVICE CORPORATION, a Delaware corporation, <br><br> Defendants. | Case No.  1:15-CV-00520-EJL-CWD <br><br><br> **MEMORANDUM IN SUPPORT OF MOTION TO AMEND COMPLAINT TO ALLEGE PUNITIVE DAMAGES** |

# TABLE OF CONTENTS

Page

I. RELEVANT FACTS.................................................................................................2

  A. The Zurich Defendants Promised A No Chargeback Program To Induce The
Dealerships To Sell Universal's VSCs And To Gain Further Business. ............................4

    1. The No Chargeback Agreement Promises A "No Chargeback Program.".....................5

    2. Zurich Defendant Personnel Represented To The Dealerships That The
Dealerships Had A No Chargeback Program Covering Future Liability For
VSCs Cancelled Over 90 Days. .........................................................................................6

  B. The Zurich Defendants Did Nothing To Manage The No Chargeback Program. ...............8

  C. The Zurich Defendants Fraudulently Concealed That They Had Never Set Up Or
Managed The No Chargeback Program, Resulting In The Program's Insolvency. ............10

II. THE DEALERSHIPS HAVE SHOWN A REASONABLE LIKELIHOOD OF
PROVING AT TRIAL FACTS TO SUPPORT PUNITIVE DAMAGES................................13

  A. Punitive Damages Are Available When Defendant Performed A Bad Act With A
Bad State of Mind...............................................................................................................13

  B. The Zurich Defendants' Acted Outrageously With A Harmful State of Mind. .................15

    1. There Is Expert Testimony. ..............................................................................................15

    2. The Dealerships Sustained Actual Harm. ........................................................................16

    3. The Parties Have A Special Relationship. ........................................................................17

    4. The Zurich Defendants' Engaged In A Course Of Oppressive Conduct..........................18

    5. The Zurich Defendants Knew The Likely Consequences Of Their Conduct.................19

III.    CONCLUSION .......................................................................................................20

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*Adams v. United States,*
    622 F. Supp. 2d 996 (D. Idaho 2009) ...................................................19

*Cheney v. Palos Verdes Corp.,*
    104 Idaho 897, 665 P.2d 661 (1983) ............................................14, 20

*Cuddy Mtn. Concrete Inc. v. Citadel Constr. Inc.,*
    121 Idaho 220, 824 P.2d 151 (Ct. App. 1992) ..........................................14

*Duffin v. Idaho Crop Imp. Ass'n,*
    126 Idaho 1002, 895 P.2d 195 (1994) .................................................17

*Garnett v. Transamerica Ins. Serv.,*
    118 Idaho 769, 800 P.2d 656 (1990) .................................................15

*Hall v. Farmers Alliance Mut. Ins. Co.,*
    145 Idaho 313, 179 P.3d 276 (2008) .................................................13

*Hangarter v. Provident Life & Acc. Ins. Co.,*
    373 F.3d 998 (9th Cir. 2004) .......................................................13

*Hydroblend, Inc. v. Nothum Mfg. Co.,*
    No. 1:13-CV-00445-EJL, 2014 WL 3446088 (D. Idaho 2014)..............................18

*Kuhn v. Coldwell Banker Landmark, Inc.,*
    150 Idaho 240, 245 P.3d 992 (2010) .................................................15

*Magic Valley Radiology Assocs. P.A. v. Prof. Bus. Servs. Inc.,*
    119 Idaho 558, 808 P.2d 1303 (1991) ............................................14, 19

*Myers v. Workmen's Auto Ins. Co.,*
    140 Idaho 495, 95 P.3d 977 (2004) .................................................16

*Skinner v. U.S. Bank Home Mort.,*
    159 Idaho 642, 365 P.3d 398 (2015) .................................................18

*Stewart Title Ins. Co. v. Credit Suisse,*
    No. 1:11-cv-227-BLW, 2013 WL 4710264 (D. Idaho Aug. 29, 2013) .............14, 17, 19

*Stouffer Corp. v. Itasca Hotel Co.,*
    119 U.S. Dist. LEXIS 18166 (N.D. Ill. Dec. 30, 1991)................................18

*Todd v. Sullivan Constr. LLC,*
    146 Idaho 118, 191 P.3d 196 (2008) .......................................................................13

*Vista Eng'g Techs., LLC. v. Premier Tech., Inc.,*
    No. CV-09-08-E-BLW, 2010 WL 300426 (D. Idaho Jan. 20, 2010) ........................14, 18, 20

*Weekes v. Ohio Nat'l Life Assur. Corp.,*
    No. 1:10-cv-566-BLW, 2011 WL 6140967 (D. Idaho Dec. 9, 2011)............................. passim

*Women's Fed. Sav. & Loan Ass'n v. Nev. Nat'l Bank,*
    811 F.2d 1255 (9th Cir. 1987) ................................................................................18

*Zazzali v. Ellison,*
    973 F. Supp. 2d 1187 (D. Idaho 2013) ....................................................................13

### STATUTES

Idaho Code § 6-1604.................................................................................................13, 14

Idaho Code § 6-1604(2)............................................................................................13

Through deception and other wrongful conduct, Universal Underwriters Service Corporation ("Universal") and Zurich American Insurance Company ("Zurich") (collectively "Zurich Defendants") misled Edmark Auto and Chalfant Corp. (the "Dealerships") into selling Universal's insurance products.  The Zurich Defendants profited handsomely from their wrongful acts.  Collectively, the Dealerships delivered millions of dollars in finance and insurance product revenue to the Zurich Defendants.  Dkt. 111-1.  The Zurich Defendants received $12.7 million in profit from the Dealerships' sale of vehicle service contracts ("VSCs") alone.  *Id.*, Schedule 1-1 Actual Warranty Costs at 30.  In 2014, the revenue the Zurich Defendants obtained from the Dealerships was about $2.7 million, approximately 22% of the annual revenue in the entire region.  Dkt. 88-24 at 131540-43.

