UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| EDMARK AUTO, Inc. an Idaho corporation; CHALFANT CORP., an Idaho corporation,<br><br>                    Plaintiffs,<br><br>v.<br><br>ZURICH AMERICAN INSURANCE COMPANY, a New York corporation; and UNIVERSAL UNDERWRITERS SERVICE CORPORATION, a Delaware corporation,<br><br>                    Defendants. | Case No. 1:15-CV-00520-EJL-CWD<br><br>**MEMORANDUM DECISION AND ORDER; (DKT. 97)**<br>**REPORT AND RECOMMENDATION (DKT. 70; DKT 112)** |

**INTRODUCTION**

The claims asserted in this matter stem from a long-running business relationship between two automobile dealers and a pair of insurance companies. For nearly 20 years, Edmark Auto, Inc. (Edmark), and for nearly 10 years, Chalfant Corp. (Chalfant), sold and marketed the insurance products of Universal Underwriters Service Corporation (Universal) and Zurich American Insurance Company (Zurich).

**MEMORANDUM DECISION AND ORDER; REPORT AND RECOMMENDATION – 1**

Edmark and Chalfant are distinct legal entities.[1] Because they bring the same claims and defenses in this matter, they will be treated as a unit unless the Court needs to identify a particular entity (Dealers). According to the Dealers, Universal and Zurich are agents and alter egos for one and other — Universal has no employees, and all actions taken on behalf of Universal are performed by Zurich employees.[2] (Dkt. 52 at 3.) Therefore, Universal and Zurich will also be treated as a unit unless it is necessary for the Court to discuss a particular entity (Insurers).

Three motions are pending before the Court: The Insurers' Motion for Partial Summary Judgment (Dkt. 70); and the Dealers' Motion to Compel (Dkt. 97) and Motion to Amend. (Dkt. 112.) All three motions are fully briefed and the Court heard oral argument from the parties on December 21, 2017, and January 3, 2018.

After careful consideration of the briefing, the parties' arguments, the standard of review, and the relevant authorities, the Court will recommend that the Insurers' motion for partial summary judgment be denied, and the Dealers' motion to amend be granted. Additionally, the Court will grant Dealers' motion to compel, with limitations set forth below.[3]

---

[1] Edmark was incorporated in April 1953. Chalfant was incorporated in March 2009. Each entity maintains its own accounts and files its own reports with the Idaho Secretary of State. However, James Chalfant is an officer for both Edmark and Chalfant. (Decl. Edmark, ¶ 2, Dkt. 15 at 1; Decl. Chalfant ¶ 3, Dkt. 16 at 2.)

[2] Defendants did not refute this contention during the December 21, 2017 hearing.

[3] Preliminarily, the undersigned notes that the presiding District Judge retains the discretion to modify the rulings contained in this decision should he conclude the undersigned committed error. 28 U.S.C. § 636(b)(1)(A).

**MEMORANDUM DECISION AND ORDER; REPORT AND RECOMMENDATION – 2**

## FACTUAL BACKGROUND

On November 1, 1996, Edmark entered into a Vehicle Service Contract Dealer Agreement (Dealer Agreement) with Universal. (Dkt. 19-2.) Thirteen years later, in 2009, Chalfant entered into the same Dealer Agreement with Universal.[4] Therein, the Dealers agreed to offer and sell Universal's Vehicle Service Contracts (VSCs) to their customers for newly-purchased automobiles.[5] VSCs are contracts for extended warranty agreements that cover the repair or replacement of parts due to mechanical breakdown. VSCs require customers to pay upfront for the extended warranty, but permit cancellation prior to the expiration of the VSC term — typically 60 months in duration. When customers exercise the option to cancel, they are entitled to a pro-rated refund of any value left in their extended warranty at the time of the VSC termination.

Universal drafted an addendum to the Dealer Agreement setting forth terms and conditions to manage the administration of such customer refunds. The addendum is entitled: "Addendum to Vehicle Service Contract – Dealers Designated Refund Account Program – Dealer Agreement."[6] This addendum agreement defined what the Dealers term a "No Chargeback Program." It is referred to in the Insurers' briefing as the DDRA

---

[4] The only difference between the 1996 Dealer Agreement and the 2009 Dealer Agreement was the addition of an arbitration clause in the 2009 version. For simplification, the Court will refer to both of these Dealer Agreements as "the Dealer Agreement." Noting, however, the factual and legal significance that Edmark and Chalfant entered into separate and distinct agreements with Universal.

[5] For an example of the Vehicle Service Contract form agreement see Dkt. 72-12 at 3-6.

[6] In the years that followed, Edmark and Chalfant established new dealerships, and those dealerships sold VSCs under the same terms as the 1996 Dealer Agreement and entered into the No Chargeback Program under the terms of the DDRA Addendum.

**MEMORANDUM DECISION AND ORDER; REPORT AND RECOMMENDATION – 3**

Addendum. (Dkt. 72-3.) Edmark entered into the DDRA Addendum in 1996 and

Chalfant entered into the DDRA Addendum in 2010.[7] The terms of the addendum were

exactly the same for each party. The overarching purpose of the DDRA Addendum was

to provide a means of administratively processing the proportional amounts of the VSC

warranty refunds the Dealers and the Insurers owed to customers.[8]

On April 21, 2015, the Insurers sent a letter to Mr. Edmark and Mr. Chalfant

terminating the DDRA Addendum. (Zurich's Termination Letter of April 21, 2015, Dkt.

72-8.) The Insurers terminated the DDRA Addendum because the Dealer's Designated

Refund Account, discussed more fully below, was "in a significant deficit position" and

no funds existed for the Insurers to continue to make refund payments to customers who

cancelled their VSCs. (Dkt. 72-8 at 2-3.)[9] At the time the termination letter was sent, the

balance of the Dealer's Designated Refund Account was purportedly a deficit of

$170,656.65. (Dkt. 91-1 at 18.) However, by May 15, 2015, the Insurers reported that the

---

[7] As with the Dealer Agreements above, for simplification, the Court will refer to both of these DDRA Addendums as "the DDRA Addendum." Noting, however, the factual and legal significance that Edmark and Chalfant entered into distinct addendum agreements with Universal.

[8] The Insurers and the Dealers disagree regarding the meaning and operative effect of the provisions of the DDRA Addendum. The disputed terms pertinent to the motions before the Court are identified and discussed in more detail herein.

[9] According to the Dealers, in March 2015, a new underwriter in charge of the Dealers Refund Account ran a query and discovered that the account had been in a deficit position since 2011. (Plaintiffs' Statement of Disputed Facts, Dkt. 91-1 at 17.)

Notably, part of the dispute in this matter is whether the Insurers were required -either by the terms of the DDRA Addendum or in their role as a potential fiduciary- to deposit the Dealer Refund Payments into distinct accounts, or if it was permissible, under the terms of the DDRA Addendum for the Insurers to just "account" for the Dealer Refund Payments and deposit the funds wherever they saw fit.

**MEMORANDUM DECISION AND ORDER; REPORT AND RECOMMENDATION – 4**

deficit was actually a deficit of $231,123 plus an additional $429,066 in estimated future liability. *Id*.

