UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| EDMARK AUTO, INC., an Idaho corporation; CHALFANT CORP., an Idaho corporation,<br><br>Plaintiffs,<br><br>v.<br><br>ZURICH AMERICAN INSURANCE COMPANY, a New York corporation; and UNIVERSAL UNDERWRITERS SERVICE CORPORATION, a Delaware corporation,<br><br>Defendants. | Case No. 1:15-CV-00520-ELJ-CWD<br><br>**MEMORANDUM DECISION AND ORDER GRANTING IN PART AND DENYING IN PART PLAINTIFFS' SECOND MOTION TO COMPEL DISCOVERY (DKT 151)** |

# INTRODUCTION

Pending before the Court is Plaintiffs' second motion to compel discovery, filed on April 2, 2018. (Dkt. 151.) It has been fully briefed, and the Court heard oral argument on the motion on May 7, 2018. After careful consideration of the briefing, the parties' arguments, the standard of review, and the relevant authorities, the Court will grant in part and deny in part Plaintiffs' motion.

**BACKGROUND**

The claims asserted in this matter stem from a long-running business relationship between Plaintiffs –two automobile dealers– Edmark Auto, Inc. (Edmark) and Chalfant Corp. (Chalfant) (Dealers), and Defendants Universal Underwriters Service Corporation (Universal), and Zurich American Insurance Company (Zurich) (Insurers).[1] On November 1, 1996, Edmark entered into a Vehicle Service Contract Dealer Agreement (Dealer Agreement) with Universal. (Dkt. 19-2.) Thirteen years later, in 2009, Chalfant entered into the same Dealer Agreement with Universal. Therein, the Dealers agreed to offer and sell Universal's Vehicle Service Contracts (VSCs) to their customers for newly-purchased automobiles. VSCs are contracts for extended warranty agreements that cover the repair or replacement of parts due to mechanical breakdown. VSCs require customers to pay upfront for the extended warranty, but permit cancellation prior to the expiration of the VSC term — typically 60 months in duration. When customers exercise the option to cancel, they are entitled to a pro-rated refund of any value left in their extended warranty at the time of the VSC termination.

Universal drafted an addendum to the Dealer Agreement setting forth terms and conditions to manage the administration of customer refunds pursuant to the VSCs. The

---

[1] According to Dealers, Universal and Zurich are agents and alter egos for one and other. (Dkt. 135 at 2.) Universal has no employees and all actions taken on its behalf are performed by Zurich employees. (Dkt. 52-3.) According to the Declaration of Robert J. Burne, currently Treasurer of Zurich, Universal is a company that sells insurance products but it is not an insurance company, and Zurich is a company that also sells insurance products but *is* an insurance company that provides services, including services in relation to Universal's insurance products. (Dkt. 156-2 at 3.) Although the Court notes these distinctions, the entities will be referred to collectively as the Insurers herein.

addendum is entitled: Addendum to Vehicle Service Contract – Dealers Designated Refund Account Program – Dealer Agreement (DDRA Addendum). (Dkt. 72-3.) The overarching purpose of the DDRA Addendum was to provide a means of administratively processing the proportional amounts of the VSC warranty refunds the Dealers and the Insurers owed to customers. The DDRA Addendum required the Dealers to pay a refund payment of $80 to Insurers for every extended warranty sold (Dealer Refund Payment). How such Dealer Refund Payments were recorded, spent or used, whether the payments were invested by Insurers, and if so, what was earned on such investments, are all facts relevant to the parties' claims and defenses in this matter.

A.  **Receipt and Use of the Dealer Refund Payments by Insurers**

The Dealer Refund Payments were initially deposited by Insurers into one of three general ledger bank accounts. These accounts held payments and funds received from other sources as well—including other customers and dealerships that also sold Insurers' extended warranty products (known as "F&I products"). Thus, upon receipt by Insurers, the Dealer Refund Payments were immediately comingled with other F&I remittances and funds. Insurers tracked the receipt of each Dealer Refund Payment and any refunds issued to Dealers' customers under the DDRA Addendum.[2]

Insurers used the general ledger accounts to pay for daily operating expenses, including the payment of claims, reinsurance, employee expenses, account fees, and other corporate obligations. Insurers state that funds remaining in the general ledger accounts

---

[2] This accounting was provided to Dealers in earlier production by Insurers.

were swept into one or more of six short-term money market accounts at the end of each business day. Insurers identified each of these money market accounts within their responses to discovery and produced Excel spreadsheets to provide the rates of return for 1-day, 7-day, and 30-day periods on each account. (Dkt. 156-1.)

