Erik F. Stidham, ISB No. 5483
A. Dean Bennett, ISB No. 7735
Jennifer M. Jensen, ISB No. 9275
HOLLAND & HART LLP
800 West Main Street, Suite 1750
P.O. Box 2527
Boise, Idaho  83701-2527
Telephone:   (208) 342-5000
Facsimile:    (208) 343-8869
E-mail:    efstidham@hollandhart.com
           adbennett@hollandhart.com
           jmjensen@hollandhart.com

Attorneys for Plaintiffs

**UNITED STATES DISTRICT COURT**

**DISTRICT OF IDAHO**

| | |
|---|---|
| EDMARK AUTO, INC., an Idaho corporation; CHALFANT CORP., an Idaho corporation,<br><br>    Plaintiffs,<br><br>vs.<br><br>ZURICH AMERICAN INSURANCE COMPANY, a New York corporation; and UNIVERSAL UNDERWRITERS SERVICE CORPORATION, a Delaware corporation,<br><br>    Defendants. | Case No.  1:15-CV-00520-EJL-CWD<br><br>**MEMORANDUM IN SUPPORT OF PLAINTIFFS' MOTIONS IN LIMINE #1 THROUGH #3** |

Plaintiffs Edmark Auto, Inc. and Chalfant Corp. ("Dealers") file this Memorandum in Support of its Motions in Limine #1 Through #3.  Plaintiffs file contemporaneously herewith the Declaration of Jennifer M. Jensen in Support of Motions in Limine #1 Through #3 ("Jensen Decl.").

### I. MOTION IN LIMINE #1
### (Providing Legal Interpretations of Contracts or Legal Conclusions)

**A.     BACKGROUND**

Insurers' expert disclosure indicates Kathi Ingham, a non-retained expert for Insurers, intends to give testimony that constitutes legal opinions on the meaning of the No Charge Back Agreement, which the Insurers have called the "DDRA Addendum" or the "custodial agreement" in this lawsuit.  Jensen Decl., Ex. A (Insurers' expert disclosure); Dkt. 72-3 (No Charge Back Agreement).  The opinions Ms. Ingham intends to provide are improper testimony, giving legal conclusions and conclusions on ultimate issues.  Likewise, Insurers have sought to elicit legal opinions regarding the No Charge Back Agreement from other witnesses, have sought to use such testimony in prior filings in this case, and apparently intend to do this again at trial.

The interpretation of the No Charge Back Agreement is a central issue in this case.  In the order denying Insurers' motion for summary judgment, the Court stated that the agreement is "ambiguous and there are genuine disputes of material fact concerning the parties' intent that must be decided by the jury."  Dkt. 145 at 11.

**1.     The Terms of the No Charge Back Agreement.**

The No Charge Back Agreement expressly states that the "total of all fees in Dealer's Designated Refund Account accurately reflect the amount of Dealer's future liabilities for refunds under Section (2b) of this program and are being transferred to [Universal] specifically for this purpose."  Dkt. 72-3 (No Charge Back Agreement), ¶ 1.  Consistent with that intent and the express terms, Dealers paid a fee per vehicle service contract sold, and, in turn, Universal was obligated to pay all charge backs for vehicle service cancellations after 90 days.  *Id.* ("refunds shall be paid by Company").  Universal was to manage the program by adjusting the amount of the fee Dealers paid into the program, as adjusting the fee was Universal's sole right.

*Id.*, ¶ 4.  Universal was to invest the money in the account to ensure there were adequate funds to cover current and future charge backs and to report periodically on the investment allocation.  *Id.*, ¶ 5 ("Dealer will periodically receive statements from Company, on a ___ basis, indicating how Dealer's Designated Refund Account has been allocated.").  Dealers were not allowed to skim interest or investment earnings from the account and thus frustrate Universal's ability to meet its duties to pay all charge backs; the funds were to remain in the program to cover the Dealers' future liability for charge backs.  Dkt. 72-3, ¶ 3 ("Dealer will not receive any interest or other income generated from fees in Dealers Designated Refund Account.").  If Universal had performed its duties under the No Charge Back Agreement, there would not be any deficiency.

