# UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| EDMARK AUTO, INC., an Idaho corporation; CHALFANT CORP., an Idaho corporation,<br><br>    Plaintiffs,<br><br>    v.<br><br>ZURICH AMERICAN INSURANCE CO., a New York corporation; and UNIVERSAL UNDERWRITERS SERVICE CORP., a Delaware corporation,<br><br>    Defendants. | Case No. 1:15-cv-00520-BLW-CWD<br><br>MEMORANDUM DECISION AND ORDER |

## INTRODUCTION

The Court has before it four motions *in limine* including: Zurich American Insurance Company's and Universal Underwriters Services Corporation's (together, "Insurers") First Motion *in Limine* Regarding Bifurcation of Trial and Related Evidentiary Matters (Dkt. 215); Insurers' Second Motion *in Limine* Regarding Equitable Unjust Enrichment and Disgorgement Issues (Dkt. 216); Insurers' Third Motion *in Limine* Regarding Testimony of Robert Anderson (Dkt. 217).

The fourth motion *in limine* was filed by Edmark Auto, Incorporated and Chalfant Corporation (together, "Dealers"). Dealers' motion contains three distinct subparts, which Dealers have labeled motions one through three. Dkt. 222-1. Dealers' first motion seeks to exclude the report and testimony of Kathi Ingham. *Id.* at 2-7. Dealers' second motion seeks to exclude specific pieces of evidence pursuant to Federal Rule of Civil Procedure 37. *Id.* at 7-10. Dealers' last motion seeks to exclude any evidence related to the sale of Edmark to Kendall Auto in 2016 and any "Financial Condition Evidence" related to the Dealers and their namesakes. *Id.* at 10-16.

## FACTUAL BACKGROUND

The factual background of this case has been described in extensive detail by Judge Candy W. Dale (Dkt. 134 and 169) and Judge Edward J. Lodge (Dkt. 145). The Court will assume the reader's familiarity with those decisions.

## LEGAL STANDARD

There is no express authority for motions *in limine* in either the Federal Rules of Civil Procedure or the Federal Rules of Evidence. Nevertheless, these motions are well recognized in practice and by case law. *See, e.g.*, *Ohler v. United States*, 529 U.S. 753, 758 (2000). The key function of a motion *in limine* is to "exclude prejudicial evidence before the evidence is actually offered." *Luce v. United States*, 469 U.S. 38, 40 (1984).

## ANALYSIS

1.  **Insurers' First Motion *in Limine* Regarding Bifurcation of Trial and Related Evidentiary Matters (Dkt. 215)**

    A.  ***Arguments Raised in Motion***

Insurers make four requests, the first two of which are interrelated. First, Insurers ask the Court to bifurcate the trial to separate the jury's consideration of liability and compensatory damages from their consideration of punitive damages. Dkt. 215-1 at 3-7. Second, Insurers ask the Court to issue an order precluding Dealers from "referenc[ing] … or [producing] evidence … [related to] Defendants' company-wide financial condition and net worth until" the punitive damages phase of the trial. *Id.* at 6. Defendants specifically identify "(1) Universal's and Zurich's company-wide consolidated audited financial statements for 2010-2017; and, (2) Universal's and Zurich's company-wide balance sheets and annual reports" as the evidence they want excluded from the liability phase. *Id.* at 5. Third, Insurers ask the Court to restrict the financial information presented to the jury during the punitive phase of the proceedings to their 2017 audited financial information. *Id.* Finally, Insurers seek to exclude parent company Zurich Financial Group's financial information from trial. *Id.* at 8-10.

**B.**   ***Legal Standards Applicable to the Arguments Raised in Insurers' First Motion* in Limine**

In the normal course of litigation, all claims and issues in a civil action are presented for resolution in one trial. Federal Rule of Civil Procedure 42(b), however, empowers courts to bifurcate a trial for any one of the following reasons: (1) "convenience"; (2) "to avoid prejudice"; or (3) "to expedite and economize." A district court is given "broad discretion" to determine whether bifurcation is appropriate. *Zivkovic v. S. Cal. Edison Co.*, 302 F.3d 1080, 1088 (9th Cir. 2002). Absent some experience demonstrating the worth of bifurcation, "separation of issues for trial is not to

be routinely ordered." Fed. R. Civ. P. 42(b) (advisory committee notes to the 1966 amendment). The party moving for bifurcation bears the burden of demonstrating that bifurcation is warranted. *See Spectra-Physics Lasers, Inc. v. Uniphase Corp.*, 144 F.R.D. 99, 101 (N.D. Cal. 1992).

Although bifurcation should not be "routinely ordered," this Court routinely bifurcates trials involving claims for punitive damages "to avoid placing evidence of a defendant's net worth before the jury in the main trial as liability is being considered." *PMG, Inc. v. Lockheed Martin Idaho Techs. Co.*, No. CV-02-539-E-BLW, 2006 WL 1207609, at *2 (D. Idaho Apr. 27, 2006) (Winmill, J.). Nevertheless, denial of a motion to bifurcate is appropriate where there is substantial overlap in the evidence that will be used to prove both liability and punitive damages. *See*, *e.g.*, *Hangarter v. Provident Life & Acc. Ins. Co.*, 373 F.3d 998, 1021 (9th Cir. 2004).