The Zurich Defendants gained and maintained these lucrative relationships with the Dealerships by falsely promising a No Chargeback Program to cover the Dealerships' liability for certain customer cancellations of VSCs the Dealerships sold for the Zurich Defendants ("chargebacks").  The Zurich Defendants were to use their special knowledge to calculate anticipated future liability for chargebacks, and pay the chargebacks from a Refund Account funded by dealership payments made each time the respective dealership sold Universal's VSCs ("Refund Payments").  Instead, they violated the Dealerships' trust by taking the Refund Payments, investing them, and keeping the income for themselves.  The Zurich Defendants took no action to provide what they promised, showing their lack of intent to ever perform.  They misrepresented and fraudulently concealed that they had disregarded any duty to manage the program, resulting in program insolvency.

And when the ruse was no longer profitable, the Zurich Defendants changed their story and went on the offensive.  On May 5, 2015, the Zurich Defendants sent a notice which

purported to "terminate" the No Chargeback Program—a program which in reality they had never put in place.  And the Zurich Defendants completely changed their position regarding the purpose and effect of the No Chargeback Program.  The Zurich Defendants disclosed that the non-existent "account" had been in deficit for years, and asserted, for the first time, that the Zurich Defendants would not cover chargebacks despite their repeated promises to do so and the fact the Dealerships had made the required Refund Payments on all VSCs under the program.

The Zurich Defendants committed bad acts with a bad state of mind: (1) The Dealerships' expert has opined that the Zurich Defendants' acts and omissions are an extreme deviation from reasonable standards; (2) the Dealerships sustained actual harm—they must pay chargebacks on VSCs that were supposed to be covered under the No Chargeback Program, and they missed opportunities to switch to a better finance and insurance product provider; (3) the parties have a special relationship because of the Zurich Defendants' expertise in assessing risk and pricing finance and insurance products and because they held the Dealerships' funds; (4) the Zurich Defendants oppressed the Dealerships, including accepting pecuniary benefits without intending to perform their own duties, deceiving the Dealerships to gain more money from the business relationship, and skimming the income earned on the Refund Payments; and (5) the Zurich Defendants knew the likely consequences of their conduct because they had (and concealed) all the information on the status of the No Chargeback Program, intending to benefit themselves at the Dealerships' expense.

## I.    RELEVANT FACTS

The Zurich Defendants would never have had the Dealerships' business, much less kept it for 19 years, if they had not misled the Dealerships into believing the Dealerships had a No Chargeback Program that would cover their liability for customer cancellations of VSCs.  Dkt.

91-2 ¶¶ 14-61; Dkt. 91-3 ¶¶ 3-18; Dkt. 91-4 ¶¶ 4-10.  VSCs, sometimes called "extended

warranties," are a highly lucrative business for insurance companies like the Zurich Defendants.

Dkt. 91-2 ¶ 8; Dkt. 111-1 Schedule 1-1 Actual Warranty Costs at 30.  But, as the sale of a VSC

is most effectively done at the time of vehicle sale, insurance companies must partner with car

dealerships, which sell the insurer's VSCs.  Dkt. 91-2 ¶ 8.  A VSC covers mechanical breakdown

of a vehicle, and is just one type of finance and insurance product insurers offer to cover various

costs and risks associated with owning a vehicle.  *Id.* ¶¶ 6, 28.  Other finance and insurance

products include maintenance contracts (which cover routine expenses, like oil changes),

guaranteed auto protection contracts (which cover the difference between replacement price of a

vehicle and the value of the vehicle if destroyed), and tire and wheel contracts.  *Id.* ¶ 28.  The

Zurich Defendants underwrote and profited from these finance and insurance products by

convincing the Dealerships to sell them to Dealership customers.  *Id.* ¶¶ 28-29; Dkt. 111-1

Schedule 1-1 Actual Warranty Costs at 30, Schedule 4 at 18.

　　　In 1996, Jim Chalfant (principal and part owner of Edmark Auto) renegotiated Edmark

Auto's contract with Universal governing the sale of VSCs because he wanted a No Chargeback

Program.  Dkt. 91-2 ¶¶ 14-21.  A No Chargeback Program is an arrangement whereby the insurer

covers a car dealership's liability for refunds, when a customer cancels his VSC (for instance, if

the customer trades in the vehicle associated with the VSC).  *Id.* ¶¶ 10-13; Dkt. 91-3 ¶ 3; Dkt.

91-4 ¶ 3; Jensen Decl., Ex. F, (Zieglmeier 83:23-84:7).  The customer is entitled to a refund that

is a prorated portion of the VSC's purchase price.  Dkt. 91-2 ¶ 10.  Typically, the insurer that

underwrites the VSC is liable to refund the prorated portion of the amount the insurer received

from the sale of the VSC, less any mechanical breakdown claims.  *Id.* ¶ 11.  And the dealership

is liable for the prorated portion of the amount the dealership received on the sale of the VSC

(called a "chargeback").  *Id.*  But under a No Chargeback Program, the insurer pays the entire customer refund, and the dealership has no future liability for cancellations.  *Id.* ¶ 12.  Universal and its competitors offered such arrangements to some car dealership clients, calling the arrangements "No Chargeback Programs."  Dkt. 91-14 (Ingham I 128:2-129:14); Jensen Decl., Ex. F, (Zieglmeier 84:8-18).  A No Chargeback Program gives the car dealership certainty that the dealer will not have future liability, avoids the administrative cost to the dealer of estimating future liability, and forecloses the risk of underestimating future liability if the dealer managed its own reserve account.  Dkt. 91-2 ¶ 15.

Edmark Auto was one of the largest car dealerships in the greater Boise area, consistently courted by insurers that wanted to get Edmark Auto to sell their finance and insurance products.  Dkt. 91-2 ¶¶ 4, 9; Dkt. 91-4 ¶ 7; Jensen Decl., Ex. A (D'Arc 199:11-200:5).  To beat the competition, Greg Powell readily promised that Universal would meet Edmark Auto's condition by delivering a No Chargeback Program.  Dkt. 91-2 ¶¶ 16-17.