## PROCEDURAL BACKGROUND

On October 8, 2015, the Dealers filed a complaint against the Insurers asserting the following claims: (1) breach of contract; (2) breach of the covenant of good faith and fair dealing; (3) fraudulent concealment; (4) unfair business practices; (5) breach of fiduciary duty; (6) unjust enrichment; and (7) fraud in the inducement. (Dkt. 1-3 at 7.)[10] There are presently three motions pending before the Court: the Insurers' Motion for Partial Summary Judgment (Dkt. 70); the Dealers' Motion to Compel (Dkt. 97); and the Dealers' Motion to Amend. (Dkt. 112.) Each motion is summarized below.

## 1.    Insurers' Motion for Partial Summary Judgment

The Insurers argue summary judgment is warranted on four distinct grounds. First, they argue as a matter of law: (a) that the language of the DDRA Addendum is clear and unambiguous, giving the Dealers authority to solicit and sell extended warranties on behalf of the Insurers. In this, they seek a ruling that the DDRA Addendum clearly modifies and does not replace the Dealer Agreement; (b) that the Dealer Agreement and DDRA Addendum require Dealers to pay portions of refunds for canceled extended warranties from the Dealer's Designated Refund Account; that such portions were to be paid from the Dealer's Designated Refund Account; and that if the account became

---

[10] The Dealers filed their First Amended Complaint on April 3, 2017. (First Amended Complaint, Dkt. 52.) The Insurers filed their Answer to the First Amended Complaint and a Counterclaim on April 24, 2017. (Dkt. 56.) The Dealers filed a Counterclaim on May 15, 2017. (Dkt. 57.)

**MEMORANDUM DECISION AND ORDER; REPORT AND RECOMMENDATION – 5**

insolvent or contained less funds than the Dealers' obligations, then the Dealers were obligated to pay the deficiency; (c) that the DDRA Addendum did not require the Insurers to deposit the $80.00 Dealer Refund Payments into any specific bank account, and that Dealers were not entitled to any interest earned on the Dealer Refund Payments; and finally, (d) that the DDRA Addendum provided that, upon its termination, the rights and obligations of the parties would be as set forth within the Dealer Agreement, with the exception of paragraph 2(c) of the DDRA Addendum, which would remain in effect.

Second, the Insurers ask the Court to dismiss the Dealers' unjust enrichment claim and related disgorgement remedy. The Insurers argue that unjust enrichment does not apply when there is an enforceable express contract regarding the same subject matter. They assert that, if an express agreement is enforceable, the Court may not apply the equitable remedy of unjust enrichment in contravention of the agreement. The Insurers argue also, that under Idaho law, a claim for unjust enrichment cannot lie when the party retains a "bargained-for benefit under the terms of a contract." Citing *Rencher v. Recontrust Co.*, No. 4:15-CV-00130-BLW, 2015 WL 7013393, at *4 (D. Idaho Nov. 12, 2015).[11]

The Insurers argue further that the disgorgement remedy is "indisputably intertwined" with the unjust enrichment claim because the remedy is focused on taking

---

[11] In *Rencher*, the benefits conferred by the plaintiff upon the defendant were payments made pursuant to a contractual obligation to repay a mortgage loan. The court dismissed the unjust enrichment claim, concluding that it was not inequitable for the defendant to retain the bargained for benefits—the loan payments.

**MEMORANDUM DECISION AND ORDER; REPORT AND RECOMMENDATION – 6**

from the wrongdoer what was gained by its wrongs. They assert the remedy cannot apply in this case because the Insurers were acting under allegedly clear terms of negotiated contracts. (Dkt. 70-1 at 16-17.)

Third, the Insurers ask the Court to dismiss Dealers' claims for fraud and breach of fiduciary duty, because the Dealers' tort-based claims cannot be based on a failure to perform obligations under a contract; they argue the Dealers have not provided evidence demonstrating false or misleading statements made by the Insurers at the time of contracting.

Fourth and finally, the Insurers assert they are entitled summary judgment on their breach of contract counterclaim in the amount of $255,123, plus interest, because the Dealers have allegedly failed to pay the deficiency in the Dealer's Designated Refund Account. The Insurers assert the Dealers are obligated to do so under the purportedly unambiguous language of the DDRA Addendum.

**2.     The Dealers' Motion to Compel Discovery Responses**

The Dealers move the Court to compel the Insurers to produce the amount of customer claims paid on contracts for products other than the VSCs that they marketed and sold on behalf of the Insurers. Such contracts include maintenance contracts, guaranteed auto protection contracts, and tire and wheel contracts.[12] (Dkt. 91-1 at 1.) The

---

[12] The VSC form agreement used by the Dealers to enroll and contract with customers for extended warranties included sections where the customer could, at the same time, contract for additional insurance products offered by the Insurers, specifically a tire and wheel plan and a maintenance plan. (Dkt. 72-12 at 3.)

**MEMORANDUM DECISION AND ORDER; REPORT AND RECOMMENDATION – 7**

Dealers argue the customer claims payment information regarding these other products is "a basic element required to calculate [the Insurers'] profits" made through their alleged conscious misconduct. (Dkt. 97-1 at 2.)

The Dealers further ask the Court to compel the Insurers to produce information on the manner of investment and amount of income the Insurers made on the Dealer Refund Payments remitted by the Dealers under the DDRA Addendum. (*Id*. at 1-2.) The Dealers assert that investment profits are income, and such income is relevant to their potential remedy. They assert also that the investment income information will help determine whether the Insurers breached their fiduciary duties to manage the Dealer's Designated Refund Account funds—or, if instead, to prove the Insurers used the funds for their sole benefit to the detriment of the Dealers. The Dealers assert that both requests are permissible and compelled under Rules 26 and 37 of the Federal Rules of Civil Procedure.[13]

---

The Zurich logo appears at the top of the first page of the VSC form agreement and the contact information for Universal, address and customer service phone number, is printed at the bottom of the first page of the VSC form agreement. (*Id*.)

[13] The Dealers seek compelled production to Request for Production Nos. 11 through 14 and No. 21, and compelled responses to Interrogatory Nos. 5 and 6. The Dealers ask for an award of attorney fees pursuant to Federal Rule of Civil Procedure 37(a)(5)(A) should the Court grant the motion to compel. Insurers, in turn, argue that should they prevail in defeating the motion to compel, the Court should award Defendants attorney fees because their objections to the discovery requests were substantially justified pursuant to Federal Rule of Civil Procedure 37(a)(5)(B).

**MEMORANDUM DECISION AND ORDER; REPORT AND RECOMMENDATION – 8**

### 3.     The Dealers' Motion to Amend Complaint

Additionally, the Dealers filed a motion for leave to add a claim for punitive damages. (Dkt. 112 at 1.) The motion is supported primarily by the contention that the Insurers would never have obtained the Dealers' business, nor kept it for so long –nearly two decades in the case of Edmark– if they had not misled the Dealers into believing that the Insurers' administration of the Dealer Refund Payments in the Dealer's Designated Refund Account would cover all of the Dealers' future liability for canceled VSCs.[14] (Dkt. 112-1 at 6; Dkt. 91-1 at 4-5.) The Dealers assert that, pursuant to Idaho Code Section 6-1604(2), they have demonstrated a reasonable likelihood of proving facts at trial to support a punitive damages award. (Dkt. 112-1 at 13.)