Insurers assert that the funds swept into these money market accounts were shortly returned to the general ledger accounts be used for daily operating expenses.[3] Other than this transfer, Dealers assert the only other transfer of the funds were periodic sweeps made pursuant to a global cash pooling agreement between Zurich North America and Zurich Insurance Company. Under the pooling agreement, funds from two of the general ledger accounts were periodically transferred to a Deutsche Bank account and returned to the same account the funds were drawn from the following day. In turn, Deutsche Bank paid short-term interest at the Federal Fund Rate. Insurers state that they do not have business records to account for how much short-term interest was credited back as a result of the pooling agreement. Further, because of the comingled nature of the funds, Insurers assert that they can in no way provide information regarding the percentage return earned specifically from the Dealer Refund Payments, if any.

---

[3] It is unclear from the briefing or the arguments whether the funds returning from the money market accounts were dispersed through the three general ledger accounts, returned specifically to the account drawn from, or moved into a fourth bank account, identified by Insurers as a liquid asset account used to supplement funds in the general ledger accounts, as needed. For purposes of the present motion, however, the important fact is the Insurers' representation that the funds were not reinvested or further invested into other longer term or higher yielding investment vehicles.

In any event, Insurers assert the percentage of interest from both the short-term money market accounts and the pooling agreement was the only investment related income earned on F&I remittances, including the Dealer Refund Payments from 2010 through 2015.[4] (Dkt. 156-2 at 5 ¶ 9.)

Dealers believe these disclosures by the Insurers fall short of telling the entire story regarding the use of F&I remittances and profits. Thus, they assert also that the disclosures fall short of providing information regarding the use of such remittances and profits, including, necessarily, the Dealer Refund Payments. Dealers point to several pieces of information garnered through the discovery process to support their contention and their second motion to compel.

First, they point to annual reports published during a portion of the relevant time period for Zurich Insurance Group. These reports reference the performance of Zurich American Insurance Companies' investments. The overall annual estimate of return, as computed by Dealers' expert, was 6.48 percent. Dealers contend this is at odds with Insurers' assertion that the only regular interest earned was from the money market accounts, which returned less than 1 percent.

Second, Dealers reference investment return information set forth in confidential consolidated reports.[5] The documents report the cash from investments for Universal for

---

[4] Insurers assert they are unable to provide information related to the general ledger accounts, prior to 2010, due to record retention policies.

[5] The consolidated reports were provided to Dealers by Universal on April 27, 2018, in response to Dealers' Third Set of Interrogatories and Requests for Production. (Dkt. 165.)

2015 and 2016. Dealers assert that the multi-million-dollar return noted for 2015 is evidence that Insurers must have made investments with Universal's F&I-related revenue beyond short-term money-market deposits and periodic sweeps under the pooling agreement.

**B.     The Discovery Dispute**

This discovery dispute centers around questions set forth in Dealers' Interrogatory Nos. 5 and 6, and on Dealers' Request for Production Nos. 11, 12, 13, and 14. On February 6, 2018, the Court ordered Insurers to respond to numerous discovery requests, including those subject to the pending motion. (Dkt. 134.) Insurers responded to those requests on March 20, 2018. The parties held a telephonic meet and confer session regarding Dealers' objections to the sufficiency of the responses on March 22, 2018.[6]

At that time, Dealers expressed their belief that Insurers had not fully responded to the requests or complied with the Court's order to supply information related to the Insurers' use of the Dealer Refund Payments. Insurers disagreed, but offered to provide Dealers with a sample of redacted bank statements from the general ledger accounts previously identified. Dealers, however, do not believe such documents will provide information relevant to Insurers' use of the Dealer Refund Payments—specifically, any profit tied to investments of the comingled F&I funds.

---

[6] Insurers contend Dealers filed the motion to compel before attempting in good faith to obtain the discovery without court action. (Dkt. 156-3 at 13.) The Court will discuss this issue below in relation to Dealers' request for attorney's fees, costs, and sanctions.