## 2. The Insurers' Seek to Have Ms. Ingham and Others Provide Legal Opinions Regarding Meaning of the Contract.

Insurers assert no management of the Dealers' funds was required under the No Charge Back Agreement and Vehicle Service Contract Dealer Agreement.  Rather, the program was strictly dollars in, dollars out with no obligation to manage the funds so that they covered the Dealers' future liability.  According to Insurers, Universal had no duty to adjust the fee, invest the money, or report to the Dealers.  And Insurers claim Dealers are responsible to pay the deficiency.  *See* Dkt. 72-1 (Insurers' Memo. ISO MSJ).

One example of the Insurers' intent to introduce legal opinions is Ms. Ingham.  Much of Ms. Ingham's intended areas of testimony constitute legal argument and legal opinions.  As excerpted below, she asserts legal conclusions on the meaning of the contract or contracts that governs the No Charge Back Program.[1]  Dealers object to such testimony, including but not limited to:

---

[1] The Insurers have called the No Charge Back Program the "custodial account" and the "DDRA" since the lawsuit began.

- "She will testify about the differences between 'traditional no charge back' programs and the Dealer's Designated Refund Account (DDRA) Program of Edmark and Chalfant." Jensen Decl., Ex. A (Insurers' expert disclosure at 4).

- "She will explain the differences between the Edmark and Chalfant VSC program and other F&I programs offered to Edmark and Chalfant." *Id.*

- "She will describe the Edmark and Chalfant DDRA Program, **its scope and purpose**, and Universal/Zurich's monitoring and oversight of the DDRA." *Id.* (emphasis added).

- "More specifically, and without limiting the foregoing, Ms. Ingham may testify to the following opinions to a reasonable degree of professional probability: . . . The DDRA Program set up a custodial account on behalf of the dealers to maintain a fund to pay the dealers' share of VSC cancellation refunds." *Id.* at 5.

- "Under the DDRA Program, the dealers bore the risk that the DDRA fund would be sufficient to pay the dealers' share of VSC cancellation refunds. To the extent the funds in the DDRA were insufficient to pay the dealers' share of VSC cancellation refunds, the dealers, according to the terms of the DDRA Addendum, were required to pay the deficiency. In contrast, under a traditional 'no charge-back' program, the underwriter or administrator (Universal/Zurich), and not the dealer, bore the risk of payment of the dealers' share of VSC cancellation refunds." *Id.*

- "[U]nder the Edmark/Chalfant DDRA Program, since Edmark and Chalfant assumed the risk of payment of the dealers' share of cancellation refunds, Universal/Zurich did not charge any additional premium or fee . . . ." *Id.* at 6.

- "Universal/Zurich did not add to the DDRA any interest or other investment returns, if any, on the balance in the DDRA because the DDRA Addendum provided that Edmark and chalfant would not receive any interest or income generated from the custodial fees in the DDRA." *Id.*

Insurers also intend to have Ms. Ingham provide a legal conclusion about something other than the contract at issue. They intend to have her testify that "VSCs are not insurance products. . . . The provisions of Idaho Code § 41-1024 are not applicable to Universal and Zurich's management of VSCs sold by Edmark and Chalfant dealerships or their management of the DDRA." *Id.* Given the intended testimony described in Insurers' expert disclosure and prior mischaracterizations of the testimony of others, including Dealers' industry expert, Robert

Anderson, the Insurers seek to introduce improper legal opinion testimony including the legal interpretation of the No Charge Back Agreement or other related agreements.

**B.  SUBJECT OF MOTION IN LIMINE #1**

Any and all testimony, references to testimony, or argument based upon the testimony of Kathi Ingham relating to Ms. Ingham's opinion of the legal interpretation of the No Charge Back Agreement or any other related agreement, testimony opining on ultimate issues related to the contracts at issue, and the interpretation and application of Idaho insurance statutes.

Any questioning or testimony of other witnesses on the legal interpretation of the No Charge Back Agreement or any other related agreement, testimony opining on ultimate issues related to the contracts at issue, and the interpretation and application of Idaho insurance statutes.

**C.  ARGUMENT**

Ms. Ingham's testimony stating or assuming how the No Charge Back Agreement, or other agreements or statutes should be interpreted, is improper.