C. *Insurers' Request to Bifurcate Trial and Exclude Evidence Related to Punitive Damages Claims Is Conditionally Granted*

Insurers, who bear the burden under Federal Rule of Civil Procedure 42(b) to show that bifurcation is appropriate, argue that "evidence relating to … the … [Insurers'] company-wide financials and net worth should be excluded during the liability and compensatory damage phase of the trial." Dkt. 215-1 at 6. More specifically, Insurers seek an order precluding Dealers from presenting the following information prior to the punitive phase of the trial: "(1) Universal's and Zurich's company-wide consolidated audited financial statements for 2010-2017; and, (2) Universal's and Zurich's company-wide balance sheets and annual reports." *Id.* at 5.

In response, Dealers argue that they intend to use Insurers' company-wide consolidated audited financial statements, balance sheets, and annual reports to prove Insurers' liability. Specifically, Dealers assert that the financial information is relevant to the intent and knowledge elements of their fraud claim. Dkt. 234 at 3-6. Dealers also argue that "the return on investment of the funds in the No Charge Back Program demonstrates Insurers' breaches of contractual, fiduciary, and statutory duties, as well as damages related thereto." *Id.* at 6. Finally, Dealers argue that the Insurers produced the "No Charge Back Program" materials in such a way that the company-wide financial data appears in the same financial reports as those containing "information about the Insurers' management of revenue, the flow of funds that went into the No Charge Back Program, and the data from which reasonable rates of return were calculated for the purpose of showing liability (whether the funds were properly managed)." *Id.* at 7.

In evaluating the Parties' arguments, the Court is immediately confronted by the problem that Insurers have described the evidence they are seeking to exclude from the liability phase of the trial in the broadest of terms, while the Dealers have described with great generality how they will use this evidence to prove liability. At this point, the prudent course is to grant the Insurers' motion conditionally: During their case-in-chief, Dealers will be allowed to offer the evidence in support of their liability claims but not as part of their claim for punitive damages. If they are successful in persuading the Court that the evidence is admissible as part of their liability claims, the issues will be submitted to the jury without bifurcation. If the Dealers cannot convince the Court that

the evidence they are seeking to admit satisfies Rules 401, 402, and 403 with respect to Dealers' liability claims, then the Court will exclude them until the punitive damages phase of the trial.

### D. *Insurers Request to Exclude All Financial Records Except Their Audited 2017 Financial Statements Is Denied*

Next, Insurers argue that Dealers should be limited to presenting only 2017 company-wide financial information to the jury. Dkt. 215-1 at 7-8. This request is expanded in Insurers' Reply brief, in which they argue that the presentation of any financial records other than Insurers' audited financial statements (*e.g.*, balance sheets, profit and loss statements, income statements, etc.) would be prejudicial and misleading to the jury. Dkt. 242 at 7-8.

Insurers' argument is not well taken. First, it is the Court's experience that jurors are sufficiently savvy that they can distinguish between financial information from different years, especially when capable counsel is present on both sides. Second, in considering whether to grant punitive damages, the jury is entitled to more than a mere snapshot of Insurers' net-worth. *See White v. Ford Motor Co.*, 500 F.3d 963, 977 (9th Cir. 2007). To provide the jury with a full portrait of the Insurers' net-worth, Dealers are entitled to show how that net-worth has evolved temporally and may, in that effort, rely on documents outside of the Insurers' audited financial statements. Such evidence falls comfortably within the bounds of Federal Rules of Evidence 401, 402, and 403.

### E. *The Court Will Reserve Ruling on Whether Non-Party Zurich Insurance Group's Consolidated Financial Reports Are Admissible*

Finally, Insurers ask the Court to exclude evidence relating to Zurich Insurance Group's consolidated financial reports. Dkt. 215-1 at 8-10. Zurich Insurance Group is the parent corporation of both Insurers. *Id.* Dealers respond that they "do not intend to use the net worth of non-party Zurich Insurance Group to prove the amount of punitive damages that should be awarded against Insurers," but do intend to use the information to establish liability and compensatory damages. Dkt. 215 at 10.

Again, on this record, the Court cannot determine what, if anything, should be excluded from the jury. In general, the Court agrees that presentation of a parent company's financial information is inappropriate because the evidence is irrelevant and unfairly prejudicial when just the subsidiaries' conduct is at issue. *Fresno Rock Taco, LLC v. Nat'l Sur. Corp.*, No. 1:11-CV-00845-SKO, 2013 WL 2182864, at *7 (E.D. Cal. May 20, 2013). But the Court cannot say, on this record, that Zurich Insurance Group's financial information is *per se* irrelevant to Dealers' claims. As such, the Court will reserve ruling on this evidence until trial.