**A.    The Zurich Defendants Promised A No Chargeback Program To Induce The Dealerships To Sell Universal's VSCs And To Gain Further Business.**

In response to Jim Chalfant's request for a No Chargeback Program, Greg Powell presented Mr. Chalfant with a contract drafted by Universal (Dkt. 72-3) (the "No Chargeback Agreement").  Mr. Powell assured he was delivering "the agreement [Mr. Chalfant] had asked for" that would "satisfy [Mr. Chalfant's] request" for a No Chargeback Program that would cover Edmark Auto's future liability for chargebacks on VSCs cancelled over 90 days into their effective term.  Dkt. 91-2 ¶ 18.  Mr. Chalfant agreed Edmark Auto would continue selling Universal's VSCs because he had the promised No Chargeback Program.  *Id.*  On or about November 1, 1996, he executed for Edmark Auto the No Chargeback Agreement (Dkt. 72-3).  *Id.*

MEMORANDUM IN SUPPORT OF MOTION TO AMEND COMPLAINT TO ALLEGE PUNITIVE DAMAGES - 4

## 1.    The No Chargeback Agreement Promises A "No Chargeback Program."

The No Chargeback Agreement recites that it offers a "no chargeback program" (Dkt. 72-3 at ¶ 8) which is a known term in the industry.  Dkt. 91-2 ¶ 13; Dkt. 91-3 ¶ 3; Dkt. 91-4 ¶ 3; Dkt. 91-13 Jensen Decl., Ex. F (Zieglmeier 83:23-84:7).  And the No Chargeback Agreement lays out a framework under which Edmark Auto's future liability for VSC cancellations over 90 days was to be covered by Universal.  Dkt. 72-3.  It promises Universal will keep an account for Edmark Auto, from which Edmark Auto's chargebacks would be paid ("Refund Account").  *Id.* ¶¶ 1, 2(b), 3.  The Refund Account was to be funded by a portion of the sale price of each VSC Edmark Auto sold, at an amount to be set by Universal.  *Id.* ¶¶ 1, 4.  Universal set the Refund Payment at $80 per VSC sold, reserving to itself the sole discretion to adjust the amount.  *Id.* ¶ 4. The parties recited the Refund Payments were to be transferred to the Refund Account with the intent that the Refund Account cover Edmark Auto's future liability for chargebacks.  *Id.* ¶ 1.  To contribute to the Refund Account, the funds in it were to be invested and used to pay Edmark Auto's chargebacks.  *Id.* ¶ 3.  The No Chargeback Agreement specified the dealer was not to "receive" any investment interest or income from the Refund Account.  *Id.*  Investment income was not for disbursement; it was to be used to pay dealership chargebacks.  *See id.* ¶¶ 2(b), 3.

In litigation the Zurich Defendants[1] have taken the absurd position they had no duty to manage the No Chargeback Program or cover the Dealerships' future liability for VSC cancellations over 90 days.  *See* Dkt. 70-1 at 8-14; Dkt. 104 at 4-9; Dkt. 91-18 (Zurich 30(b)(6)

---

[1] As Zurich has represented in this lawsuit, Zurich is not a party to the No Chargeback Agreement or the other agreements related to the Dealerships' sale of Universal's VSCs.  Dkt. 70-17 ¶¶ 5-6, 10-12; Dkt. 91-18 (Zurich 30(b)(6) 64:23-65:17).  In 2008, Zurich began acting on behalf of Universal in the management of the No Chargeback Program through some informal arrangement between Universal and Zurich. Jensen Decl., Ex. G (Universal 30(b)(6) 6:21-7:7, 10:14-11:4); Dkt. 91-18 (Zurich 30(b)(6) 75:9-76:7).  In 2015, Universal and Zurich executed a contract under which Zurich was to service Universal's contracts.  Dkt. 88-29.

165:14-175:10).  But the interpretation they urge offers no consideration, and no dealer would

accept such an arrangement.  Dkt. 91 at 9-12; Dkt. 91-18 (Zurich 30(b)(6) 165:14-175:10).  The

Zurich Defendants claim the No Chargeback Agreement only requires them to provide

administrative services in calculating the chargebacks.  *Id.*  But their position is belied by the

facts.  *Id.*  It is undisputed that the Zurich Defendants calculated the chargebacks during the No

Chargeback Program and after the program was terminated.  Dkt. 91-5 ¶¶ 13-18; Dkt. 91-7 ¶¶

10-16; Dkt. 91-18 (Zurich 30(b)(6) 165:14-169:7).  And their own witnesses had trouble

articulating the Zurich Defendants' post hoc  justification for completely ignoring the Refund

Account.  Dkt. 91-18 (Zurich 30(b)(6) 165:14-175:10); Jensen Decl., Ex. B (Linafelter 234:8-

236:5).

> **2.    Zurich Defendant Personnel Represented To The Dealerships That The
> Dealerships Had A No Chargeback Program Covering Future Liability For
> VSCs Cancelled Over 90 Days.**

The Zurich Defendants promoted the No Chargeback Program as a great value to Edmark

Auto, to keep Edmark Auto selling VSCs. Jensen Decl., Ex. C (Jim Chalfant 47:4-48:3); Dkt. 91-

23 (Edmark 30(b)(6) 179:20-182:23, 227:1-230:7); Dkt. 91-21 (John Chalfant 38:20-40:20,

41:12-42:20, 71:14-71:22, 80:13-81:17); Dkt. 91-3 ¶¶ 7-15; Dkt. 91-4 ¶¶ 4-9.  The Zurich

Defendants further leveraged the program to get Edmark Auto to sell more finance and insurance

products, to sell Edmark Auto property and casualty insurance and worker's compensation

insurance, and to commit Edmark Auto's new Kia dealership to the No Chargeback Program.