---

[14] The Dealers assert that, in 1996, when negotiating with Universal about whether Edmark would continue to market and sell Universal's insurance products to its customers, including extended warranty service contracts, Jim Chalfant, who was negotiating for Edmark, told Greg Powell, an account executive at Universal that "he wanted a 'no chargeback program' that would take care of all liability for charge backs on VSCs cancelled over 90 days into their effective term." (Dkt. 91-1 at 4.) The Dealers assert further that, in response, Powell presented the DDRA Addendum, assured Chalfant that it was the agreement he asked for, and that it would satisfy his request that there be no future dealer liability for the VSCs. *Id.* at 4-5.

The Insurers object to the Court's consideration of this evidence. Arguing that it is evidence of prior negotiations, and its introduction violates the Parol Evidence Rule. (Dkt. 105; Dkt. 105-1 at 21.) The Court has determined, however, that the DDRA Addendum is ambiguous. Therefore, the Court may properly consider this evidence as it goes to the parties' intent regarding ambiguous terms. *Johnson Cattle Co. v. Idaho First Nat. Bank*, 716 P.2d 1376, 1379 (Idaho Ct. App. 1986). In light of this finding, the Court need not consider whether the fraud exception to the Parol Evidence Rule also applies to these statements.

The Insurers object to the Court's consideration of related deposition testimony from Chalfant regarding the specific benefits of no-chargeback programs and why dealerships enter into those types of agreements. The Insurers object on the bases that the Dealers failed to lay a proper foundation, the question calls for speculation, and that it is an improper and undisclosed expert opinion. (*See* Dkt. 105-1.) The Court has found that the DDRA Addendum is ambiguous on its face and need not consider any of this type of evidence to decide the Insurers' motion for partial summary judgment. However, the Insurers' objections to this evidence and other evidence offered by the Dealers but not discussed herein are preserved for trial. (*See* Insurers' Objections, Tables A through E, Dkt. 105-1.)

**MEMORANDUM DECISION AND ORDER; REPORT AND RECOMMENDATION – 9**

## DISCUSSION

**1.     Motion for Summary Judgment**

Summary judgment is appropriate when the evidence, viewed in the light most favorable to the non-moving party, demonstrates that "there is no genuine issue of any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Galen v. County of Los Angeles*, 477 F.3d 652, 658 (9th Cir. 2007). Evidence includes "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits…." *DeVries v. DeLaval, Inc.*, No. CV 04-136 S EJL, 2006 WL 1582179, at *5 (D. Idaho June 1, 2006), report and recommendation adopted, No. CIV 04-136-S-EJL, 2006 WL 2325176 (D. Idaho Aug. 9, 2006). The moving party initially bears the burden to show no material fact is in dispute and a favorable judgment is due as a matter of law. *Celotex*, 477 U.S. at 323. If the moving party meets this initial burden, the non-moving party must identify facts showing a genuine issue for trial to defeat the motion for summary judgment. *Cline v. Indus. Maint. Eng'g & Contracting Co.*, 200 F.3d 1223, 1229 (9th Cir. 2000). To deny a motion for summary judgment, a court "need only conclude that a result other than that proposed by the moving party is applicable under the facts and applicable law. *DeVries*, 2006 WL 1582179 at *6.

If a contract is found to be ambiguous, courts hesitate to grant summary judgment. *San Diego Gas & Elec. Co. v. Canadian Hunter Mktg. Ltd.*, 132 F.3d 1303 (9th Cir. 1997). Differing views on the intent of the parties at the time of contracting raise genuine

**MEMORANDUM DECISION AND ORDER; REPORT AND RECOMMENDATION – 10**

issues of material fact.[15] *Id*.; *See also Maffei v. Northern Ins. Co.*, 12 F.3d 892, 898 (9th Cir. 1993). However, in the Ninth Circuit, extrinsic evidence may be considered by a court to resolve ambiguity raised in a motion for summary judgment. In considering such evidence, a court must view it in a light most favorable to the non-moving party. *International Bhd. of Elec. Workers Local 47 v. Southern Cal. Edison Co.*, 880 F.2d 104, 107 (9th Cir. 1989).

> When the language of a contract is clear and unambiguous, its interpretation and legal effect are questions of law. An unambiguous contract will be given its plain meaning. The purpose of interpreting a contract is to determine the intent of the contracting parties at the time the contract was entered. In determining the intent of the parties, this Court must view the contract as a whole. If a contract is found ambiguous, its interpretation is a question of fact. Whether a contract is ambiguous is a question of law. A contract is ambiguous if it is reasonably subject to conflicting interpretations.

*Commercial Ventures, Inc. v. Rex M. & Lynn Lea Family Tr.*, 177 P.3d 955, 960 (Idaho 2008).

For the reasons outlined below, the Court finds the DDRA Addendum as whole is reasonably subject to conflicting interpretations and is ambiguous on its face. The Court need not consider extrinsic evidence to make this finding. Interpretation of the DDRA Addendum is a question of fact for a jury.

---

[15] "A 'material fact' is one which constitutes substantially the consideration of the contract, or without which it would not have been made." Idaho Civil Jury Instructions 6.08.4 – Interpretation of Contract – Definition of Material Fact (citing *Material Fact*, Black's Law Dictionary (5th ed. 1979)).

**MEMORANDUM DECISION AND ORDER; REPORT AND RECOMMENDATION – 11**

A.      *The DDRA Addendum Contract Claims*

First, the Insurers ask the Court to find as a matter of law that the DDRA Addendum clearly indicates the Dealers had authority to solicit their customers and to sell extended warranties on behalf of the Insurers. The purpose of the DDRA Addendum was to set forth an agreement between the Insurers and the Dealers regarding how refund obligations related to canceled extended warranty agreements would be allocated and administered. Therefore, it is implicit, and necessary, that the Dealers had authority to solicit and sell the extended service warranties to their customers. Additionally, the DDRA Addendum clearly relates to the Dealer Agreement, of which the subject was the Dealers' and Insurers' obligations regarding the sale of extended service warranties by the Dealers to their customers for the parties' mutual benefit.

The Insurers next ask the Court to declare that the DDRA Addendum clearly modifies the Dealer Agreement. Although the question seems simple, ambiguity in the terms of the DDRA Addendum raises multiple issues of material fact. The DDRA Addendum indicates it was intended to replace Section 15 of the Dealer Agreement in its entirety. (Dkt. 16 at page 5.) Section 15 of the Dealer Agreement outlines terms for changes to the Dealer Agreement and any extended warranty service contract thereunder. (Dkt. 72-2.) Yet, upon termination of the DDRA Addendum, other terms indicate that Section 15 of the Dealer Agreement was to "replace the provisions of [the] addendum, with the exception of Section 2(c)," which was to continue to be in effect. (Dkt. 72-3 at

**MEMORANDUM DECISION AND ORDER; REPORT AND RECOMMENDATION – 12**

2.) Section 2(c) outlined what was to happen to funds remaining in the Dealer's Designated Refund Account upon termination of the DDRA Addendum. (*Id.* at 3.)