In the motion to compel, Dealers contend Insurers' responses "appear to misrepresent the facts and are so incomplete it is hard to believe they were provided in good faith." (Memorandum in Support of Second Motion to Compel, Dkt. 151-1 at 4.) As such, Plaintiffs argue sanctions are appropriate. Insurers, in turn, contend Dealers' use of the motion to compel to challenge the factual accuracy of Insurers' responses is inappropriate, and that they have answered the requests "directly and fully," and thus they have complied with the Court's order. (Defendants' Opposition to Second Motion to Compel, Dkt. 156-3 at 3.) Dealers reply by explaining the motion to compel is not based on a challenge to the accuracy of Insurers' responses, rather, it is based on their assertion that the responses were incomplete. (Plaintiffs' Reply in Support of Second Motion to Compel, Dkt. 158 at 6.)

Of note, after the motion to compel had been fully briefed, Insurers filed with the Court a copy of their Third Supplemental Responses, which were provided to Dealers on April 26, 2018. (Dkt. 162.) These responses have been considered by the Court in its evaluation of the merits of the present motion.

## STANDARD OF REVIEW

A party may move for an order compelling discovery pursuant to Federal Rule of Civil Procedure 37(a)(1) when an opposing party fails to respond or to adequately respond to requests for production or interrogatories permissible under Federal Rules of Civil Procedure 33 and 34. The permissible scope of discovery is set forth in Federal Rule of Civil Procedure 26(b)(1), which reads as follows:

> Unless otherwise limited by court order, the scope of discovery is as follows: Parties may obtain discovery regarding any nonprivileged matter that is relevant to any party's claim or defense and proportional to the needs of the case, considering the importance of the issues at stake in the action, the amount in controversy, the parties' relative access to relevant information, the parties' resources, the importance of the discovery in resolving the issues, and whether the burden or expense of the proposed discovery outweighs its likely benefit. Information within this scope of discovery need not be admissible in evidence to be discoverable.

Relevant information "need not be admissible in evidence to be discoverable." *Id.* Parties may move for an order from the Court to compel discovery. Fed. R. Civ. P. 37. However, such motion may not be made unless the movant has in good faith conferred, or attempted to confer, with the party allegedly failing to answer, disclose or respond. *Id.* at 37(a)(1). Under the rules, an evasive or incomplete disclosure, answer or response is treated as a failure to disclose, answer or respond. *Id.* at 37(a)(4).

If the motion is granted, the Court must, after opportunity for hearing, order the party whose conduct resulted in the motion, or attorney advising the conduct, or both, to pay the reasonable attorney's fees of the movant. *Id*. at 37(a)(5)(A). However, the court must not make such order for fees if the moving party filed the motion before making a good faith effort to obtain disclosure without court intervention, the nondisclosure was substantially justified, or, other circumstances would make the award of fees unjust. *Id.* at 37(a)(5)(A)(i-ii). If the court issues an order, and the party fails to obey the order, the court may issue further just orders as specified in Federal Rule of Civil Procedure 37(b)(2)(A-B), including payment of further incurred expenses.

# DISCUSSION

Dealers request the Court to order Insurers "to produce responsive documents showing annual percentages and totals of investment returns for any funds or accounts" into which the Dealer Refund Payments may have flowed. (Dkt. 151-1.) Dealers seek also authentic documents, not summaries or documents created for purposes of litigation.

Insurers respond to this request in several ways. The first is to assert that they have fully complied with the discovery requests and the Court's previous order to compel. In this, they assert the above request goes beyond the language of the discovery requests at issue, i.e. the Dealers did not ask for such information. The second response is their assertion that the Dealer Refund Payments did not flow into any unidentified investment accounts—the comingled funds were invested in short-term money market accounts, and were potentially periodically invested pursuant to the pooling agreement— but in both instances, the funds were returned to the general ledger accounts and used to pay daily operating expenses.

The Court will first address the motion to compel as to Interrogatory Nos. 5 and 6, as well as Request for Production Nos. 12, 13, and 14. For the reasons set forth below, the Court will deny the motion regarding each of these requests. Next, the Court will discuss the motion to compel as to Request for Production No. 11, which the Court will grant, as explained below.