**1.  Witnesses may not provide legal meaning or interpret a contract.**

"In general, the interpretation of a contract . . . is a matter of law for the Court." *Stewart Tit. Ins. Co. v. Credit Suisse*, 2015 WL 4250704, at *4 (D. Idaho 2015) (citing *PMI Mort. v. American*, 2008 WL 3838297 (9th Cir. 2008) (unpublished disposition) (excluding expert's legal interpretation of policy term)). "[A]n expert witness 'cannot give an opinion as to her legal conclusion, i.e., an opinion on an ultimate issue of law.'" *Id.* (quoting *Nationwide Transp. Fin. v. Cass Info. Sys., Inc.*, 523 F.3d 1051, 1058 (9th Cir. 2008) (excluding expert testimony labeling conduct as "wrongful" or "intentional").

In *Stewart Title*, the court cautioned that "[t]he expert may not testify about what a certain term in the policy means and whether the insured or insurer 'violated' or 'complied with' that term. Embedded in such testimony are legal conclusions about contract interpretation and

MEMORANDUM IN SUPPORT OF PLAINTIFFS' MOTIONS IN LIMINE #1 THROUGH #3- 5

breach." *Id.* at 5.  Or as another court put it, "[c]ontract interpretation is a matter of law for the Court. Expert 'testimony cannot be used to provide legal meaning or interpret [a contract] as written. . . . But, an expert can testify about the practices and norms of an industry if the expert is 'qualified as an expert by knowledge, skill, experience, training, or education.'" *Med. Sales & Consulting Grp. v. Plus Orthopedics USA, Inc.*, 2011 WL 290986, at *3 (S.D. Cal., 2011) (internal quotation marks and citations omitted).

### 2. Insurers should be prevented from offering legal opinion testimony.

In the description of intended testimony, Insurers set up a dichotomy between the program offered to Dealers and a so-called "traditional no charge back program."  In doing so, they use Ms. Ingham to assume that Insurers' interpretation of the No Charge Back Agreement is correct, or outright assert interpretations to sections of the contract, in order to conclude the No Charge Back Agreement is different than a "traditional no charge back program."  This is improper and should be differentiated from appropriate testimony about what Ms. Ingham believed the contracts to mean, or what the Insurers believed the contracts to mean.  Ms. Ingham may not provide an opinion of what the No Charge Back Agreement or other contracts **actually** mean and further has no foundation to provide an opinion on what constitutes a traditional no charge back program under the law.  *See Stewart Tit. Ins. Co.*, 2015 WL 4250704, at *4; *Nationwide Transp. Fin.*, 523 F.3d at 1058; *Med. Sales & Consulting Grp.*, 2011 WL 290986, at *3.  And she may not provide a legal opinion whether Idaho Insurance Code applies to vehicle service contracts or any other aspect of the finance and insurance product business.  *Id.*

To the extent Insurers intend to question Mr. Anderson or other witnesses about the legal interpretation of contracts or other ultimate legal issues, they should be precluded from doing so, to the same extent they should be barred from eliciting such testimony from Ms. Ingham.

### D.  CONCLUSION

The Dealers respectfully request the Court exclude Ms. Ingham's testimony asserting the meaning of the No Charge Back Agreement's terms (e.g., which party must pay a deficiency in the account, whether interest or investment funds must be paid into the account); whether Idaho insurance statutes apply to vehicle service contracts; or any other legal interpretation, application, or conclusion.  Such testimony is improper legal opinion testimony.

## II.  MOTION IN LIMINE #2
### (Investment Return Information Not Provided in Discovery)

### A.  BACKGROUND

#### 1.  Insurers' use and/or investment of the $80 fees is material.

Universal and Zurich have repeatedly taken the position that they do not have information on their investment returns and that this information is irrelevant to any claim or defense in this case.  The Court has consistently disagreed with the Insurers.  What the Insurers have provided as information in response to the Court's orders is incomplete, misleading, and without foundation.  Accordingly, the Insurers should be barred from introducing evidence at trial about their investment performance, returns, rates of return, or losses, as set forth below.

The use and investment of the fees is relevant in many respects, including that Zurich admitted it took the funds, commingled them, and invested them for its own benefit, which is a basis for the Dealers' breach of fiduciary duty claim.  The use and investment of the funds is also relevant to Universal's contract duties.  As explained above, how the Insurers invested the commingled funds that included Dealers' $80 payments is relevant to how the funds could have been managed so Universal could meet its contractual duty to maintain funds to cover the Dealers' anticipated future liability for charge backs.  Investment is also relevant to damages.