## 2. Insurers' Second Motion *in Limine* Regarding Equitable Unjust Enrichment and Disgorgement Issues (Dkt. 216)

### A. *Arguments Raised in Motion*

Insurers' second motion *in limine* contains three distinct arguments. First, Insurers ask the Court to find that Dealers are not entitled to a jury trial on their unjust enrichment claim and on the disgorgement remedy. Dkt. 216-1 at 3-4. Second, Insurers ask that any evidence related to "conscious wrongdoing," which is an element of the disgorgement

remedy, be reserved for the punitive phase of the trial.[1]  *Id.* at 4-6.  Third, Insurers ask the

Court to preemptively limit the profits subject to disgorgement.  *Id.* at 6-10.

Dealers oppose Insurers at every turn.  First, Dealers contend that disgorgement is

not purely an equitable remedy, and therefore should go to the jury.  Dkt. 235 at 6-9.

Second, Dealers strenuously argue against the imposition of a preemptive limit on the

profits subject to disgorgement.  *Id.* at 9-13.  According to Dealers, they are entitled to

prove the exact amount of profits that should be disgorged at trial subject to the sole

restriction that Dealers "are not seeking disgorgement of all 'company wide' profits in

general, … [but instead] specifically seek the profits from the sale of F&I products."

Dkt. 235 at 13.

### B.  *Legal Standards Applicable to the Arguments Raised in Insurers' Second Motion* in Limine

### (1)  The Jury Trial Right

The Seventh Amendment states "[i]n Suits at common law, where the value in

controversy shall exceed twenty dollars, the right of trial by jury shall be preserved."

"The right to a jury trial includes more than the common-law forms of action recognized

in 1791; the phrase 'Suits at common law' refers to 'suits in which legal rights [are] to be

ascertained and determined, in contradistinction to those where equitable rights alone

_____

[1] The Court will resolve this argument in the same manner outlined in its discussion of Insurers'
first motion in limine (Dkt. 215), *supra*.

[are] recognized, and equitable remedies [are] administered.'" *Chauffeurs, Teamsters & Helpers, Local No. 391 v. Terry*, 494 U.S. 558, 564 (1990).

The Supreme Court has developed a two-part test to determine if the jury trial right is triggered. "First, … [the court must] compare the … *action* to 18th-century actions brought in the courts of England prior to the merger of the courts of law and equity. Second, … [the court] examine the remedy sought and determine whether it is legal or equitable in nature." *Tull v. United States*, 481 U.S. 412, 417-418 (emphasis added). The second inquiry is the more important factor. *See Granfinanciera, S.A. v. Nordberg*, 492 U.S. 33, 42 (1989). The Supreme Court has "characterized damages as equitable where they are restitutionary, such as in 'action[s] for disgorgement of improper profits.'" *Tull*, 481 U.S. at 424.

When legal and equitable claims are joined in the same action, the trial judge has only limited discretion in determining the sequence of trial. This means that the court's discretion must be exercised to preserve the right to a jury trial, whenever possible. *Dollar Systems, Inc. v. Avcar Leasing Systems*, Inc., 890 F.2d 165, 170 (9th Cir. 1989). "[O]nly under the most imperative circumstances ... can the right to a jury trial of legal issues be lost through prior determination of equitable claims." *Dollar Systems*, 359 U.S. at 509. When legal and equitable claims involve the same set of facts, the right to a jury trial should predominate. If, however, the legal and equitable claims do not involve any common questions of law or fact, a court does not abuse its discretion by deciding the equitable claims prior to the legal claims. *Id.* at 170-71.

**(2)    The Causation Inquiry for Disgorgement**

Where a party seeks disgorgement as a remedy, the unjust enrichment of a conscious wrongdoer … is the net profit attributable to the underlying wrong. Restatement (Third) of Restitution and Unjust Enrichment § 51 (2011) (hereinafter, "Restatement").   In calculating the net profit, "the court may apply … tests of causation and remoteness" and may grant the conscious wrongdoer "a credit for money expended in … carrying on the business that is the source of the profit subject to disgorgement." *Id.*

**C.    *Dealers Are Entitled to a Jury Trial on All of Their Claims***

The Court begins by addressing Insurers' Seventh Amendment argument. Insurers' position contains a fundamental flaw: rather than analyzing, as they must, the nature of Dealers' *action*, Insurers instead focus on just one of the seven claims asserted by Dealers and Dealers' request for disgorgement as a remedy.  *Contra Wooddell v. Int'l Bhd. of Elec. Workers, Local 71*, 502 U.S. 93, 97 (1991) (requiring courts to evaluate the nature of the *action* when determining if there is a jury trial right).

Stepping back, the Dealers' Second Amended Complaint asserts claims for (1) breach of contract, (2) breach of covenant of good faith and fair dealing, (3) fraud and fraudulent concealment, (4) unfair business practices, (5) breach of fiduciary duty, (6) unjust enrichment, and (7) fraud in the inducement.  Dkt. 147 at 11-23.