Dkt. 91-2 ¶¶ 28-31, 40-42, 61; Dkt. 91-3 ¶¶ 12-15, 18; Jensen Decl., Ex. C  (Jim Chalfant 85:24-

86:24).  The Zurich Defendants accomplished this by sending representatives to Edmark Auto's

dealership as often as weekly to train sales staff on how to sell Universal's VSCs and advise on

industry standards and pricing.  *Id.* ¶¶ 23-24; Dkt. 91-3 ¶ 8; Jensen Decl., Ex. A (D'Arc 17:19-

18:16, 61:20-62:17, 67:22-68:11, 163:3-164:6).  During these visits, the Zurich Defendants'

representatives would talk about what a great program they offered Edmark Auto, covering the

chargebacks on VSCs, while in fact they were doing nothing to deliver a functioning program

that would remain solvent.  Jensen Decl., Ex. C (Jim Chalfant 47:4-48:3); Dkt. 91-23 (Edmark

30(b)(6) 179:20-182:23, 227:1-230:7); Dkt. 91-21 (John Chalfant 38:20-40:20, 41:12-42:20,

71:14-71:22, 80:13-81:17); Dkt. 91-2 ¶ 26; Dkt. 91-3 ¶¶ 7-15; Dkt. 91-4 ¶¶ 4-9.  These Zurich

representatives made tens of thousands of dollars in commissions each year from Edmark Auto's

business.  Jensen Decl., Ex. B (Linafelter 26:13-27:5, 28:2-28:12, 29:1-29:17, 31:15-17, 242:2-

243:9); Dkt. 88-24 at 131540-43.  The Zurich Defendants claimed the No Chargeback Program

was the reason for Edmark Auto to not transfer its business to one of Zurich's competitors, and

managed to keep Edmark Auto's business in 2010 when the dealership was considering moving

its finance and insurance product business to Ally.  Dkt. 91-2 ¶¶ 41-42; Dkt. 91-4 ¶¶ 8-10.

The Zurich Defendants followed the same plan with Chalfant Corp.  Chalfant Corp.

formed in 2009, and acquired a Volkswagen dealership and an Audi dealership in Boise.  Dkt.

91-2 ¶ 35.  As with Edmark Auto, the Zurich Defendants visited the Volkswagen and Audi

dealerships frequently and touted the No Chargeback Program as a material reason why Chalfant

Corp. ought to sell Universal's finance and insurance products.  Dkt. 91-2 ¶¶ 44-45; Dkt. 91-4

¶¶ 4-6, 10.  Chalfant Corp. committed its dealerships to the No Chargeback Program, and sold

Universal's finance and insurance products for years, relying on the Zurich Defendants' repeated

representations that the No Chargeback Program would cover dealership liability for

chargebacks on VSC cancellations over 90 days.  Dkt. 91-2 ¶¶ 44-45, 49-51; Dkt. 91-4 ¶¶ 4-6,

10; Jensen Decl., Ex. C (Jim Chalfant 85:24-86:24).

**B.      The Zurich Defendants Did Nothing To Manage The No Chargeback Program.**

The Zurich Defendants misled the Dealerships into believing the No Chargeback

Program was being implemented as promised and the Dealerships were protected from future

liability: the Zurich Defendants paid the chargebacks as expected, and the Zurich representatives

always spoke about the No Chargeback Program as if all were in working order.  Dkt. 91-2 ¶¶

22-27, 32, 44-47, 50; Dkt. 91-3 ¶¶ 5-11; Dkt. 91-4 ¶¶ 4-6.  But behind the scenes, the Zurich

Defendants never took any steps to set up a No Chargeback Plan, resulting in a four-year-long

deficit in the Refund Account that the Zurich Defendants concealed from the Dealerships.  Dkt.

64-14; Dkt. 91-2 ¶ 60; Dkt. 91-3 ¶ 17.

The Zurich Defendants only assessed the Dealerships' future liability twice during the

19-year period the No Chargeback Program was in place—in 2009 and 2010, prior to the

addition of Chalfant Corp.'s Volkswagen and Audi dealerships and Edmark Auto's Kia

dealership to the No Chargeback Program.  Jensen Decl., Ex. G (Universal 30(b)(6) 60:23-62:15,

181:25-182:8, 203:8-204:2). The new dealerships were added to the No Chargeback Program

"by way of an addendum letter referencing the document signed in 1996 in order to avoid

scrutiny over a new contract."  Dkt. 88-18 at 103435; Dkt. 72-6; Dkt. 72-7.  The future liability

calculations were withheld from the Dealerships.  Jensen Decl., Ex. D (Sept. 29, 2017 Zurich

RFA Resp. 16-17), Ex. E (Sept. 29, 2017 Universal RFA Resp. 70-71).  Zurich's Vice President

and Head of Finance and Insurance Profit Centers, Kathi Ingham, testified she knew of the No

Chargeback Program since its inception and conceded that future liability analyses should have

been performed on the program twice a year.  Dkt. 91-14 (Ingham I 26:24-27:25, 28:16-29:8,

51:23-52:8, 58:20-58:25).  Ms. Ingham also acknowledged in email correspondence a duty to

"monitor the program to ensure it remains adequately priced,"  Dkt. 64-19 at 103414, but the

Zurich Defendants never did, Jensen Decl., Ex. G (Universal 30(b)(6) 60:23-62:15, 181:25-182:8, 203:8-204:2); Dkt. 91-18 (Zurich 30(b)(6) 28:13-29:2, 29:17-30:11).

Throughout the 19 years the No Chargeback Program existed, the Zurich Defendants never provided the Dealerships with a statement showing the balance of the funds (until terminating the program).  Jensen Decl., Ex. G (Universal 30(b)(6) 200:7-201:11); Dkt. 91-2 ¶ 60; Dkt. 91-3 ¶ 17.  Zurich Defendants' own witnesses, including the General Manager of Sales for the Northwest Division, testified they believed balance statements should have been shared. Jensen Decl., Ex. A (D'Arc 308:8-309:17), Ex. F (Zieglmeier 32:23-33:4, 131:18-131:24, 154:15-155:22), Ex. B (Linafelter 232:14-232:21).