The DDRA Addendum both *replaces* Section 15 of the Dealer Agreement with its terms, *and* indicates that Section 15 of the Dealer Agreement *replaces* the terms of the addendum—with the exception of Section 2(c) upon termination. Thus, these provisions create a circular ambiguity that raises the question of whether the DDRA Addendum continues to exist post-termination as modified by Section 15 of the Dealer Agreement.

The content of Section 2(c) raises other questions. It specifically references and incorporates the terms of Section 2(b) of the DDRA Addendum. Therefore, for Section 2(c) to continue post-termination, Section 2(b) would necessarily have to continue as well. Because of such ambiguity, considered in the context of the termination language discussed immediately above, the Court cannot definitively determine at this stage whether the DDRA Addendum *modifies* the Dealer Agreement or if the DDRA Addendum *is modified by* the Dealer Agreement post-termination, or both.

The Insurers ask the Court to find also, as a matter of law, that the DDRA Addendum clearly and unambiguously required the Dealers to pay portions of refunds for canceled extended warranties from the Dealer's Designated Refund Account. However, as with the request above, this question asks the Court to ignore other terms of the agreement and to oversimplify its analysis to arrive at a fast conclusion. Because of surrounding ambiguity in the terms of the DDRA Addendum, the Court cannot find as

**MEMORANDUM DECISION AND ORDER; REPORT AND RECOMMENDATION – 13**

requested by the Insurers. The DDRA Addendum defines what it terms the "Dealer's Designated Refund Account." The relevant language reads as follows:

> (1)     Company and Dealer agree that $80.00 per each Approved Service Contract hereinafter referred to as "Dealers Refund Payment", will be added to dealers remit, and will be designated for the payment by Company, of Dealer's refund liability under Section 2(b) of this agreement. Company and Dealer agree that the sum of such funds designated for this purpose will be known as "Dealer's Designated Refund Account."
>
> It is the intent of Company and Dealer that the total of all fees in Dealer's Designated Refund Account accurately reflect the amount of Dealer's future liabilities for refunds under Section 2(b) of this program and are being transferred to Company specifically for this purpose.

(DDRA Addendum, Dkt. 73-3 at 2.)

It is clear that the DDRA Addendum requires the dealerships to pay a "Dealers Refund Payment" of $80 to Universal for each VSC sold. (DDRA Addendum, Dkt. 72-3 at 2.)  This amount was then "designated for the payment by [Universal], of Dealer's refund liability" in the case the express warranty contract was canceled by the customer prior to the expiration of its term. *Id*. Therefore, it is clear that the Dealers were expected to provide their $80 portion of the refund upfront, and that Universal would later administer and pay the refund. As the DDRA Addendum states: Universal was obligated to make refunds "under the provision of each Approved Service Contract," yet under the DDRA Addendum, the Dealer acknowledged that it was "obligated to reimburse the Company for a portion of such refunds made." (DDRA Addendum, Dkt. 72-3 at 2.)

**MEMORANDUM DECISION AND ORDER; REPORT AND RECOMMENDATION – 14**

Therefore, the DDRA Addendum does not clearly and unambiguously require Dealers to pay portions of refunds for canceled extended warranties from the DDRA Account.

The Insurers ask the Court to find, as a matter of law, that the following two related statements also be answered in the affirmative: (a) that the language of the DDRA Addendum is clear and unambiguous that such portions were to be paid from the Dealers' Designated Refund Account; and (b) that the DDRA Addendum clearly and unambiguously required the Dealers to pay any deficiency if the account became insolvent.

Yet, as for several of the questions above, to answer these questions in the affirmative, the Court would need to ignore ambiguity in the contract as a whole. For instance, the DDRA Addendum reads as follows regarding such deficiencies:

> If the amount remaining in Dealer's Designated Refund Account is less than Dealers' obligation as determined in Section 2(b), Company will charge and Dealer will be obligated to pay Company any deficiency. Company also has the authority to offset any deficiency to Company under Section 2(b), from any other amounts owned by Company to dealer.

(DDRA Addendum, Section 2(c), Dkt. 72-3 at 3.)

Although this section appears to indicate the Dealer is obligated to pay any deficiency if the obligation, as determined in Section 2(b) of the DDRA Addendum, exceeded the amount in the Dealer's Designated Refund Account, it is unclear whether that determination should have been made on a case-by-case basis (i.e. refund-by-refund or some other periodic determination) by the Insurers in administration of the account.

**MEMORANDUM DECISION AND ORDER; REPORT AND RECOMMENDATION – 15**

Furthermore, the question of whether there should have been a deficiency at all is raised by the Dealers through their assertion that the Insurers had a duty to manage and monitor the funds and the account in the Dealers' best interest and according to industry standards. For example, the DDRA Addendum provides that it was the intent of the parties that the total of all fees in the Dealer Designated Refund Account would "accurately reflect the amount of dealer's future liabilities for refunds under Section 2(b)" of the No Chargeback Program, "and are being transferred to [Universal] specifically for that purpose." (Dkt. 72-3 at 3.) Therefore, because of surrounding inconsistencies, the Court finds that these provisions in the DDRA Addendum are ambiguous.

Next, the Insurers ask the Court to find, as a matter of law, that the DDRA Addendum did not require the Insurers to deposit the $80 Dealer Refund Payments into a specific bank account. There is a material factual dispute concerning the meaning of the provisions regarding the Dealer Designated Refund Account—significantly, whether the Dealer Refund Payments should have been deposited in a designated account. The question implicates others, including whether a potential fiduciary relationship or the implied covenant of good faith and fair dealing required the Insurers to manage the Dealer's Designated Refund Account for the Dealers' benefit— consistent with relevant industry standards.

Finally, the Insurers ask the Court to find, as a matter of law, that upon termination of the DDRA Addendum, the rights and obligations of the parties would be as set forth

**MEMORANDUM DECISION AND ORDER; REPORT AND RECOMMENDATION – 16**

within the Dealer Agreement, with the exception of paragraph 2(c) of the DDRA Addendum, which remained in effect. However, as stated above, the DDRA Addendum creates circular ambiguity by both replacing Section 15 of the Dealer Agreement with its terms, while also replacing the terms of the addendum with Section 15, with the exception of Section 2(c) upon its termination. And, as set forth above, Section 2(c) of the DDRA Addendum references and incorporates the terms of Section 2(b)—indicating the answer to the Insurers' question is by no means clear and unambiguous.

In sum, although the Court could potentially answer one or two of the questions posed by the Insurers in the affirmative, when considering the DDRA Addendum as a whole, the Court finds that there are genuine issues of material fact and recommends the Insurers' motion for partial summary judgment be denied as to the contract language.