**I.     Discovery Requests**

   **A.     *Interrogatory No. 5***

Interrogatory No. 5 asks Insurers to identify "the bank, investment, and/or other financial institution account(s) into which Zurich deposited the $80 fee per vehicle service contract sold by Edmark and Chalfant…" (Dkt. 151-1 at 5.) Insurers' response identified three general ledger accounts used for all Universal F&I related deposits, including deposits from other dealerships and customers. Insurers assert this information answers Interrogatory No. 5. The Court's previous order compelling discovery required the Insurers to "reasonably identify the account or accounts where the Dealer Refund Payments were deposited. If the deposits were made into a general ledger account or accounts" the Insurers were to identify such accounts. (Dkt. 134 at 31.) Notably, Interrogatory No. 5 and the Court's instructions use the term "deposited." Neither includes or uses terms such as "moved," "invested" or "transferred."

To *deposit* is the act "of giving money or other property to another who promises to preserve it or to use it and return it in kind; esp., the act of placing money in a bank for safety and convenience;"[7] and actions made "[t]o place in some repository, to commit to the charge of any one, for safekeeping; *spec*. to place (money) in a bank at interest,[8]" also

---

[7] *Deposit*, Black's Law Dictionary, (9th ed. 2009).

[8] *Deposited*, Oxford English Dictionary, http://www.oed.com/view/Entry/50370?redirectedFrom=deposited#eid123213337 (last visited May 9, 2018).

"to put in a bank.[9]" Given these definitions, the sole use of the term in Interrogatory No. 5, and the Court's order, the Court finds that Insurers sufficiently answered Interrogatory No. 5 through identification of the three general ledger bank accounts into which the Dealer Refund Payments were deposited. Therefore, the motion to compel as to Interrogatory No. 5 is denied.

**B.     *Interrogatory No. 6 and Request for Production Nos. 12, 13, and 14***

Four of the discovery requests at issue include the defined term "Bank Account(s)" – Interrogatory No. 6 and Request for Production Nos. 12, 13, and 14. Interrogatory No. 6 supplies the definition as "the bank, investment, and/or other financial institution account(s) into which Zurich deposited the [Dealer Refund Payments][10] (the "Bank Account(s)") [...]." (Dkt. 151-1 at 6.) The intent and meaning of the term is a subject of dispute.

Insurers assert *Bank Account(s)* includes only the general ledger accounts into which they deposited the Dealer Refund Payments. Dealers argue the term is broader, as the definition includes "investment, and/or other financial institution accounts(s)" in addition to bank accounts. Given these arguments, the term *deposited* is necessarily also at issue. To broaden the scope of this set of discovery requests, the Court would need to interpret *deposited* to include other actions such as *moved*, *transferred*, and *invested*.

---

[9] *Deposited*, Meriam Webster Dictionary, https://www.merriamwebster.com/dictionary/deposited?src=search-dict-hed (last visited May 9, 2018).

[10] Dealers' discovery requests call the $80 per VSC a "No Chargeback Fee." For the sake of consistency within this memorandum, the Court will continue to refer to the $80 fees as a "Dealer Refund Payment."

The Court declines to do so for two reasons: First, it would require interpretation of a term the parties did not address in their briefing. Second, per the nature of Dealers' specific requested relief set forth above, the Court finds Request for Production No. 11 is the only discovery request currently at issue that is composed in such a manner to exclude both limiting terms—*Bank Account(s)* and *deposited*. Therefore, the Court will deny the motion to compel as to Interrogatory No. 6, and Request for Production Nos. 12, 13, and 14.

### C. *Request for Production No. 11*

Request for Production No. 11 asks for "all Documents Related to Zurich's use and/or investment of the [Dealer Refund Payments] collected by Zurich." (Dkt. 151-1 at 6.) In response to this request, Insurers provided the information set forth above including that: Dealer Refund Payments were deposited into the identified general ledger accounts; once deposited, the Dealer Refund Payments became comingled with F&I remittances from other dealers and customers; Insurers' used the comingled funds in the general ledger accounts to pay daily operating expenses; every day, the funds remaining in the accounts were swept into short-term money market accounts; periodically, funds from two of the accounts were swept into a Deutsche Bank account for 24 hours, per the pooling agreement.