**2.      The discovery dispute over Request for Production 11.**

A summary of this particular discovery dispute is useful.  On May 1, 2017, Edmark Auto served Request for Production 11, which states, "Please produce all Documents Related To Zurich's use and/or investment of the $80 No Chargeback Fees collected by Zurich."  Zurich refused to provide any documents responsive to this request.  Dkt. 221-1 (6-28-17 Response).  Dealers moved to compel on RFP 11 and prevailed.  The Court noted that the use and/or investment of the fees "is relevant to the Dealers' claims.  The request is also relevant to the question of damages." Dkt. 134 at 30.  In response to the Court's order, Zurich produced six lists of percentages of rates of return on money market accounts for a limited time period.  Dkt. 221-6 (money market lists Bates Nos. 182608-13).  Zurich produced no long-term investment information, despite Zurich's 30(b)(6) designee having previously testified that the $80 fees were commingled with other funds that Zurich treated as general revenue, including funneling to other related entities for long-term investment for the benefit of the international Zurich conglomerate. Dkt. 221-9 (Zurich 30(b)(6) 26:8-30:24); Dkt. 221-2 (3-20-18 Supplemental Response).

Dealers again successfully moved to compel on RFP 11.  Dkt. 151 (Second Motion to Compel); Dkt. 169 (Order on Second Motion to Compel).  In response to the Court's second order, Zurich produced two pages: a screen shot of two percentages and a conclusory chart listing investment return numbers devoid of percentages of return, principal from which the returns were generated, or any information on how the table was created, just further conclusory statements about "an internal computing methodology" Zurich and Universal claimed to have applied.  Dkt. 221-3 (6-5-18 Supplemental Response) at 9; Dkt. 221-7, (screen shot 182718); Dkt. 221-8, (chart 182719).

The Dealers prevailed on a third motion to compel production responsive to RFP 11. Dkt. 188; (Motion for Clarification); Dkt. 207 (Order on Motion for Clarification).  In opposition

to the motion, Insurers again took the position that they had no further documents to provide, even though they had never provided its standard financial statements other than two years' worth (2015-2016) in response to punitive damages discovery. Dkt. 165-1; Dkt. 165-2. Insurers took this position, despite having represented in discovery responses that their investments were subject to (withheld) pooling agreements with other entities in the Zurich conglomerate. Dkt. 221-3 (6-5-18 Supplemental Response). The binding testimony about pooling of revenue for investment was also made by Zurich's 30(b)(6) designee, although she did not answer questions about what the returns were or the rates of return, despite Rule 30(b)(6) Topic 8, which expressly required Zurich to testify about "Zurich's and/or Universal's returns on investment of the No Charge Back Fees." Dkt. 181-2, Ex. E (Second Amended Notice of Zurich 30(b)(6) Deposition); Dkt. 221-9 (Zurich 30(b)(6) 26:8-30:24, 175:3-175:10).[2] The Court ordered Insurers to produce financial statements for 2010, 2011, 2013, 2014, 2017;[3] the pooling agreements; and summary bank account statements. Dkt. 207.

      Zurich refused to present a witness to testify about the documents it had been successively compelled to produce since the date of the Rule 30(b)(6) deposition, for which two hours of testimony time remained. Dkt. 181 (Insurers' motion for protective order). In light of the upcoming trial date, questioning on the compelled documents was not permitted by the Court.

---

[2] "Q: Zurich made interest off the money, right?
A: I don't know.
Mr. Burke: Objection, foundation.
Q: Has Zurich ever lost money on its investments in a year?
A: I'm not qualified to answer that question."

[3] Presumably because the financial statements are done biannually, Insurers produced the 2009-2010 statement in addition to the years listed above.

MEMORANDUM IN SUPPORT OF PLAINTIFFS' MOTIONS IN LIMINE #1 THROUGH #3- 9

### B. SUBJECT OF MOTION IN LIMINE #2

Documents Bates Nos. 182718 (Dkt. 221-7), 182719 (Dkt. 221-8), 182608-13 (Dkt. 221-6), and any evidence or argument related thereto; any testimony or evidence repeating, augmenting, or supplementing Insurers' written responses to discovery (Dkt. 221-1; Dkt. 221-2; Dkt. 221-3; Dkt. 221-4); and any other testimony or other evidence Insurers may attempt to offer on investment returns or manner of investment that was not disclosed in discovery.