Dealers' claims for breach of contract, fraud, fraud in the inducement, and unfair business practices are actions that would have been tried at law.  *See Full Spectrum*

*Software, Inc. v. Forte Automation Systems, Inc.*, 858 F.3d 666 (1st Cir. 2017) (finding that actions for fraud and unfair practices would have been tried at law); *Dairy Queen, Inc. v. Wood*, 369 U.S. 469, 477 (1962) (characterizing breach of contract claims as legal claims); 3 William Blackstone, Commentaries *432 ("[E]very kind of fraud is equally cognizable, and equally adverted to, in a court of law" as in a court of equity, "and some frauds are only cognizable [in a court of law], as fraud in obtaining a devise of lands."). Conversely, Dealers' claims for breach of fiduciary duty would have been tried in equity. *Chauffeurs, Teamsters & Helpers, Local No. 391*, 494 U.S. at 567; 2 J. Story, Commentaries on Equity Jurisprudence § 960, p. 266 (13th ed. 1886). Thus, the Court finds itself at the same place the Supreme Court was in *Chaffeurs, Teamsters and Helpers, Local 391*: "in equipoise as to whether … [Dealers' claims, in and of themselves,] entitle[] [Dealers] to a jury trial." 494 U.S. at 570.

Although the nature of Dealers' action is not dispositive, their requested relief is. Specifically, Dealers seek compensatory damages, punitive damages, and disgorgement. "[A]ctual and punitive damages … [are] the traditional form of relief offered in the courts of law." *Curtis v. Loether*, 415 U.S. 189, 196 (1974). Of course, the Supreme Court in *Curtis* did not "go so far as to say that any award of monetary relief must necessarily be 'legal' relief" but it is nevertheless true that "the 'general rule' [is] that monetary relief is legal." *Feltner*, 523 U.S. at 352. With respect to disgorgement, Section 4 of the Restatement reads "[i]f restitution to the claimant is accomplished exclusively by a judgment for money, without resort to any of the ancillary remedial devices traditionally

available in equity but not at law, the remedy is presumptively legal." *Accord Whitehead v. Shattuck*, 138 U.S. 146, 151 (1891) ("[W]here an action is simply for the recovery and possession of specific, real, or personal property, or for the recovery of a money judgment, the action is one at law."). Here, any judgment in favor of Dealers to account for disgorgement will solely be for money; there is no need to resort to constructive trusts or other legal figments. Though it is true that the Supreme Court in *Tull* categorized the disgorgement of illicit profits as an equitable remedy, 481 U.S. at 417-418, the Court does not read *Tull* as a categorical mandate to treat all actions for disgorgement of profits as equitable. As a result, the Court concludes that Dealers are entitled to a jury trial on all of their claims and requested remedies.

> **D.**     ***The Court Will Not Preemptively Impose a Temporal Limitation on the Profits Subject to Potential Disgorgement***

The Court is also unpersuaded that it should impose, at this time, a temporal limitation on the profits made by Insurers that are subject to disgorgement. Section 51 of the Restatement reads, "the court may apply … tests of causation and remoteness" and may grant the conscious wrongdoer "a credit for money expended in … carrying on the business that is the source of the profit subject to disgorgement." *Id.* Critically, the Restatement does not affirmatively suggest that the Court should impose a temporal limitation, especially before trial.

The cases cited by Insurers are similarly unpersuasive.[2]  In *Saint Alphonsus Diversified Care, Inc. v. MRI Assocs.*, LLP, 157 Idaho 106, 131 (2014) the Idaho Supreme Court found that the trial judge properly granted a directed verdict where one partner claimed that another had violated its duty of loyalty by appropriating a partnership opportunity three years *after* the partnership ended.  In those circumstances, the Idaho Supreme Court found that "opening the … facility is too remote in time from both the dissociation and the expiration of the non-compete obligation to find … damages."  *Id.* at 131.  Although it is certainly true that the Idaho Supreme Court relied in part on the temporal gap between the termination of the partnership and the development of the facility in concluding that a directed verdict was appropriate, that inquiry came within what appears to be a but-for and proximate-cause inquiry.  *Saint Alphonsus*, 157 Idaho at 132 ("The eventual establishment of an MRI facility in Eagle by IMI under no stretch of the imagination could be construed as usurping a partnership opportunity of any of the MRI Entities.").

Though it is true that the proximate-cause and but-for causation inquiries called for by the Restatement and *St. Alphonsus* incorporate a temporal inquiry, neither the Restatement nor *St. Alphonsus* lend any support to preemptively setting a temporal limitation on disgorgement prior to trial.  Considering the foregoing, the Court will not, at

---

[2] The Court has reviewed and is also not persuaded by *Maz Partners LP v. Shear*, 265 F. Supp. 3d 109 (D. Mass. 2017), *Lanovaz v. Twinings North America, Inc.*, No. 12-cv-02646-R, 2015 WL 729705 (N.D. Cal. Feb. 19, 2015), and *Pender v. Bank of Am. Corp.*, No. 3:05-CV-00238-GCM, 2017 WL 1536234 (W.D.N.C. April 27, 2017).

this stage of the proceedings, to impose a temporal limitation on the profits that are potentially subject to disgorgement.

3.    **Insurers' Third Motion *in Limine* Regarding Testimony of Robert Anderson (Dkt. 217)**

   A.    ***Arguments Raised in Motion***

Insurers' final motion seeks to exclude the report and testimony of Dealers' expert, Robert Anderson. Mr. Anderson is an insurance executive with forty years of experience. This experience includes the negotiation of specialty insurance programs. Dkt. 219 at 28. He holds a degree from Claremont Men's College and attended the Owner, President, Manager Program at Harvard Business School. Dkt. 219 at 18.