Universal set the Refund Payment at $80 in 1996, and the Zurich Defendants never adjusted the amount, despite changing market conditions over a period of nearly two decades. Dkt. 72-3 ¶ 1; Jensen Decl., Ex. G (Universal 30(b)(6) 163:8-163:23).  Had Universal increased the Refund Payment by $9.75 in 1998 when the average VSC retail price began to rise, and invested the funds in the Refund Account for a reasonable rate of return, the No Chargeback Program would have had a sufficient balance to cover the $231,123 deficit and the hundreds of thousands in future liability for VSC cancellations after the Zurich Defendants terminated the No Chargeback Program.  Dkt. 88-32 at 5-6.  But from at least 1996 through late 2014, the Zurich Defendants' employees and agents did not even communicate internally about adjusting the Refund Payment or whether it was adequate to cover the Dealerships' anticipated future liability. Jensen Decl., Ex. G (Universal 30(b)(6) 164:5-165:24, 26:21-27:16), Ex. H (Cook 26:21-27:1). When they finally discussed increasing the fee to $200 in late 2014, 18 years into the program, the underwriter in charge of the No Chargeback Program admitted that increasing the fee to $200

at that point would only "prolong the overall issue that the money in this account will eventually run out." Dkt. 111-2 at 102585.

Besides the revenue the Dealerships generated for the Zurich Defendants through selling the finance and insurance products, the No Chargeback Program itself was a profit center for the Zurich Defendants. They took the millions of dollars in Refund Payments the Dealerships entrusted to them to cover future liability and treated the money as their own, investing it and keeping the income for themselves. Dkt. 70-17 ¶ 22; Dkt. 91-18 (Zurich 30(b)(6) 28:13-29:2, 29:17-30:11).

The Zurich Defendants never set up an account for the No Chargeback Program. Jensen Decl., Ex. G (Universal 30(b)(6) 67:4-67:23); Dkt. 91-18 (Zurich 30(b)(6) 28:13-29:2, 29:17-22). They instead commingled their own funds with the Refund Payments in violation of their legal duties and industry standards. Dkt. 91-18 (Zurich 30(b)(6) 28:13-29:2, 29:17-22); Dkt. 91-10 at 4. And they commingled Refund Payments from Edmark Auto-owned dealerships and Chalfant Corp.-owned dealerships, offsetting one dealership's deficit with another dealership's funds. Dkt. 111-3 at 103454-55; Dkt. 111-4 at 102933; Dkt. 64-14 at 100021-22. They did this while acknowledging that Edmark Auto and Chalfant Corp. were distinct entities. Dkt. 111-5 at 162209; Jensen Decl., Ex. I (Jenkins 117:17-118:8).

**C.    The Zurich Defendants Fraudulently Concealed That They Had Never Set Up Or Managed The No Chargeback Program, Resulting In The Program's Insolvency.**

The Zurich Defendants concealed that they were doing nothing to manage the No Chargeback Program throughout the entire time the program was in effect. Dkt. 91-2 ¶¶ 26, 46, 55-58; Dkt. 91-3 ¶¶ 17-18. They certainly did not disclose the belief they assert in litigation—that they could do absolutely nothing to maintain the No Chargeback Program, and at the same time stick the Dealerships with any deficit that resulted. *Id.*

MEMORANDUM IN SUPPORT OF MOTION TO AMEND COMPLAINT TO ALLEGE
PUNITIVE DAMAGES - 10

The fraudulent concealment intensified in 2014, when the Zurich Defendants were preparing a bid for Edmark Auto to potentially contract to reinsure Universal's finance and insurance products.  Dkt. 91-2 ¶¶ 51-55.  The Zurich Defendants' internal communications reveal their undisclosed understanding that the No Chargeback Program, which had not been monitored by underwriting for 18 years, was insolvent.  In June 2014, the underwriter who oversaw the No Chargeback Program, John Jenkins, concluded the program was "no longer adequate."  Jensen Decl., Ex. G (Universal 30(b)(6) 88:24-89:6).  On September 2, 2014, Mr. Jenkins concluded that the No Chargeback Program would run out of funds within a few months.  Dkt. 88-21 at 103650.  That same day, he emailed other Zurich personnel a copy of the No Chargeback Agreement.  Dkt. 111-6.  The Zurich Defendants did not share this information with the Dealerships while Edmark Auto considered Zurich's reinsurance bid (presented to Edmark Auto on September 4, 2014), instead stating to one another that they should not bring up the subject "prior to solidifying the VSC business."  Dkt. 91-2 ¶¶ 51-55; Dkt. 64-15 at 122049; Dkt. 64-16 at 114052.  One of the former Zurich account executives, Sam D'Arc, acknowledged this concealment was wrong, stating that had he been the Dealerships' contact he would have "very quickly" disclosed to the Dealerships.  Jensen Decl., Ex. A (D'Arc 287:6-288:10, 308:8-309:17).

The Zurich Defendants continued to withhold this information.  Dkt. 64-16 at 114052; Dkt. 91-2 ¶¶ 52-55.  At or around November 25, 2014, Edmark accepted the reinsurance bid of a competitor of Zurich's and notified Zurich it would no longer sell Zurich's finance and insurance products, including VSCs.  Id. ¶ 55.  The Zurich Defendants continued to withhold their intent to end the program and the balance of the so-called account from the Dealerships, as they attempted to win back Edmark Auto's finance and insurance product business and retain Chalfant Corp.'s business.  Dkt. 91-2 ¶¶ 54-55; Dkt. 64-16 at 114052; Dkt. 111-7.  Meanwhile, the General

Manager of Sales for the Northwest Division turned a blind eye. Jensen Decl., Ex. F (Zieglmeier 116:19-117:19, 130:4-130:23, 155:25-156:20, 168:5-168:24).

The Zurich Defendants continued to conceal the state of the No Chargeback Program into the spring of 2015, as they sought renewal of property and casualty insurance policies with both Edmark Auto and Chalfant Corp. and tried to get Chalfant Corp. to enter a new No Chargeback Program hoping to keep Chalfant Corp. selling Universal's finance and insurance products. Dkt. 64-18 at 119023; Dkt. 64-17 at 151346-48; Dkt. 64-20; Dkt. 91-2 ¶¶ 58-59. The Vice President of Sales admitted this was "probably" a breach of business ethics. Jensen Decl., Ex. J (Kaminski 93:1-94:8).