###    B.    *The Unjust Enrichment Claim*

A party is unjustly enriched when it receives a benefit that would be inequitable to retain without compensating the party that conferred the benefit. *Vanderford Co. v. Knudson*, 165 P.3d 261, 271 (Idaho 2007). A party must show three elements to establish a prima facie case for unjust enrichment: that plaintiff conferred a benefit upon the defendant; that the defendant appreciated the benefit; and that the circumstances are such that it would be inequitable for the defendant to retain the benefit without compensating the plaintiff for its value. *Id*.

The Insurers raise two issues challenging the Dealers' unjust enrichment claims: the first, that the Dealers may not bring a claim for unjust enrichment in the presence of

**MEMORANDUM DECISION AND ORDER; REPORT AND RECOMMENDATION – 17**

an express contract covering the same subject matter; and the second, that the Dealers did not confer a benefit upon the Insurers.

In general, the Insurers are correct: Under Idaho law, parties may not recover under a theory of unjust enrichment if there is an express contract in place that covers the same subject matter. *Blaser v. Cameron*, P.2d 1361, 1366 (Idaho Ct. App. 1991); *Triangle Min. Co. v. Stauffer Chem. Co.*, 753 F.2d 734, 742 (9th Cir. 1985).  However, there are two situations that affect application of the general rule. The first: If the express contract is found to be unenforceable a party is not precluded from pursing an unjust enrichment claim. *Blaser*, P.2d 1361 at 1366. The second: If the unjust enrichment claim is pursued against a party that was not a party to the contract –even when the claim for unjust enrichment covers the same subject matter as the express contract– a party is not precluded from pursing an unjust enrichment claim as to that party. *In re Estate of Boyd*, 8 P.3d 664, 668 (Idaho Ct. App. 2000).

The Dealers argue that both of these situations apply to bar the general rule because the agreements between Universal and the Dealers have yet to be found enforceable –the enforceability is specifically challenged by their fraud in the inducement claim– and additionally, Zurich was not a signatory, and thus is not party to any of the contracts at issue. The Dealers assert also, because they agreed to and did exclusively sell the Insurers' other products under false pretenses, it would be unjust for the Insurers to retain the profits.

**MEMORANDUM DECISION AND ORDER; REPORT AND RECOMMENDATION – 18**

Whether the Dealers were fraudulently induced into contracting with and continuing to contract with the Insurers is a question of fact to be determined at trial. The determination of the merits of the fraudulent inducement claim will directly affect the potential validity of the unjust enrichment claim. Therefore, although the Court credits the legal merits of the Insurers' argument, it will recommend that, at this stage in proceedings, summary judgment on the Dealers' unjust enrichment claim be denied.

### C.      *The Fraud-Based Claims*

Pursuant to Idaho law, claims for actual fraud consist of nine elements. *Doe v. Boy Scouts of Am.*, 356 P.3d 1049, 1054 (Idaho 2015). A plaintiff is required to prove each element by clear and convincing evidence. *Id.* Those elements are:

> (1) a statement of fact; (2) its falsity; (3) its materiality; (4) the speaker's knowledge of its falsity; (5) the speaker's intent to induce reliance; (6) the hearer's ignorance of the falsity of the statement; (7) reliance by the hearer; (8) the hearer's right to rely; and (9) consequent and proximate injury.

*Humphries v. Becker*, 366 P.3d 1088, 1096 (Idaho 2016), reh'g denied (Feb. 23, 2016) (quoting *Country Cove Dev., Inc. v. May*, 150 P.3d 288, 293 (Idaho 2006)).

Fraud cannot be based on statements of a promissory nature when such promises relate to "mere failure to perform a promise or an agreement to do something in the future." *DeVries v. DeLaval, Inc.*, No. CV 04-136 S EJL, 2006 WL 1582179, at *7 (D. Idaho June 1, 2006) (finding mere predictions that turn out to be wrong in the future are not fraudulent). Fraud *is* shown, however, when the representation concerns a material fact that existed in the past. *Id.* For example, during contract negotiations, a company represented certain things about its product: that it would work, and that it had been a

**MEMORANDUM DECISION AND ORDER; REPORT AND RECOMMENDATION – 19**

success for other customers. *G&M Farms v. Funk Irrg. Co.*, 808 P.2d 851, 856 (Idaho 1991). The company made these representations while knowing that there was a flaw in the product design and it was likely to malfunction. *Id*. at 857. The Idaho Supreme Court held that such pre-contract representations fell into the category of intentional misrepresentation. *Id*.

The Dealers assert two fraud-based claims against the Insurers. The first is their third claim for relief—fraud and fraudulent concealment. Therein, the Dealers allege that the Insurers represented they were implementing and managing the No Chargeback Program. Through such statements and assurances, the Dealers contend they were purposefully led to believe they would have no future liability for refunds of VSCs (after 90 days). The Dealers allege the Insurers used this false scenario to secure ongoing business and actively concealed what was actually happening—that the funds were not being managed, that the account had been insolvent since 2006, and that since at least 2011, the account was in a deficit position. More fundamentally, the Dealers allege the Insurers concealed the fact that there was never an actual, designated account. The Dealers' seventh claim for relief –fraud in the inducement– argues that such misrepresentations were made to induce the Dealers to enter into the No Chargeback Program from the get-go, to maintain the contract and arrangement for decades, and to exclusively sell other insurance products, such as the tire and wheel plan and maintenance plan.

**MEMORANDUM DECISION AND ORDER; REPORT AND RECOMMENDATION – 20**

The Insurers argue that the Dealers have failed to provide evidence that the Insurers made false or misleading statements prior to or at the time of contracting, which they assert is an essential element of the Dealers' fraud-based claims. In response, the Dealers allege that the Insurers knew, at the time of the first negotiation in 1996, and every time a dealership was added thereafter, that they had no intent of implementing the No Chargeback Program and their representations regarding its function and performance were false. (First Amended Complaint, Dkt. 52 at 23.) The Dealers offer evidence that a representative from Universal told Chalfant there would be no future liability for the VSCs with the DDRA Addendum in place.[16] And, despite this representation, the Insurers never managed or set up the Dealer Designated Refund Account to effectuate that purpose. These allegations are similar to the allegations in *G&M Farms*, where the Insurers likely knew at the time of negotiation that the No Chargeback Program would not be put in place as represented, and thus also knew or should have known it would not function as the Dealers intended and expected. 808 P.2d at 856-87. Further, the Insurers continued to make these misrepresentations throughout the decades-long history of contracting between the parties.

Like the facts in *G&M Farms*, these facts may fall within the category of intentional misrepresentations of material fact. Even if the Dealers are unable to show the Insurers knew the program would not function as represented or agreed upon at the time

---

[16] The Insurers object to the Court considering this evidence. Objection considered, *supra* note 14.

the DDRA Addendum was first executed in 1996, they have shown that, at some point in the course of the 20-year relationship, the Insurers did know the program was not working as expected. And, further, they claim ongoing misrepresentation by virtue of continuing to contract with the Dealers and their dealerships without alerting them to that material fact.[17] Therefore, the Court finds the Dealers have alleged factual circumstances supporting their fraud-based claims and recommends that the Insurers' motion for summary judgment as to such claims be denied.