Insurers assert that, because the Dealer Refund Payments were comingled in the general ledger accounts with other fungible cash, none of the money, including the Dealer Refund Payments, can be specifically traced in the records of the money market accounts or the pooling agreement. This difficulty tracing the money can be analogized to

baking bread. Before you mix the batter, you have separate identifiable ingredients—flour, salt, water, and yeast. Once you bake it, the finished product is a loaf of bread. However, if the Court were to look at Zurich as a bakery, and its F&I business with Universal as one type of bread, that bread would be just one of many different baked items Zurich produces. And, although the individual components that were combined to make the bread are impossible retrieve once the mixture is baked, the particular type of bread is not.

Thus, there is potential information that would be responsive to the intent of Request for Production No. 11—which is production of all documents related to the use and investment of the Dealer Refund Payments. As demonstrated in the confidential consolidated financial statements for Universal and Zurich (Dkt. 165), Insurers track the return on Universal's and Zurich's investments. Therefore, Insurers likely have further reports or figures that break out what percentage of the total return on Universal's and Zurich's investments is attributable to F&I-related revenue and profits.

Should it also be the case that neither Universal nor Zurich invested any of their F&I revenues or profits at any point through the duration of the contract period –beyond in the six identified money market accounts– the documents detailing the composite of the total investment returns achieved on the totality of the Insurers' business should reflect the limited investment returns generated from the short-term money market accounts and the pooling agreement draws related specifically to the F&I business. This information is responsive to the Dealers' discovery request because such investments

included at least some portion of the revenue from Dealer Refund Payments over the course of the contract period.[11]

The Court finds this revenue information is responsive, and pursuant to the broad scope of Federal Rule of Civil Procedure 26(b), is relevant to the issue of causation and Dealers' damages claims. Therefore, the Court will grant the motion to compel, as so specified, in relation to Request for Production No. 11.

## II. Attorney's Fees, Costs, and Sanctions

The Court is keenly aware of the protracted nature of discovery in this matter. In its previous order to compel (Dkt. 134), the Court found the requests were relevant to Dealers' claims and to the issue of damages, specifically, the issue of punitive damages. At the time the Court issued its order, it submitted also a Report and Recommendation to the presiding District Judge, Edward J. Lodge, recommending Dealers' motion to amend the complaint to add a claim for punitive damages be granted. (Dkt. 135 at 29.) The Court adopted the Report and Recommendation in full, and issued an order permitting Dealers' to amend and add the claim.[12] (Dkt. 145.)

Thus, although this is Dealers' second motion to compel, it is the first time the Court has analyzed the dispute when a claim for punitive damages has been a viable basis

---

[11] The Court understands that Insurers assert they cannot segregate remittances for F&I products sold by Dealers from remittances for F&I products sold by other dealerships or customers. However, they should be able to identify the profit, investment gains or otherwise, derived from the F&I product business in the aggregate.

[12] However, the Court reserved "the right to determine whether the punitive damages claim, and any other claim, will be submitted to the jury at trial." (Dkt. 145 at 21.)

for review of Dealers' responses. Further, as set forth above, the Court finds Insurers' responses to all but one of the requests at issue in the present motion to compel sufficient. Therefore, pursuant to Federal Rule of Civil Procedure 37(a)(5)(A)(ii) and (iii), the Court will not order payment of attorney's fees or costs, nor will the Court impose sanctions against Insurers or their counsel.

## CONLCUSION

The Court will grant the motion to compel as to Request for Production No. 11, and deny it as to all other requests addressed in Dealers' motion. Insurers must provide documents detailing the composition of total investment returns on all revenue or profits resultant from, or related to, Insurers' F&I business for the duration of the contract period, or, to the extent records exist per record retention policies, i.e. at minimum from 2010 through 2015. (*See infra* note 4.)

## ORDER

**NOW THEREFORE IT IS HEREBY ORDERED:**

1) Plaintiffs' Motion to Compel (Dkt. 151), is **GRANTED in PART** and **DENIED in PART**.

2) Defendants must provide a supplemental response to Request for Production No. 11 consistent with this memorandum decision and order **on or before May 29, 2018**.

DATED: May 15, 2018

Candy W. Dale
U.S. Magistrate Judge

MEMORANDUM DECISION AND ORDER GRANTING IN PART AND DENYING IN PART PLAINTIFFS' SECOND MOTION TO COMPEL DISCOVERY– 15