### C. ARGUMENT

#### 1. A district court may exclude evidence a party failed to timely disclose.

A "court may validly exclude, as a discovery sanction, evidence not produced in discovery." *Zhang v. Am. Gem Seafoods, Inc.*, 339 F.3d 1020, 1028 (9th Cir. 2003). In *Zhang*, the court affirmed the exclusion of a written policy because it was not produced in discovery, and because "there was no foundation establishing that the document was the policy of the corporate defendants." *Id.* (citing F.R.C.P. 37(c)(1)); *see also Yeti by Molly, Ltd. v. Deckers Outdoor Corp.*, 259 F.3d 1101, 1105-06 (9th Cir. 2001) ("Courts have upheld the use of the sanction [of exclusion from evidence] even when a litigant's entire cause of action or defense has been precluded."); *Anhing Corp. v. Viet Phu, Inc.*, 671 F. App'x 956, 959 (9th Cir. 2016) (unpublished) (affirming district court's ruling to exclude evidence of damages as a discovery sanction for failure to disclose computation of damages); *Grewall v. Choudhury*, 377 F. App'x 617, 618 (9th Cir. 2010) (unpublished) (finding that district court did not abuse its discretion by excluding belatedly produced documents from use at trial.").

      **2.**      **The Court should exclude from evidence Bates Nos. 182718, 182719, any evidence or argument related thereto, and any and all information on investment returns Insurers attempt to offer which was not disclosed in discovery.**

**1996-2005**.  The Court should exclude all evidence Insurers attempt or intend to introduce, relating to their investment returns or manner of investment, during the period 1996-2005, of the commingled finance and insurance product revenues that included the $80 fees from Dealers.  They refused to provide this information in discovery and should be precluded from offering any evidence on that subject.  *See Zhang*, 339 F.3d at 1028; *Yeti by Molly*, 259 F.3d at 1105-06; *Anhing Corp.*, 671 F. App'x at 959; *Grewall*, 377 F. App'x at 618.

**2006-2008**.  The Court should exclude any evidence Insurers attempt or intend to introduce, relating to their investment returns, during the period 2006-2008.  All that has been provided on this time period are two percentages in a screen shot with no foundation whatsoever.  Dkt. 221-7 (screen shot 182718).  Further, the screen shot selectively omits whole categories of investment assets reflected in Insurers' financial statements.  *Id.*; Dkt. 221-3 (6-5-18 Supplemental Response); Dkt. 165-1 (Universal Consolidated Financial Statements 2015-2016 at 182700-03 (showing types of investments not included in Bates No. 182718); Dkt. 165-2 at 182619-21 (Zurich Consolidated Financial Statements 2015-2016 (same)).

Accordingly, the screen shot itself should be excluded because it has no foundation and on its face selectively omits information.  And Insurers have prevented Dealers from learning anything about its foundation by producing it late and refusing deposition testimony on the document.

Any further evidence on the period 2006-2008 should be excluded because Insurers have represented they have no further information.  Dkt. 221-5 (9-19-18 hearing transcript), at 15-16.  To the extent they find some before trial, they should be precluded from introducing it.  *See*

*Zhang*, 339 F.3d at 1028; *Yeti by Molly*, 259 F.3d at 1105-06; *Anhing Corp.*, 671 F. App'x at 959; *Grewall*, 377 F. App'x at 618.

**2009-2015**.  The Court should exclude, related to investment returns during the period 2009-2015: (1) the conclusory chart Zurich produced (Bates No. 182719), (2) the money market percentage lists, (3) testimony or other evidence repeating, augmenting, or supplementing Insurers' written responses to discovery (Dkt. 221-1; Dkt. 221-2; Dkt. 221-3; Dkt. 221-4), and (4) any evidence Insurers attempt or intend to introduce that has not been produced in discovery.