Insurers put forth a variety of arguments in support of excluding Mr. Anderson's reports and testimony. Insurers argue that (1) Mr. Anderson's testimony, based on the contents of his reports, will likely constitute improper legal testimony; (2) the Vehicle Service Contracts ("VSC") and the DDRA Agreement are not insurance contracts, thereby rendering Mr. Anderson's experience meaningless and his testimony irrelevant; (3) Mr. Anderson is not qualified to testify about the rate of return Insurers achieved using the funds that were deposited with them by the Dealers. Dkt. 217-1 at 13-15.

   B.    ***Legal Standards Applicable to the Arguments Raised in Insurers' Third Motion* in Limine**

      (1)    **Federal Rule of Evidence 702**

Federal Rule of Evidence 702 should be applied with a "liberal thrust" favoring admission. *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 588 (1993). At the same

time, Rule 702 requires that "[e]xpert testimony ... be both relevant and reliable." *Estate of Barabin v. AstenJohnson, Inc.*, 740 F.3d 457, 463 (9th Cir. 2014).

The relevancy bar is low, demanding only that the evidence "logically advance[] a material aspect of the proposing party's case." *Daubert v. Merrell Dow Pharm., Inc.*, 43 F.3d 1311, 1315 (9th Cir. 1995). Relevancy depends on the particular law at issue because "[e]xpert opinion testimony is relevant if the knowledge underlying it has a valid connection to the pertinent inquiry." *Primiano v. Cook*, 598 F.3d 558, 563 (9th Cir. 2010). The reliability threshold requires that the expert's testimony have "a reliable basis in the knowledge and experience of the relevant discipline." *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 149 (1999).

### (2)     Expert Testimony on Ultimate Issues Versus Legal Conclusions

Expert testimony may "embrace[ ] an ultimate issue to be decided by the trier of fact." *See* Fed. R. Evid. 704(a). At the same time, an expert witness "cannot give an opinion as to her legal conclusion, i.e., an opinion on an ultimate issue of law." *Nationwide Transp. Fin. v. Cass Info. Sys., Inc.*, 523 F.3d 1051, 1058 (9th Cir. 2008) (excluding expert testimony labeling conduct as "wrongful" or "intentional," but allowing testimony on "industry standards" and "factual corporate norms"). *Id.*

Rule 704(a) must be read together with Rule 702. The reason that courts exclude opinions that merely tell the jury what result to reach—for example, that a testator did not have the capacity to make a will—is that the opinion is not helpful to the jury, as required by Rule 702. *See* 29 Wright & Gold, Federal Practice & Procedure § 6284 at p. 380-82.

The opinion becomes helpful when it is linked to the facts of the case.  *See* Advisory

Committee Notes to Rule 704.  An example used in the Advisory Committee Notes

makes this plain:

> Thus, the question "Did T have capacity to make a will?" would be excluded, while the question, "Did T have sufficient mental capacity to know the nature and extent of his property and the natural objects of his bounty to formulate a rational scheme of distribution?" would be allowed.

*Id.*

### (3)    Expert Testimony Regarding Insurance Industry Standards

Expert testimony is allowed where the expert testifies that an insurer violated

customs and practices in the insurance industry.  *Hangarter*, 373 F.3d at 998.  In

*Hangarter,* the plaintiff alleged that his insurer committed bad faith in denying his claim

for disability insurance benefits.  The plaintiff's expert testified that the insurer (1) based

its denial on "facts" it knew to be false, (2) relied on an examining physician it knew to

be biased in its favor, and (3) targeted claims by professionals like plaintiff for denial.  *Id.*

at 1010-11.  The expert testified that this conduct deviated from industry standards, but

never said it constituted bad faith under the law.  *Id.* at 1016.  The district court allowed

this testimony under Rules 702 and 704(a) and the Circuit affirmed that decision after

finding that the expert complied with Rule 702 because he (1) identified specific conduct

of the insurer, (2) explained its consequences for the insured, and (3) described how that

conduct deviated from industry standards, all without rendering a conclusion on the legal

significance of the conduct.  *Id.*

### (4) Expert Testimony Describing Industry Standards by Reference to State Law

The insurer in *Hangarter* also faulted the expert for referring to state law while discussing industry standards. The Ninth Circuit rejected this challenge as well:

> Although [the expert's] testimony that Defendants departed from insurance industry norms relied in part on his understanding of the requirements of state law, specifically California's Unfair Settlement Claims Practice § 2695, a witness may refer to the law in expressing an opinion without that reference rendering the testimony inadmissible. Indeed, a witness may properly be called upon to aid the jury in understanding the facts in evidence even though reference to those facts is couched in legal terms.