The first time anyone at Universal or Zurich took a meaningful look at the No Chargeback Program was in March 2015. The Zurich underwriter then in charge of the No Chargeback Program, Chris Cook, ran a query in the "Crystal" system, Zurich's internal software, which confirmed the No Chargeback Program was not just at or near a deficit position, it had been in deficit since 2011. Jensen Decl., Ex. H (Cook 78:13-80:1, 82:12-82:20); Dkt. 111-8. Despite confirming that the No Chargeback Program was not just insolvent but was deficit, the Zurich Defendants continued to conceal the situation. On April 21, 2015, one Zurich representative emailed other Zurich personnel, "We are prepared to discuss with both dealers but need additional time. We delivered the latest proposed chargeback program to Jim Chalfant last Friday and he requested that we give him until this Friday to review. We would like to have this agreement in place prior to delivering the bad news on the old program." Dkt. 88-26. Zurich's national Vice President of Sales and Distribution encouraged the deception, replying, "That's fine[.]" *Id.*; Jensen Decl., Ex. J (Kaminski 42:8-43:4).

Worried they would lose their third largest client in the region (Chalfant Corp.) after having just lost their largest client (Edmark Auto), the Zurich Defendants delayed disclosing to the Dealerships the negative balance of the No Chargeback Program until May 5, 2015, after pursuing the property and casualty policies and trying to get Chalfant Corp. to sign into a new No Chargeback Program.  Dkt. 64-18 at 119023; Dkt. 64-17 at 151346-48; Dkt. 64-20; Dkt. 91-2 ¶¶ 58-60; Dkt. 64-1 through 64-13; Dkt. 88-24 at 131540-43.

## II.   THE DEALERSHIPS HAVE SHOWN A REASONABLE LIKELIHOOD OF PROVING AT TRIAL FACTS TO SUPPORT PUNITIVE DAMAGES.

### A.   Punitive Damages Are Available When Defendant Performed A Bad Act With A Bad State of Mind.

Idaho Code § 6-1604(2) mandates amendment of pleadings where the movant shows a reasonable likelihood of proving facts at trial to support an award of punitive damages.[2] Whether punitive damages may be pleaded does not depend on the causes of action in the complaint, but on whether plaintiff can demonstrate "a reasonable likelihood" that defendant "performed a bad act with a bad state of mind."  *Todd v. Sullivan Constr. LLC*, 146 Idaho 118, 123, 191 P.3d 196, 201 (2008); *Hall v. Farmers Alliance Mut. Ins. Co.*, 145 Idaho 313, 319, 179 P.3d 276, 282 (2008).  Competent evidence meets the standard, regardless of conflicting evidence.  *Weekes v. Ohio Nat'l Life Assur. Corp.*, No. 1:10-cv-566-BLW, 2011 WL 6140967, at *8 (D. Idaho Dec. 9, 2011).  Ultimately, whether punitive damages are awarded, and how much,

---

[2] A federal court sitting in diversity should look to opinions of the Idaho Supreme Court interpreting Idaho Code § 6-1604.  *See Hangarter v. Provident Life & Acc. Ins. Co.*, 373 F.3d 998, 1012 (9th Cir. 2004) ("It is well established that a state court's interpretation of its statutes is binding on the federal courts unless a state law is inconsistent with the federal Constitution."); *Zazzali v. Ellison*, 973 F. Supp. 2d 1187, 1209 (D. Idaho 2013) ("The question of whether to permit a claim for punitive damages is substantive in nature and accordingly is controlled by relevant Idaho law for all claims and causes of action arising under state law.").

are jury questions. *Cheney v. Palos Verdes Corp.*, 104 Idaho 897, 904, 665 P.2d 661, 668 (1983), *superseded by statute on other grounds*, Idaho Code § 6-1604.

Punitive damages may be pleaded when defendant uses deceit to further its own financial interests. *See, e.g.*, *Cheney*, 104 Idaho at 905, 665 P.2d at 669. In *Cheney*, punitive damages were affirmed because defendant lied, saying his payment was in the mail so plaintiff would release defendant's cattle. *Id.* In *Cuddy Mountain*, defendant falsified records to avoid paying for work performed. *Cuddy Mtn. Concrete Inc. v. Citadel Constr. Inc.*, 121 Idaho 220, 230, 824 P.2d 151, 161 (Ct. App. 1992). Even if defendant's conduct is not deceitful, punitive damages are available if the defendant acts in an "oppressive, unreasonable, or irrational" manner in conducting its business. *See Magic Valley Radiology Assocs. P.A. v. Prof. Bus. Servs. Inc.*, 119 Idaho 558, 808 P.2d 1303 (1991) (defendant withheld ledgers plaintiff needed to try to get plaintiff to pay a contested debt); *Weekes*, 2011 WL 6140967, at *7 (defendant took unreasonable position on contract interpretation); *Vista Eng'g Techs., LLC. v. Premier Tech., Inc.*, No. CV-09-08-E-BLW, 2010 WL 300426, at *3 (D. Idaho Jan. 20, 2010) (defendant never intended to perform contract). "If a party breaches its duty to act in good faith, it may be liable . . . [for] punitive damages." *Cuddy Mtn.*, 121 Idaho at 229, 824 P.2d at 160.

Factors the court should consider on a motion to amend to add punitive damages are (1) the presence of expert testimony; (2) whether the unreasonable conduct harmed the plaintiff; (3) whether there is a special relationship between the parties; (4) proof of continuing oppressive conduct; and (5) the actor's knowledge of likely consequences. *Stewart Title Ins. Co. v. Credit Suisse*, No. 1:11-cv-227-BLW, 2013 WL 4710264, at *11 (D. Idaho Aug. 29, 2013) (citing *Cuddy Mtn.*, 121 Idaho at 229, 824 P.2d at 160). To grant amendment, the court need not

determine every factor weighs in favor of punitive damages.  *See Weekes*, 2011 WL 6140967, at

*7-9 (granting amendment when some, but not all, factors favored amendment).