### D.      *The Breach of Fiduciary Duty Claim*

The inquiry into whether a fiduciary relationship exists is "inherently factual and dependent upon the nature of the specific relationship in question." *Presiding Bishop of Church of Jesus Christ of Latter-Day Saints*, 837 F. Supp. 2d 1145, 1155 (D. Idaho 2011). Relationships where the law finds fiduciary obligations in relation to a duty to disclose information include when the parties are "members of the same family, partners, attorney and client, executor and beneficiary of an estate, principal and agent, insurer and insured, or close friends." [18] *Doe v. Boy Scouts of Am.*, 356 P.3d 1049, 1055 (Idaho 2015)

---

[17] The Court finds it irrelevant to the merits of the fraud-based claims whether the concealment lasted for one month or five years. These factual determinations, to be made by a jury, go to the determination of damages.

[18] Notably, there is interplay between the Dealers' fraud-based claims and breach of fiduciary duty claims: "[I]f a plaintiff establishes that there has been a breach of duty arising from a relationship of trust and confidence, the plaintiff is not required to prove the speaker's knowledge of the falsity of the statement, or (2) the speaker's intent that the hearer rely on the statement or representation of fact. *See Country Cove Development, Inc. v. May*, 150 P.3d 288, 294 (Idaho 2006). However, the party is still required to prove the remaining seven elements of actual fraud. *Gray v. Tri-Way Const. Servs., Inc.*, 386, 210 P.3d 63, 71 (Idaho 2009).

**MEMORANDUM DECISION AND ORDER; REPORT AND RECOMMENDATION – 22**

(quoting *Mitchell v. Barendregt*, 820 P.2d 707, 714 (Idaho Ct. App. 1991); and *Gray v. Tri-Way Const. Servs., Inc.*, 386, 210 P.3d 63, 71 (Idaho 2009)). "To establish a claim for breach of fiduciary duty, the plaintiff must establish that defendants owed plaintiff a fiduciary duty and that the fiduciary duty was breached." *Tolley v. THI Co.*, 92 P.3d 503, 511 (Idaho 2004). "Fiduciary relationships are commonly characterized by one party placing property or authority in the hands of another, or being authorized to act on behalf of the other." *High Valley Concrete, L.L.C. v. Sargent*, 234 P.3d 747, 752 (Idaho 2010).

The Dealers argue the Insurers owed duties as fiduciaries to manage the Dealer Designated Refund Account because the Dealers placed their property and confidence in the Insurers' control. They assert also that they conveyed complete control of the management of the funds and account to the Insurers—relying on their superior expertise.

In response, the Insurers argue that, under Idaho law, the Dealers' fiduciary duty claims cannot be based on a failure to perform duties under a contract because such duties arise in the theory of tort law and "a breach of contract is not a tort." (Dkt. 70-1 at 23.) They further argue that, "the undisputed facts demonstrate that Defendants had no duty independent of the parties' contractual relationship." *Id.* The Insurers allege that the Dealers' claim for breach of fiduciary duty arises out of alleged breaches of the written contracts—the Dealer Agreement and DDRA Addendum. (Dkt. 70-1 at 23.) And, that if there is merit to the contract claims, the remedy must be in contract, and not in tort because the duties, if breached, arose exclusively from the contractual relationship.

**MEMORANDUM DECISION AND ORDER; REPORT AND RECOMMENDATION – 23**

While it is certainly the case that the law of contracts and torts are distinct, it is not the case that fiduciary duties do not arise between parties to a contract. The Insurers point to a case where the Idaho Supreme Court held that a fiduciary duty does not ordinarily arise between parties to an arms-length business transaction. *High Valley Concrete*, 234 P.3d 747 at 752. However, the reason for the conclusion was not the existence of a contract between the parties. *Id.* Indeed, the court's holding was based on the fact that there was no relationship of trust and confidence between the parties—contract or not. *Id.*

Here, the Dealers assert they placed property, the $80 Dealer Payments, in the control of Universal. The Dealers authorized Universal to act on the Dealers' behalf in issuing their share of the customer refunds. There is no evidence in the record to the contrary. The Dealers allege they placed trust in, and relied on the Insurers' superior knowledge and expertise to manage the funds in all respects. These facts are exactly the type that commonly characterize a fiduciary relationship between an insurer and the insured. Therefore, the Court will recommend that the Insurers' motion for summary judgment as to the fiduciary duty claims be denied.

### E.    *The Counterclaim for Account Deficiency*

Insurers argue they are entitled summary judgment on their breach of contract counterclaim in the amount of $255,123, plus interest, because the Dealers have failed to pay a deficiency in the Dealer Designated Refund Account. The Insurers assert the Dealers are obligated to do so under the purportedly unambiguous language of the DDRA

Addendum. As stated previously, the DDRA Addendum reads as follows regarding such deficiencies:

> If the amount remaining in Dealer's Designated Refund Account is less than Dealers' obligation as determined in Section 2(b), Company will charge and Dealer will be obligated to pay Company any deficiency. Company also has the authority to offset any deficiency to Company under Section 2(b), from any other amounts owned by Company to dealer.

(DDRA Addendum, Section 2(c), Dkt. 72-3 at 2.)

This sole section on its face appears to indicate the Dealers were obligated to pay any deficiency when the obligation, as determined in Section 2(b) of the agreement, exceeded the amount in the Dealer Designated Refund Account. However, this conclusion raises other important questions. For example: did the Insurers have an obligation to audit the account and alert the Dealers that the dealer payments needed to be increased to cover estimated future deficiencies? The answer to this question is a disputed fact. Therefore, it is also up to debate whether a deficiency should even exist in the account. For instance, the DDRA Addendum provides that it was the intent of the parties that the total of all fees in the Dealer Designated Refund Account would "accurately reflect the amount of dealer's future liabilities for refunds under Section 2(b)" of the No Chargeback Program, "and are being transferred to [Universal] specifically for that purpose." (Dkt. 72-3 at 2.)

When the Court construes these facts in a light most favorable to the non-moving party, –the Dealers– issues of material arise, begging the broader and more fundamental question of whether the deficiency is valid or is a result of a breach of

contract, fiduciary duty, or both. Therefore, the Court finds the Insurers'
counterclaim is not a subject appropriate for summary judgment and will
recommend that the motion be denied.

**2.      Motion to Amend to Add Punitive Damages**

Like contract-based claims, claims for punitive damages are substantive in nature.
*Bauer v. Metropolitan Life Ins. Co.*, No. 2:08–cv–00284–LMB, 2010 WL 2595291, at *5
(D. Idaho June 23, 2010). Therefore, Idaho law governing such claims is controlling in a
federal action based on diversity jurisdiction. *Windsor v. Guarantee Trust Life Ins. Co.*,
684 F. Supp. 630, 633 (D. Idaho 1988). Idaho Code Section 6-1604 sets forth the
standards governing claims for punitive damages. Thereunder, after an appropriate
pretrial motion and after a hearing on the matter, a court must allow a party to amend the
pleadings "if, after weighing the evidence presented, the court concludes that, the moving
party has established at such hearing a reasonable likelihood of proving facts at trial
sufficient to support an award of punitive damages." I.C. § 6-1604(2).