Zurich's written responses to Request for Production 11 seek to avoid addressing long-term investment returns by unilaterally imposing limitations on the information provided.  Zurich testified, through its 30(b)(6) designee, that it did not know its investment returns on the commingled monies that included the $80 payments and that were funneled through various Zurich entities worldwide.  Dkt. 221-9 (Zurich 30(b)(6) 26:8-30:24, 175:3-175:10).  Zurich's written discovery response seeks to avoid addressing the scope and thrust of RFP 11, which are the long-term investment returns.  Instead, Zurich unilaterally imposed limitations.  For instance, Zurich states that the commingled funds were not "**directly** invest[ed]" by Zurich American Insurance Company and therefore Zurich could not provide information on investments.  Dkt. 221-3 (6-5-18 Supplemental Response).  And Zurich represented that "Universal has no record of any money from any F&I revenue sources being deposited in its long-term portfolio **since 2010**, other than the one deposit on August 18, 2014" and therefore there was no information on investments except as relevant to one day's worth of information in the relevant 20-year time period.  *Id.*  The relevant time period is 1996 through 2015, not 2010 onward.  And the question is not whether Zurich American Insurance Company directly invested money, but rather how the

funds were used and invested, in light of the fact Zurich's 30(b)(6) designee testified the funds were commingled and spread out throughout the larger web of Zurich entities.

Accordingly, the conclusory chart (Bates No. 182719) should be excluded because it lacks foundation, omits principal invested and the rates of return, written discovery responses indicate information is being withheld through Insurers' unilaterally imposed limitations, and Insurers have refused any deposition testimony thereon.  Because of lack of foundation and unilaterally imposed limitations, testimony or other evidence repeating, augmenting, or supplementing the written discovery responses should be excluded as well.  For the same reasons (lack of foundation and unilaterally imposed limitations), the lists of money market percentages (Bates Nos. 182608-13) should also be excluded.  And as with the 2006-2008 time period, because Insurers have taken the position they have no further information on their investments, they should be barred from introducing any information they have not produced.  *See Zhang*, 339 F.3d at 1028; *Yeti by Molly*, 259 F.3d at 1105-06; *Anhing Corp.*, 671 F. App'x at 959; *Grewall*, 377 F. App'x at 618.

    D.    CONCLUSION

The Dealers respectfully request the Court exclude the above-identified evidence Insurers may attempt to introduce at trial, relating to their investment returns.

### III.   MOTION IN LIMINE #3
### (Sale Price of Edmark Auto's Dealerships to Third Party)

    A.    BACKGROUND

Edmark Auto sold its dealerships to a third party, Kendall Auto, in 2016.  This sale occurred well after the No Charge Back Program terminated (May 2015).  In discovery, Insurers requested information on this sale of the dealerships.  Edmark Auto permitted discovery into the issue because it had identified earlier in the litigation that it sought as a potential component of

damages the reduced sale price of the dealerships due to the continuing future liability of vehicle service contract charge backs. *See, e.g.*, Jensen Decl., Ex. B (Edmark 30(b)(6) 189:20-191-3). As part of that discovery, Edmark Auto produced the sale documents (which included the sale price) for the transaction with Kendall Auto, pursuant to the protective order entered in this case. Jensen Decl., ¶ 3.

Edmark Auto is no longer pursuing the reduction in sale price as an item of damages. The price for which Edmark Auto's dealerships were sold is irrelevant. Other evidence of financial condition of the Plaintiffs and their representatives is also irrelevant.

**B.    SUBJECT OF MOTION IN LIMINE #3**

Any and all testimony, documents, references to testimony or documents, and argument on the amount of the sale price of Edmark Auto's dealerships ("Sale Price Evidence").

Any and all testimony, documents, references to testimony or documents, and argument on the financial condition of Edmark Auto, Chalfant Corp., Jim Chalfant, Dave Edmark, or any other shareholder in the companies ("Financial Condition Evidence").

**C.    ARGUMENT**

The Sale Price Evidence and Financial Condition Evidence are irrelevant to any claim or defense in this case. *See* F.R.E. 402 ("Irrelevant evidence is not admissible."). Or, at the very least, its "probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, [or] misleading the jury[.]" F.R.E. 403.

District courts in the Ninth Circuit and elsewhere have determined that "[e]vidence of a party's financial condition is generally not relevant and can be unduly prejudicial, as it can distract the jury from the real issues in the case." *In re Homestore.com, Inc. Sec. Litig.*, No. cv-01-11115, 2011 U.S. Dist. LEXIS 10677 at *7 (C.D. Cal. Jan. 25, 2011) (citing *Util. Trailer Sales of Kansas City, Inc. v. MAC Trailer Mfg., Inc.*, 2010 U.S. Dist. LEXIS 48089 (D. Kan.