*Id.* at 1017 (internal quotations and citations omitted). This reference to state law, the Ninth Circuit held, was proper because it was helpful to the jury in understanding the industry standards and was "ancillary to the ultimate issue" in the case. *Id.*

### (5) Expert Testimony Regarding Insurance Policies

In general, the interpretation of a contract or insurance policy is a matter of law for the Court. *See PMI Mortgage v. American*, 2008 WL 3838297 (9th Cir. 2008) (unpublished disposition) (excluding expert's legal interpretation of policy term). However, an expert is permitted to testify about how certain terms in the policy are commonly interpreted in the title insurance industry. *Manhattan Re–Ins. Co. v. Safety Nat'l Cas. Corp.*, 2003 WL 22718008 (9th Cir. 2003) (unpublished disposition) (allowing expert to testify about industry understanding of common terms in insurance policy). "Thus, an expert on the standards and practices in the … insurance industry may testify that (1) certain terms in a[n] … insurance policy are standard in the industry; (2) … insurance companies typically interpret those provisions in certain ways; and (3) the

conduct of an insurer or insured was in accord with, or deviated from, those industry practices." *Stewart Title Ins. Co. v. Credit Suisse*, No. 1:11-CV-227-BLW, 2015 WL 4250704, at *4 (D. Idaho July 13, 2015) (Winmill, J.).

### C.     *Mr. Anderson Is a Qualified Expert*

Insurers' first argument is that Mr. Anderson lacks the qualifications to required to testify about VSCs. Dkt. 217-1 at 7-8. According to Insurers, Mr. Anderson's general experience in the insurance industry is insufficient; any testifying expert must be familiar with the VSC market. *Id.*

Insurers' argument misses the forest for the trees. Mr. Anderson may lack familiarity with VSCs specifically, but his forty years of experience in the insurance industry, much of which was spent at the executive level, make him well qualified to testify as an expert in this matter. Even if VSCs are not a prototypical species of insurance contract, they belong within that genus given the way they operate. Furthermore, Mr. Anderson's experience "direct[ing] and negotiat[ing] a variety of specialty insurance programs" for major casualty underwriters is particularly relevant in this case, given Insurers' insistence that the arrangement between the Parties was an atypical bespoke agreement. Dkt. 222-3 at 6 (noting that Ms. Ingham will testify that "the DDRA program was a unique, one-of-a-kind custodial program only offered to the Edmark and Chalfant dealerships").

### D.     *Mr. Anderson's Report Is Permissible Expert Testimony Embracing Ultimate Issues*

Next, Insurers argue that Mr. Anderson's report and future testimony are merely a rehashing of Dealers' theory of the case which threatens to invade the province of the jury to decide the facts. Dkt. 217-1 at 9-13. But Insurers' argument runs squarely into *Hangarter* and this Court's decision in *Stewart Title*. In both cases, the testifying expert was allowed to "explain[] industry standards, identif[y] how … [the defendant's] conduct fell short of those standards, and describe[] the consequences of that conduct for [plaintiff]." *Stewart Title Ins. Co.*, 2015 WL 4250704, at *6. Furthermore, the experts were allowed to refer to state law in describing industry standards. *Id.* at *4; *see also Hangarter*, 373 F.3d at 1017.

Although the Court will allow Mr. Anderson to testify regarding customs and practices in the insurance industry and Insurers' conduct in comparison to those customs and practices, the Court acknowledges that there is a distinct risk that Mr. Anderson's testimony may edge into the province of the jury. This risk, however, will be policed at trial and remedied, if need be, through a limiting instruction.

E.    ***Mr. Anderson's Calculation of Insurers' Rate of Return Is Sufficiently Reliable Given the Circumstances Under Which It Was Produced***

Finally, Insurers challenge Mr. Anderson's calculation of Insurers' rate of return on the funds that Dealers deposited with them pursuant to the agreement between the Parties. Dkt. 217-1 at 14. Specifically, Insurers object to Mr. Anderson's use of non-party Zurich Financial Group's annual reports regarding their profitability as a proxy for the rate of return that was actually achieved by Zurich American Insurance Company and Universal Underwriters Service Corporation. *Id.* In calculating Insurers' rate of return,

Mr. Anderson relied on Zurich Insurance Group's Annual Reports for the years of 2003 through 2015. Dkt. 219 at 14. Dealers argue that Mr. Anderson was forced to rely on non-party Zurich Financial Group's publicly available reports because Insurers did not produce equivalent data for Zurich American Insurance Company and Universal Underwriters Service Corporation during discovery. Dkt. 236 at 9-11.

This clash has its roots in a discovery dispute between the Parties that has been the subject of three written opinions by Judge Dale. To recap, Mr. Anderson issued his report on May 3, 2017. Judge Dale, in a series of decisions, continually ordered Insurers to produce an increasing amount of information related to the investments made by the Insurers. Dkts. 134, 169, and 207. Each of these decisions were delivered *after* Mr. Anderson issued his initial report, and the final decision came *after* Mr. Anderson had submitted his supplemental expert report. As a result of this sequencing, it is clear that Mr. Anderson was precluded from assessing the rate of return that the Insurers achieved on their investments because the final data and underlying documents regarding those specific investments was not produced to Dealers until *after* Mr. Anderson's supplemental report issued. In light of this history, Insurers are not entitled to the exclusion of Mr. Anderson's report. Insurers remain free to explore this alleged deficiency in Mr. Anderson's report at trial, but it is not an appropriate basis upon which to exclude the report.