**B.      The Zurich Defendants' Acted Outrageously With A Harmful State of Mind.**

Evidence of the Zurich Defendants' conduct and state of mind more than meets the

threshold standard for amendment to add punitive damages.  The Zurich Defendants' purposely

misled Plaintiffs to believe that they offered a No Chargeback Program.  They disregarded

known duties to manage the program, never intending to perform their legal duties and taking

unreasonable positions on their obligations.  They fraudulently concealed that the program was

and had failed its purpose.  They misrepresented to Plaintiffs that the No Chargeback Program

was the reason to continue selling the Zurich Defendants' finance and insurance products.  Only

when it became apparent to the Zurich Defendants they would lose the income stream from two

of their largest clients in the region did the Zurich Defendants finally disclose that the program

was worth less than nothing.  The No Chargeback Program was simply a ploy to get Plaintiffs'

business.  Although the Dealerships need not establish every factor for amendment, all five

factors favor adding a prayer for punitive damages to the Dealerships' complaint.

**1.      There Is Expert Testimony.**

Expert testimony that a defendant's conduct constituted an extreme deviation from

reasonable standards weighs heavily for amendment.  In *Garnett v. Transamerica Ins. Serv.*, 118

Idaho 769, 800 P.2d 656 (1990), the court held punitive damages were appropriate when an

expert witness concluded the defendant insurer's conduct constituted an extreme deviation from

the customary practices in the industry.  *Id.* at 781, 800 P.2d at 668; *see also Kuhn v. Coldwell

Banker Landmark, Inc.*, 150 Idaho 240, 252, 245 P.3d 992, 1004 (2010) (real estate industry

expert's affidavit "certainly provided grounds" to add punitive damages).

The Dealerships' expert, Robert Anderson opined that the Zurich Defendants' "failing to set up and manage the account, and failure to disclose this to Dealers, was an extreme deviation from how a party responsible for managing a no charge back account should have acted."  Dkt. 91-10 at 4.  *Inter alia*, the Zurich Defendants' deviated from reasonable standards because they (1) did not conduct the periodic future liability analyses that Zurich admitted should have been performed, (2) did not set up or manage any account, (3) put the Zurich Defendants' own interests in obtaining further revenue from the Dealerships ahead of required periodic communication on the status of the No Chargeback Program, (4) commingled funds from dealerships owned by different entities, offsetting deficits from one entity against the surpluses of another, and (5) concealed the balance of the No Chargeback Program.  *Id.* at 4-6.

Further, the Zurich Defendants' own witnesses, some of whom individually had decades of experience in the industry, admitted this information should have been shared with the Dealerships.  Jensen Decl., Ex. A (D'Arc 308:8-309:17), Ex. F (Zieglmeier 32:23-33:4, 131:18-131:24, 154:15-155:22).

### 2.      The Dealerships Sustained Actual Harm.

Actual harm is not a requirement for amendment, as "nominal damages may support an award of punitive damages."  *Myers v. Workmen's Auto Ins. Co.*, 140 Idaho 495, 503, 95 P.3d 977, 985 (2004).  But failure to pay money owed or cover liability bargained for constitutes actual harm favoring amendment to add punitive damages.  *Weekes*, 2011 WL 6140967, at *7.

The Dealerships suffered actual harm, paying the chargebacks on cancelled VSCs that the No Chargeback Program was obligated to cover.  Dkt. 91-23 (Edmark 30(b)(6) 179:5-179:19); Jensen Decl., Ex. K (Chalfant 30(b)(6) 129:17-132:1).  Had the Zurich Defendants managed the No Chargeback Program under industry standards, they would have increased the Refund

Payment gradually throughout the 19-year period the No Chargeback Program was running and invested the funds to maintain the accounts' ability to cover the future liability for VSC chargebacks.  Dkt. 91-10 at 4-6; Dkt. 88-32 at 6.  These actions would have kept the No Chargeback Program solvent, able to cover chargebacks on all VSCs purchased under the program.  *See id.*  And the Dealerships were harmed because they could have chosen a more profitable finance and insurance product provider sooner, as they eventually did by signing up one with Zurich's competitors, JM&A.  Jensen Decl., Ex. K (Chalfant 30(b)(6) 125:14-128:6).

      **3.**      **The Parties Have A Special Relationship.**

A "special relationship" exists when a party holds "itself out as having expertise in the performance of a specialized function" to induce reliance on the party's expertise.  *Duffin v. Idaho Crop Imp. Ass'n*, 126 Idaho 1002, 895 P.2d 195 (1994) (discussing special relationship in economic loss context); *see also Stewart Title Ins. Co.*, 2013 WL 4710264, at *12 ("special relationship" between insurer and insured).

There was a special relationship between the Zurich Defendants and the Dealerships because the Zurich Defendants held themselves out as experts, advising the Dealerships on trends in the industry and pricing of their finance and insurance products.  Dkt. 91-2 ¶¶ 23-24; Dkt. 91-3 ¶ 8; Jensen Decl., Ex. A (D'Arc 17:19-18:16, 61:20-62:17, 67:22-68:11, 163:3-164:6). The Zurich Defendants' underwriting departments existed to anticipate losses, and specifically calculated future liability for dealership chargebacks, the precise expertise needed to manage the No Chargeback Program.  Jensen Decl., Ex. J (Kaminski 52:6-52:9), Ex. G (Universal 30(b)(6) 20:18-22:23, 23:5-23:21, 25:21-27:16, 76:21-78:18, 80:2-80:23).

Not only did the Dealerships have a special relationship with the Zurich Defendants, but the Zurich Defendants owed the Dealerships fiduciary duties arising from the No Chargeback

Program.  Dkt. 91-10 at 4.  Placing property or authority in the hands of another, advising for the benefit of another, or managing funds for another gives rise to a fiduciary duty.  *Skinner v. U.S. Bank Home Mort.*, 159 Idaho 642, 647, 365 P.3d 398, 403 (2015); *Hydroblend, Inc. v. Nothum Mfg. Co.*, No. 1:13-CV-00445-EJL, 2014 WL 3446088, at *5 (D. Idaho 2014); *Women's Fed. Sav. & Loan Ass'n v. Nev. Nat'l Bank*, 811 F.2d 1255, 1257 (9th Cir. 1987); *Stouffer Corp. v. Itasca Hotel Co.*, 119 U.S. Dist. LEXIS 18166, at *34 (N.D. Ill. Dec. 30, 1991).