"The issue revolves around whether the plaintiff is able to establish the requisite
intersection of two factors: a bad act and a bad state of mind." *Todd v. Sullivan Const.
LLC.*, 191 P.3d 196, 201 (Idaho 2008) (citing *Myers v. Workmen's Auto. Ins. Co.*, 95 P.3d
977, 985 (Idaho 2004)). At the trial stage, an award of punitive damages is permissible
only where the party proves, "by clear and convincing evidence, oppressive, fraudulent,
malicious or outrageous conduct by the party against whom the claim for punitive
damages is asserted." *Id*. at 6-1604(1). But, at the motion stage, the Plaintiff must show

**MEMORANDUM DECISION AND ORDER; REPORT AND
RECOMMENDATION – 26**

only a "reasonable likelihood" that defendants "performed a bad act with a bad state of mind." *Hall v. Farmers All. Mut. Ins. Co.*, 179 P.3d 276, 282 (Idaho 2008). Punitive damages may be recovered in a contract action. *Cuddy Mtn. Concrete, Inc. v. Citadel Construction, Inc.*, 824 P.2d 151, 158 (Idaho Ct. App. 1992). Yet, breach of the underlying contract by itself is not sufficient to warrant an award of punitive damages. *General Auto Parts Co., Inc. v. Genuine Parts Co.*, 979 P.2d 1207, 1211 (Idaho 1999).

Here, the alleged bad acts are that the Insurers promoted the great value of the No Chargeback Program to the Dealers for decades and used it as a linchpin to secure ongoing, exclusive business relationships with the Dealers. The facts supporting the alleged bad state of mind are that the Insurers did this, all the while knowing they had not set up the program, that it was not functioning as they represented, and that it did not provide such value. The Dealers assert such acts constitute an extreme deviation from industry practice. They assert further that the active concealment of such facts, and later, of knowledge the account was in a deficit position amount to outrageous conduct sufficient to support a claim for punitive damages. The Court agrees.

The facts as alleged by the Dealers, if proved, go beyond breach of contract. The single fact that the Insurers knew that the account was in a deficit position and concealed that from the Dealers for a matter of time, all the while trying to secure more business, presents a reasonable likelihood that the Insurers performed a bad act with a bad state of mind. It may be, that in the industry, such acts amount to conduct that is unreasonable and irrational in the business context, and demonstrate a lack of professional regard for

**MEMORANDUM DECISION AND ORDER; REPORT AND RECOMMENDATION – 27**

the consequences of the breach of the contractual agreement. *See Cuddy Mtn. Concrete*, 824 P.2d at 160.

To support the motion to amend, the Dealers assert there is expert testimony that the Insurers' alleged failure to set up and manage the account and disclose the failure to the Dealers amounted to an extreme deviation from how parties who manage such accounts should act. (Dkt. 91-10 at 4; *See also* Dkt. 112-1 at 20.) According to the Dealers, the Dealers' Designated Refund Account had been in a deficit since 2011 but such deficit was not disclosed until 2015. The Dealers point to the deposition of Samuel D'Arc, a Zurich account representative, who testified that such information would be the type of information he would immediately take to a client. (D'Arc Deposition, Dkt. 112-5 at 7.) The Dealers assert this information was purposefully withheld from them.[19]

All the while, the Insurers allegedly touted the benefits of the No Chargeback Program and used it as a carrot to induce the Dealers to continue to sell the extended warranty service contracts and other insurance products to the benefit of the Insurers. The Dealers assert this conduct was even more egregious because the dealerships suffered actual harm as a result, the parties had a special relationship wherein the Insurers held themselves out as experts, and the Dealers relied on their advice.

---

[19] According to the Deposition of Duke Zieglmeier, General Manager and Vice President of Zurich's Northwest Division from 2008-2015, there is evidence contained in internal email correspondence between himself and other employees of the Insurers that they were aware the funds in the Dealer Designated Refund Account were dwindling—and there was a balance of only $53,545.70 as of August 31, 2014. (Zieglmeier Deposition, Dkt. 112-10 at 7.)

**MEMORANDUM DECISION AND ORDER; REPORT AND RECOMMENDATION – 28**

The Dealers argue that, had the Insurers monitored the Dealers Refund Account, they could have adjusted the Dealer Refund Payment from $80 to $89.75 and such adjustment would have created a balance sufficient to cover the present deficiency, a deficit of $231,123, and the future liability, a deficit of $429,066. (Dkt. 91-1 at 18.)

Additionally, the Dealers argue the Insurers "engaged in textbook oppressive conduct, for years. Accepting the benefits of another party's performance without intent to perform one's own contractual obligations merits punitive damages." (Dkt. 112-1 at 22.) Finally, the Dealers assert the Insurers knew the likely consequences of their conduct, constituting evidence of a harmful state of mind.

The Court finds, therefore, that Dealers have a reasonable likelihood of proving, by clear and convincing evidence, that the Insurers acted with a harmful state of mind and such actions were an extreme deviation from reasonable standards. As such, the Court will recommend that the motion to amend to add a claim for punitive damages be granted.

### 3.      The Motion to Compel

A party may move for an order compelling discovery pursuant to Federal Rule of Civil Procedure 37(a)(1) when an opposing party fails to respond or to adequately respond to requests for production or interrogatories permissible under Federal Rules of Civil Procedure 33 and 34. The permissible scope of discovery is set forth in Federal Rule of Civil Procedure 26(b)(1), which reads as follows:

> Unless otherwise limited by court order, the scope of discovery is as follows:
> Parties may obtain discovery regarding any nonprivileged matter that is

**MEMORANDUM DECISION AND ORDER; REPORT AND RECOMMENDATION – 29**

relevant to any party's claim or defense and proportional to the needs of the case, considering the importance of the issues at stake in the action, the amount in controversy, the parties' relative access to relevant information, the parties' resources, the importance of the discovery in resolving the issues, and whether the burden or expense of the proposed discovery outweighs its likely benefit. Information within this scope of discovery need not be admissible in evidence to be discoverable.

The moving party must certify it has in good faith conferred or attempted to confer with the opposing party in an effort to obtain the discovery without court action.

The parties have been unable to reach a resolution regarding multiple requests for production and interrogatories. The parties met and conferred regarding these requests and failed to reach an amicable resolution. The Insurers objected to the requests on multiple grounds, including and not limited to objections that they were overly broad, unduly burdensome and vague in that some terms were left undefined. The Insurers also objected that the requests would include disclosure of irrelevant proprietary information and that the requests were not proportionate to the needs of the case. For the reasons that follow, the Court will grant the Dealers' motion to compel, as specifically limited herein.