May 14, 2010)); *see also Rogers v. S. Star Logistics, Inc.*, No. 3:14-cv-179, 2015 U.S. Dist. LEXIS 69526 at *5 (M.D. Ala. May 29, 2015) ("Under Alabama law, evidence of the defendant's wealth is highly prejudicial and, therefore, inadmissible") (internal quotation marks and citations omitted).

Courts routinely exclude evidence of a party's financial position where such evidence is irrelevant to the claims under Rules 401 and 402 of the Federal Rules of Evidence. *See, e.g.*, *Farris v. Int'l Paper, Inc.*, No. 5:13-cv-00485, 2014 U.S. Dist. LEXIS 162335 at *65-67 (C.D. Cal. Nov. 17, 2014); *Herwick v. Budget Rent a Car Sys.*, No. cv-10-00409, 2011 U.S. Dist. LEXIS 16813 at *18-20 (C.D. Cal. Mar. 22, 2011) (granting motion in limine to exclude evidence of parties' financial conditions as irrelevant to plaintiffs' breach of contract claim)

While Idaho law does allow evidence of a defendant's wealth to be admitted for the purpose of determining the amount of punitive damages necessary to deter or punish a defendant, *Schaefer v. Ready*, 134 Idaho 378, 381, 3 P.3d 56, 59 (2000), there is no such claim against Dealers. *See, e.g., Catipovic v. Turley*, 68 F. Supp. 3d 983, 1000-03 (N.D. Iowa 2014) (excluding evidence of parties' relative wealth as irrelevant due to lack of punitive damages claim). Further, evidence of a party's wealth or financial condition is excluded by courts where the potential for prejudice and misleading the jury is apparent. *See Schaefer*, 134 Idaho at 381.

Here, the Sale Price Evidence and Financial Condition Evidence are irrelevant to any claim or defense. Reduction in sale price is not an item of damages. There is no claim of punitive damages asserted against the Dealers. Any attempt to offer such evidence could only be to prejudice the jury against the Dealers by implying that regardless of the merits of this lawsuit, the jury need not award damages because of the amount for which Edmark Auto sold its dealerships or other evidence showing financial condition. *See Schaefer*, 134 Idaho at 381, 3

P.3d at 59; *Catipovic*, 68 F. Supp. 3d at 1000-03; *Farris*, 2014 U.S. Dist. LEXIS 162335, at *65-67; *Herwick*, 2011 U.S. Dist. LEXIS 16813, at *18-20.

### D.   CONCLUSION

The Dealers respectfully request the Court exclude the Sale Price Evidence and Financial Condition Evidence because it is irrelevant.  Alternatively, the Dealers request the Court exclude this evidence because its probative value is substantially outweighed by the danger of undue prejudice, confusing the issues, and/or misleading the jury.

DATED this 19th day of October 2018.

                                        HOLLAND & HART LLP

                                        By */s/ Jennifer M. Jensen*
                                             Jennifer M. Jensen, for the firm
                                             Attorneys for Plaintiffs

## CERTIFICATE OF SERVICE

  I HEREBY CERTIFY that on the 19th day of October 2018, I filed the foregoing electronically through the CM/ECF system, which caused the following parties or counsel to be served by electronic means, as more fully reflected on the Notice of Electronic Filing:

| | |
|---|---|
| Richard H. Greener | rgreener@parsonsbehle.com |
| Christopher Burke | cburke@parsonsbehle.com |
| Slade Sokol | ssokol@parsonsbehle.com |
| Parsons Behle & Latimer | |
| 800 W. Main Street, Ste. 1300 | |
| Boise, ID  83702 | |
| Telephone: (208) 562-4900 | |
| Facsimile: (208) 562-4901 | |
| | |
| John R. Lund (Admitted *Pro Hac Vice)* | jlund@parsonsbehle.com |
| Parsons Behle & Latimer | |
| 201 S. Main Street, Suite 1800 | |
| Salt Lake City, UT 84111 | |
| Telephone: (801) 536-6872 | |
| Facsimile: (801) 536-6111 | |

                */s/ Jennifer M. Jensen*
                Jennifer M. Jensen for HOLLAND & HART LLP

11509731_3