4.    **Dealers' Motion *in Limine* Number One Regarding the Testimony of Kathi Ingham (Dkt. 222)**

   A.    ***Arguments Raised in Motion Number One***

In response to the motions *in limine* filed by Insurers, Dealers responded with three of their own.  First, Dealers argue that the report and testimony of Insurers' expert, Ms. Kathi Ingham, should be excluded because the opinions disclosed in the report constitute improper legal testimony.  Dkt. 222-1 at 2-7.  Insurers respond that Ms. Ingham's opinions are not legal conclusions and are therefore admissible.  Dkt. 233 at 6-10.

If this recitation is sounding familiar, it is because the Parties took the exact *opposite* positions with respect to the report and testimony of Mr. Anderson.  Although the Court will apply the law discussed above to Ms. Ingham's report, as a threshold matter the Court reminds the Parties of the age-old adage that, "what is good for the goose is good for the gander – or possibly more appropriate, what is sauce for the goose is sauce for the gander."  *Bright Harvest Sweet Potato Co., Inc. v. H. J. Heinz Co., L.P.*, No. 1:13-CV-00296-BLW, 2016 WL 552455, at *1 (D. Idaho Feb. 10, 2016) (Winmill, J.).

**B.**   ***Ms. Ingham's Report Is Permissible Expert Testimony Embracing Ultimate Issues***

Turning to Ms. Ingham's report, the Court finds that the proposed testimony mirrors the testimony that Mr. Anderson intends to give.  Ms. Ingham's report indicates that she will testify that the VSC program at issue in this case was unique compared to traditional VSC programs.  Dkt. 22-3 at 4-8.  Contrary to Mr. Anderson, however, Ms. Ingham's report does unequivocally state that "No insurance license is required to solicit

and sell VSCs in the state of Idaho.  Consequently, the provisions of Idaho Code § 41-1024 are not applicable to Universal and Zurich's" sale of VSCs to Dealers.  *Id.* at 7.  Though the practical difference between Ms. Ingham's statement and Mr. Anderson's statement is slim, Ms. Ingham's statement offers a definitive legal conclusion on whether Idaho insurance law applies to the VSCs in this case.  Conversely, Mr. Anderson's citation of Idaho law merely suggests the scope of the custom and practice of insurance providers.  Dkt. 219 at 12.  As such, Mr. Ingham's statements regarding the applicability of Idaho law would run afoul of Federal Rule of Evidence 702 if they were offered at trial.

Although Ms. Ingham's testimony regarding the applicability of Idaho law is barred by Rule 702, the remainder of her report and testimony are by and large admissible at trial.  Like Mr. Anderson's testimony however, the Court will police Ms. Ingham's testimony as it comes in to ensure that it does not invade the province of the jury and will give a limiting instruction if needed.

**4.    Dealers' Motion *in Limine* Number Two Regarding Evidence Produced Pursuant to RFP 11 and Related Discovery Requests (Dkt. 222)**

**A.    *Arguments Raised in Motion Number Two***

Next, Dealers seek to exclude pursuant to Federal Rule of Civil Procedure 37 "Documents Bates Nos. 182718, 182719, 182608-13, and any evidence or argument related thereto; any testimony or evidence repeating, augmenting, or supplementing Insurers' written responses to discovery; and any other testimony or other evidence Insurers may attempt to offer on investment returns or manner of investment that was not

disclosed in discovery." Dkt. 222-1 at 10 (internal citations excluded). These materials

are, of course, the subject of Judge Dale's motion to compel decisions. Insurers, in turn,

argue that (1) Judge Dale refused to impose sanctions and (2) any delay in disclosure was

substantially justified. *Id.* at 14.

**B.** ***Legal Standards Applicable to the Arguments Raised in Dealers' Second Motion* in Limine**

Rule 37 authorizes the district court, in its discretion, to impose a wide range of

sanctions when a party fails to comply with the rules of discovery or with court orders

enforcing those rules. Specifically, Rule 37(c)(1) rule "forbid[s] the use at trial of any

information required to be disclosed by Rule 26(a) that is not properly disclosed."

*Hoffman v. Constr. Protective Servs., Inc.*, 541 F.3d 1175, 1179 (9th Cir. 2008) (*quoting*

*Yeti by Molly, Ltd. v. Deckers Outdoor Corp.*, 259 F.3d 1101, 1106 (9th Cir. 2001)). The

rule provides:

> If a party fails to provide information or identify a witness as required by Rule 26(a) or (e), the party is not allowed to use that information or witness to supply evidence on a motion, at a hearing, or at a trial, unless the failure was substantially justified or is harmless.

Fed. R. Civ. P. 37(c)(1). The party facing sanctions bears the burden of proving that its

failure to disclose the required information was substantially justified or is harmless.

*Torres v. City of L.A.*, 548 F.3d 1197, 1213 (9th Cir. 2008).

**C.** ***The Court Will Not Exclude Evidence Regarding the Rate of Return Achieved by Insurers***

The Court begins by noting the extraordinary nature of Dealers' argument. The

documents Dealers seek to exclude were the subject of a bitterly contested discovery

dispute. Now, on the eve of trial, Dealers seek to exclude all the evidence that they fought so hard to obtain.