Universal agreed to set up a separate, segregated Refund Account with the Dealerships' money, and the Zurich Defendants were to manage the Refund Account to ensure its solvency and keep the Dealerships informed about the account.  Dkt. 91-10 at 4; Dkt. 72-3.  The Zurich Defendants assumed a fiduciary position when they took Plaintiffs' property and authority for Plaintiffs' benefit, and maintained complete control of fund management and disbursement.  *Id.*

### 4.   The Zurich Defendants' Engaged In A Course Of Oppressive Conduct.

The Zurich Defendants engaged in textbook oppressive conduct, for years.  Accepting the benefits of another party's performance without intent to perform one's own contractual obligations merits punitive damages.  *Vista Eng'g Techs., LLC*, 2010 WL 300426, at *1-3 (granting amendment when defendant urged plaintiff to perform engineering services, and defendant did not intend to pay plaintiff).  Taking an unreasonable position in business dealings is oppressive conduct.  *Weekes*, 2011 WL 6140967, at *6.  In *Weekes*, the court granted plaintiff's motion to amend when defendant insurance company unreasonably interpreted an insurance application.  *Id.* at *7.  Defendant determined decedent had misrepresented the date for replacing an existing life insurance policy when decedent had filled in a dash mark in the date blank.  *Id.*  Defendant also acted unreasonably by determining decedent would be over-insured, based on a calculation of decedent's income that omitted bonuses decedent had disclosed to

insurer.  *Id.* at *8.  Or in *Magic Valley Radiology*, defendant withheld ledgers plaintiff needed to transition its business to defendant's competitor, to get plaintiff to pay a contested debt defendant asserted plaintiff owed.  119 Idaho at 561-63, 808 P.2d at 1306-08 (holding there was substantial evidence of oppressive conduct).

Universal and Zurich engaged in oppressive conduct for years.  As set forth in Part I.B., there is ample evidence the Zurich Defendants (like the *Vista Engineering* defendant) never intended to perform their legal obligations, while accepting the benefit of the Dealerships' performance (selling Universal's finance and insurance products).  The Zurich Defendants knew their duties to manage the No Chargeback Program yet never performed them.  Their own witnesses admit this.  Stunningly, they even took the funds meant to be held for the Dealerships' benefit and invested them for Defendants' own gain.  Like the *Weekes* defendant, the Zurich Defendants have maintained an unreasonable position that would eviscerate the No Chargeback Agreement's consideration.  Part I.A.1.  They misrepresented and fraudulently omitted material information about the No Chargeback Program and, like the *Magic Valley Radiology* defendant, wrongly prevented the Dealerships from moving to a competitor.

### 5. The Zurich Defendants Knew The Likely Consequences Of Their Conduct.

Intent to confer a benefit upon oneself constitutes evidence of a harmful state of mind, for purposes of amending to add punitive damages.  *See Adams v. United States*, 622 F. Supp. 2d 996, 1006 (D. Idaho 2009) (denying motion to amend to add punitive damages for misrepresentation when plaintiff did not submit evidence that defendant had "rendered the advice with the intent to injure the farmers or to confer some benefit upon itself").  Further, an insurance company is in a superior position to understand the consequences of its failure to

perform its duties.  *See Stewart Title Ins. Co.*, 2013 WL 4710264, at *13-14 (granting motion to amend).

Evidence of fraud also supports the state of mind required to amend to add punitive damages.  *See Cheney*, 104 Idaho at 905, 665 P.2d at 669 (defendant lied about payment being in the mail); *Vista Eng'g Techs., LLC*, 2010 WL 300426, at *3 (defendant urged plaintiff to continue rendering services without telling plaintiff defendant did not intend to pay).

The Zurich Defendants knew they were not fulfilling their obligations to manage the No Chargeback Program but continued their conduct anyway.  Part I.  Or, assuming arguendo the Zurich Defendants' interpretation of the No Chargeback Agreement can be countenanced, they knew they were providing a meaningless program but promoted it as a great benefit to further their own profits.  Defendants were in the better position to know the consequences of disregarding their duties because they held all the cards—the control over the program and the information given (or not given) the Dealerships.

### III.   CONCLUSION

While the Dealerships need not establish all five factors, all factors favor amendment. Evidence of the Zurich Defendants' acts and omissions demonstrates Plaintiffs are likely to prove facts to support punitive damages.  Plaintiffs respectfully request the Court grant their Motion.

DATED this 3rd day of November, 2017.

HOLLAND & HART LLP

By  */s/ Jennifer M. Jensen*
    Erik F. Stidham, of the firm
    Kevin C. Braley
    Jennifer M. Jensen
    Attorneys for Plaintiffs

MEMORANDUM IN SUPPORT OF MOTION TO AMEND COMPLAINT TO ALLEGE PUNITIVE DAMAGES - 20

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on the 3rd day of November, 2017, I filed the foregoing electronically through the CM/ECF system, which caused these parties or counsel to be served by electronic means, as more fully reflected on the Notice of Electronic Filing:

| | |
|---|---|
| Richard H. Greener | rgreener@greenerlaw.com |
| Christopher Burke | cburke@greenerlaw.com |
| Slade Sokol | ssokol@greenerlaw.com |

GREENER BURKE SHOEMAKER OBERRECHT P.A.
950 W. Bannock Street, Suite 950
Boise, ID  83702
Telephone: (208) 319-2600
Facsimile: (208) 319-2601

*/s/ Jennifer M. Jensen*
Jennifer M. Jensen for HOLLAND & HART LLP

9549401_6

MEMORANDUM IN SUPPORT OF MOTION TO AMEND COMPLAINT TO ALLEGE PUNITIVE DAMAGES - 21