***Request for Production No. 11*** asks for all documents related to the Insurers' use and investment of the Dealer Refund Payments. Because the Court has recommended that the Insurers' motion for summary judgment be denied in full, this request is relevant to the Dealers' claims. The request is also relevant to the question of damages. Therefore, pursuant to the scope of Federal Rule of Civil Procedure 26(b)(1), the Court will order the Insurers to comply with Request for Production No. 11.

**MEMORANDUM DECISION AND ORDER; REPORT AND RECOMMENDATION – 30**

***Interrogatory No. 5*** seeks specific information regarding the bank accounts, investment accounts or other financial accounts where the Insurers deposited the Dealer Refund Payments received from the Dealers. The Insurers assert this information is not relevant because the DDRA Addendum did not require segregation of the $80.00 Dealer Refund Payments into a specific account to benefit the Dealers. (Dkt. 103 at 3.) As the Court set forth above, this is a question of material fact. Therefore, this discovery request falls within the scope of Rule 26(b)(1), and a response will be compelled. The Insurers must reasonably identify the account or accounts where the Dealer Refund Payments were deposited. If the deposits were made into a general account or accounts, the Insurers must say so and identify such general accounts.

***Request for Production No. 12***, like Interrogatory No. 5, asks for documents related to information sufficient to identify the bank accounts where the Dealer Refund Payments were deposited or held. For the reasons stated above regarding Request for Production No. 11, the Court orders also that the Insurers comply with Request for Production No. 12 to the extent that documents exist or are prepared by Insurers to answer Interrogatory No. 5.

***Request for Production No. 13*** asks for all documents related to all revenue, income, interest, profit and gains generated, earned, recognized or realized from the bank accounts that held the Dealer Refund Payments. Information regarding the use and investment of the $80 Dealer Refund Payments is pertinent to the Dealers' claim that the Insurers misrepresented that the program under the DDRA Addendum would be managed

**MEMORANDUM DECISION AND ORDER; REPORT AND RECOMMENDATION – 31**

so the Dealers "would not be exposed to any liability for reasonably anticipated liabilities." (First Amended Complaint, Dkt. 52 at 6.) The Dealers assert that discovery thus far has shown the Insurers comingled these funds with their general revenue funds and invested the funds for their own benefit. The Insurers assert they have "already given exhaustive testimony on this subject, including disclosing that the Dealer Refund Payments were not deposited into accounts specific to the Dealers—i.e. they were not segregated. (Dkt. 103 at 3-4.) They assert that, because the payments were not segregated, it would be impossible to identify whether the Dealer Refund Payments were held in cash or invested or how much money was made from any invested funds. (Dkt. 103-1 at 7.) As such, the Insurers argue the request is unduly burdensome and disproportionate to the needs of the case. The Dealers' response to this assertion is that they are not asking for specific, detailed information—but instead are requesting information that could give them, and the Court, "a reasonable approximation of the profits casually connected to the [alleged] violation." (Dkt. 113 at 6.) Given this and the relevance of the request, the Court will grant the motion to compel to provide such reasonable approximation.

*Request for Production No. 14* asks for all documents related to the source, origin, vendor and means of generating funds, other than the Dealer Refund Payments from the DDRA Addendum agreement, that were deposited by the Insurers. *Interrogatory No. 6*, like Request for Production No. 14, seeks a description of the source, origin, vendor and means of generating funds, other than the Dealer Refund

**MEMORANDUM DECISION AND ORDER; REPORT AND RECOMMENDATION – 32**

Payments, deposited by the Insurers in any identified financial accounts. The Court instructs that these two requests are permitted, but only for descriptions sufficient to provide identification of the source, origin, vendor or means of generating funds from the profits made through the Dealers' sale of other F&I products to Dealers' customers. The Insurers are permitted, per the protective order in place, to redact information as necessary to protect their proprietary information. With these limitations, the motion to compel as to Interrogatory No. 6 will be granted.

*Request for Production No. 21* asks for all documents related to the customer claims paid and losses paid to third parties by the Insurers for each of the F&I products sold by dealerships owned by Edmark and Chalfant from 1996 through 2015. This request goes beyond the scope of the claims paid and losses paid related to the VSC contracts—including with it any claims or losses related to any of the insurance products sold by the Dealers to the parties' mutual benefit. The Dealers assert this customer claims information is required to calculate the profits made through the Insurers' misconduct. (Dkt. 97-1 at 2.) The Dealers claim the disgorgement remedy would potentially include a disgorgement of profits made on the other insurance products because the dealerships were induced into selling them based on the DDRA Addendum. (*Id*. at 4.)

The Insurers responded to this request by producing a list of total customer claims and losses paid to third parties on the VSCs sold by the Dealers organized by year. The Insurers assert that interrogatories related to the other insurance products are irrelevant because the unjust enrichment claims are barred as a matter of law, and the Dealers'

**MEMORANDUM DECISION AND ORDER; REPORT AND RECOMMENDATION – 33**

claims related to the other products are too remote or attenuated to be considered in equity within the scope of their profits arising out of alleged breaches of duty related to the No Chargeback Program. (Dkt. 103 at 2.) Although the claims regarding profits and claims paid related to those products may indeed prove to be too attenuated from the claims made in regard to the Insurers' alleged breach of fiduciary duty and fraud – because the claims for unjust enrichment and disgorgement of profits should not be dismissed at this stage, this discovery request falls within the scope of Federal Rule of Civil Procedure 26(b)(1), and a response will be compelled.

Finally, although the Court is granting the Dealers' motion to compel, as limited herein, the Court finds that the Insurers' non-production, answers, and objections were substantially justified given the motion for partial summary judgment was pending before the Court, along with potential hurdles to production and the likely need to redact some proprietary information. Therefore, the Court will not order payment of the Dealers' expenses or attorney's fees incurred in making the motion. Fed. R. Civ. P. 37(5)(A)(ii).

## CONCLUSION

For the reasons outlined herein, the Court recommends that the Insurers' motion for partial summary judgment be denied in full, recommends that the Dealers' motion to amend to add a claim for punitive damages be granted, and hereby grants the Dealers' motion to compel responses to discovery as set forth above.

**MEMORANDUM DECISION AND ORDER; REPORT AND RECOMMENDATION – 34**

## <u>ORDER</u>

**NOW THEREFORE IT IS HEREBY ORDERED:**

1)      Plaintiffs' Motion to Compel (Dkt. 97) is **GRANTED**. Defendants must fully respond by producing the compelled discovery within twenty-eight (28) days of the date of this Order.

## <u>RECOMMENDATION</u>

**NOW THEREFORE IT IS HEREBY RECOMMENDED:**

1)      Defendants' Motion for Partial Summary Judgment (Dkt. 70) be **DENIED**; and

2)      Plaintiffs' Motion to Amend/Correct (Dkt. 112) be **GRANTED**.

Written objections to this Report and Recommendation must be filed within fourteen (14) days pursuant to 28 U.S.C. § 636(b)(1) and Dist. Idaho L. Rule 72.1(b), or as a result of failing to do so, that party may waive the right to raise factual and/or legal objections to the United States Court of Appeals for the Ninth Circuit.

Dated: **February 06, 2018**

Honorable Candy W. Dale
United States Magistrate Judge