More to the point, although the Court agrees with Dealers' general premise that Insurers were less than forthcoming in their productions in response to RFP 11, it is also true that RFP 11, on its face, is extraordinarily broad and non-specific. As a result, through a series of decisions Judge Dale wisely narrowed the scope of RFP 11 to balance Dealers' need to obtain information regarding how the funds were invested with the proportionality limitation contained in Rule 26. *See* Dkt. 134, 169, and 207. In doing so, Judge Dale affirmatively declined to impose Rule 37 sanctions on Insurers twice. Dkt. 134 & 169. Although it is true that there were additional disputes regarding RFP 11 that arose after the last time Judge Dale affirmatively declined to impose sanctions, it is clear from the record that she did not view Insurers' discovery conduct as sanctionable.

The Court agrees with Judge Dale's assessment. Although Insurers were not forthcoming, they fought an overbroad request apparently in good faith. Any delay in the production of documents in response to RFP 11 was substantially justified given RFP 11's overbreadth and the fact that Insurers were forced to seek protection from the Court. Though this sequence of events does not comport with Federal Rule of Civil Procedure 1, it is not sanctionable under Federal Rule of Civil Procedure 37.

**5.    Dealers' Motion *in Limine* Number Three Regarding "Sale Price Evidence" and "Financial Condition Evidence" (Dkt. 222)**

**A.    *Arguments Raised in Motion Number Three***

Finally, Dealers seek to exclude under Federal Rules of Evidence 401, 402, and 403 any evidence related to the sale price Edmark received from its 2016 sale to Kendall Auto ("Sale Price Evidence"). Dkt. 222-1 at 14-16. Additionally, Dealers seek to exclude "[a]ny and all testimony, documents, references to testimony or documents, and argument on the financial condition of Edmark Auto, Chalfant Corp., Jim Chalfant, Dave Edmark, or any other shareholder in the companies" ("Financial Condition Evidence"). *Id.* at 14.

**B.** ***Dealers' Motion Is Moot Because Both Parties Agree that the Categories of Evidence Described in Dealers' Motion Will Not Be Admitted***

In response, Insurers agree that they will not introduce Sales Price Evidence. Dkt. 233-1 at 15. Dealers' motion is therefore moot with respect to the Sales Price Evidence. Turning to the Financial Condition Evidence, it is apparent that the Parties are also in basic agreement, though they appear reluctant to forthrightly say so in their briefing. Nevertheless, Dealers' motion is moot with respect to the Financial Condition Evidence.

## CONCLUSION

The Court looks forward to trying this case. However, it will take this opportunity to caution Counsel regarding the importance of Federal Rule of Civil Procedure 1, which requires Counsel, the Parties, and the Court to "secure the just, speedy, and inexpensive determination of every action and proceeding." Dealers' Motion *in Limine* Number 3 is a perfect example of an issue that the Court expects Counsel to work out among themselves, thereby saving time for the Court and Counsel and, more importantly,

expense for the Parties.  It is imperative that Counsel live up to the spirit of Federal Rule of Civil Procedure 1 as this case progresses to trial.  I am confident that they will.

# ORDER

1. Insurers' First Motion *in Limine* Regarding Bifurcation of Trial and Related Evidentiary Matters (Dkt. 215) is **CONDITIONALLY GRANTED** with respect to Insurers' request for bifurcation.

2. Insurers' First Motion *in Limine* Regarding Bifurcation of Trial and Related Evidentiary Matters (Dkt. 215) is **DENIED** with respect to excluding the introduction of all financial records expect Insurers' 2017 audited financial statements.

3. Insurers' First Motion *in Limine* Regarding Bifurcation of Trial and Related Evidentiary Matters (Dkt. 215) is **DENIED** with respect to excluding Zurich Insurance Group's financial information. Insurers may re-raise this objection at trial.

4. Insurers' Second Motion *in Limine* Regarding Equitable Unjust Enrichment and Disgorgement Issues (Dkt. 216) is **DENIED**.

5. Insurers' Third Motion *in Limine* Regarding Testimony of Robert Anderson (Dkt. 217) is **DENIED**.

6. Dealers' Motion *in Limine* #1 Through #3 (Dkt. 222) is **DENIED IN PART** with respect to the testimony of Kathi Ingham, but is **GRANTED IN PART** as to her opinion concerning whether the Idaho insurance law applies to the VSC in this case.

7. Dealers' Motion *in Limine* #1 Through #3 (Dkt. 222) is **DENIED** with respect to excluding documents Bates Nos. 182718, 182719, 182608-13, and any evidence or argument related thereto; any testimony or evidence repeating, augmenting, or supplementing Insurers' written responses to discovery; and any other testimony or other evidence Insurers may attempt to offer on investment returns or manner of investment that was not disclosed in discovery.

8. Dealers' Motion *in Limine* #1 Through #3 (Dkt. 222) is **DENIED AS MOOT** with respect to excluding the Sales Price Evidence and the Financial Condition Evidence.

DATED: March 1, 2019

B. Lynn Winmill
U.S. District Court Judge