Erik F. Stidham, ISB No. 5483
A. Dean Bennett, ISB No. 7735
Jennifer M. Jensen, ISB No. 9275
HOLLAND & HART LLP
800 West Main Street, Suite 1750
P.O. Box 2527
Boise, Idaho  83701-2527
Telephone:   (208) 342-5000
Facsimile:   (208) 343-8869
E-mail:      efstidham@hollandhart.com
             adbennett@hollandhart.com
             jmjensen@hollandhart.com

Attorneys for Plaintiffs

# UNITED STATES DISTRICT COURT

## DISTRICT OF IDAHO

| | |
|---|---|
| EDMARK AUTO, INC., an Idaho corporation; CHALFANT CORP., an Idaho corporation, <br><br> Plaintiffs, <br><br> vs. <br><br> ZURICH AMERICAN INSURANCE COMPANY, a New York corporation; and UNIVERSAL UNDERWRITERS SERVICE CORPORATION, a Delaware corporation, <br><br> Defendants. | Case No.  1:15-CV-00520-EJL-CWD <br><br> **PLAINTIFFS' TRIAL BRIEF** |

**PLAINTIFFS' TRIAL BRIEF**

# TABLE OF CONTENTS

I.   INTRODUCTION ...........................................................................................................1

II.  THE DEALERS' THEORIES OF RECOVERY ........................................................3

    A.   THE DEALERS WILL PROVE THEIR BREACH OF CONTRACT CLAIMS AGAINST
UNIVERSAL..............................................................................................................4

        1.   The Express Written Intent of the Agreement Should Control. ..................5

        2.   The Language of the Agreement, Read as a Whole, Supports Dealers'
Interpretation. ...........................................................................................5

        3.   The Context and Negotiation That Led to the Execution of the Agreement
Supports Dealers' Reading. .......................................................................6

        4.   The Course of Conduct of the Insurers, Including Their Internal
Documentation and Written and Oral Communications to the Dealers
Supports the Dealers' Understanding of the Agreement............................6

        5.   The Agreement Should be Construed Against the Insurers as the Drafter. ..............7

        6.   The Insurers' Interpretation of the Agreement Leads to Absurd Results and
Must be Rejected........................................................................................8

        7.   Any Obligation to Pay a "Deficiency" was Discharged by Universal's Prior
Breach of the Agreement..........................................................................10

    B.   THE DEALERS WILL PROVE THEIR BREACH OF THE COVENANT OF GOOD FAITH
AND FAIR DEALING CLAIMS. ...............................................................................10

    C.   THE DEALERS WILL PROVE THEIR UNJUST ENRICHMENT CLAIMS. ................13

    D.   THE DEALERS WILL PROVE THEIR BREACH OF FIDUCIARY DUTY CLAIMS.......13

    E.   THE DEALERS WILL PROVE THEIR FRAUD CLAIMS...........................................14

    F.   THE DEALERS WILL PROVE THEIR UNFAIR BUSINESS PRACTICES CLAIMS.......15

III. REMEDIES ................................................................................................................17

    A.   THE DEALERS SEEK BENEFIT OF THE BARGAIN DAMAGES FOR THEIR CLAIMS OF
BREACH OF CONTRACT AND BREACH OF THE IMPLIED COVENANT OF GOOD FAITH
AND FAIR DEALING. ...........................................................................................17

    B.   FOR CLAIMS OF UNJUST ENRICHMENT, BREACH OF FIDUCIARY DUTY, FRAUD,
AND UNFAIR BUSINESS PRACTICES, DEALERS SEEK RESTITUTION
DAMAGES/DISGORGEMENT OF PROFITS. ...........................................................17

    C.   THE DEALERS SEEK PUNITIVE DAMAGES........................................................18

IV.  UNIVERSAL'S COUNTERCLAIMS ....................................................................19

    A.   UNIVERSAL'S BREACH OF CONTRACT AND BREACH OF THE IMPLIED COVENANT
OF GOOD FAITH AND FAIR DEALING CLAIMS FAIL............................................19

    B.   UNIVERSAL'S UNJUST ENRICHMENT CLAIM FAILS...........................................20

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*Albemarle Paper Co. v. Moody,*
  422 U.S. 405 (1975)...................................................................................17

*Archer v. Mtn. Fuel Supply. Co.,*
  642 P.2d 943 (Idaho 1982)..........................................................................11

*Bafus v. Aspen Realty, Inc.,*
  No. CV-04-121-S-BLW, 2006 WL 318779 (D. Idaho Feb. 8, 2006)....................16

*Battelle Energy Alliance, LLC v. Southfork Sec., Inc.,*
  3 F. Supp. 3d 852 (D. Idaho 2014) ..............................................................19

*Big Butte Ranch, Inc. v. Grasmick,*
  415 P.2d 48 (Idaho 1966).............................................................................7

*Bonner County v. Panhandle Rodeo Ass'n, Inc.,*
  620 P.2d 1102 (Idaho 1980).........................................................................4

*Bright Harvest Sweet Potato Co., Inc. v. H.J. Heinz Co., L.P.,*
  No 1:13-cv-00296-BLW, 2016 WL 552455 (D. Idaho Feb. 10, 2016)..................8

*Bushi v. Sage Health Care, PLLC,*
  203 P.3d 694 (Idaho 2009)..........................................................................13

*Countrywide Home Loans, Inc. v. Sheets,*
  371 P.3d 322 (Idaho 2015)..........................................................................13

*Davis v. First Interstate Bank of Idaho, N.A.,*
  765 P.2d 680 (Idaho 1988)..........................................................................19

*DBSI Signature Place, LLC v. BL Greensboro, L.P.,*
  No. CV 05-051-SLMB, 2006 WL 1275394 (D. Idaho May 9, 2006) ..................16

*Devereaux Mortg. Co. v. Walker,*
  268 P. 37 (Idaho 1928)..............................................................................5, 9

*Duspiva v. Fillmore,*
  293 P.3d 651 (2013)...................................................................................15

*Eckard Brandes, Inc. v. Riley,*
  338 F.3d 1082 (9th Cir. 2003) .....................................................................17

*Elec. Wholesale Supply Co., Inc. v. Nielson,*
  41 P.3d 242 (Idaho 2001).............................................................................6

*Ferguson v. City of Orofino,*
    953 P.2d 630 (Idaho Ct. App. 1998) ............................................................. 11, 12

*Holladay v. Lindsay,*
    152 P.3d 638 (Idaho 2006) .............................................................................. 17

*Hydroblend, Inc. v. Nothum Mfg. Co.,*
    No. 1:13-CV-00445-EJL, 2014 WL 3446088 (D. Idaho 2014) ....................... 13

*Idaho v. Coeur d'Alene Tribe,*
    No. 2:14-cv-000170-BLW, 2014 WL 2818682 (D. Idaho June 23, 2014) ........... 8

*In re Bailey,*
    518 B.R. 594 (D. Idaho 2014) ......................................................................... 10

*In re Edwards,*
    233 B.R. 461 (Bankr. D. Idaho 1999) .............................................................. 16

*J.P. Stravens Planning Assocs., Inc. v. City of Wallace,*
    129 Idaho 542 (Ct. App. 1996) ........................................................................ 10

*J.R. Simplot Co. v. Bosen,*
    167 P.3d 748 (Idaho 2007) ................................................................................ 7

*Long Rockwood VII, LLC v. Rockwood Lodge, LLC,*
    No. 2:14-CV-00318-REB, 2016 WL 335853 (D. Idaho Jan. 26, 2016) ............ 11

*Long v. Rockwood VII, LLC v. Rockwood Lodge, LLC,*
    No. 2:14-cv-00318-REB, 2017 WL 10765197 (D. Idaho Sept. 29, 2017) .......... 15

*Margaret H. Wayne Tr. v. Lipsky,*
    846 P.2d 904 (Idaho 1993) ................................................................................ 5

*Moss v. Mid-Am. Fire & Marine Ins. Co.,*
    647 P.2d 754 (Idaho 1982) ................................................................................ 5

*Moto Tech, LLC v. KTM N. Am., Inc.,*
    No. 1:13-CV-00165-BLW, 2014 WL 4793904 (D. Idaho Sept. 25, 2014) ......... 16

*Nelson v. Serwold,*
    576 F.2d 1332 (9th Cir. 1978) .......................................................................... 18

*Nora v. Safeco Ins. Co.,*
    577 P.2d 347 (Idaho 1978) .............................................................................. 17

*Obendorf v. FDIC,*
    667 F. Supp. 2d 1223 (D. Idaho 2009) ....................................................... 10, 12

*Path to Health, LLP v. Long,*
    383 P.3d 1220 (Idaho 2016) .............................................................................. 4

*Pocatello Hosp., LLC v. Quail Ridge Med. Inv., LLC,*
    330 P.3d 1067 (Idaho 2014)....................................................................6

*Samuel v. Helpworth, Nungester & Lezamiz, Inc.,*
    996 P.2d 303 (Idaho 2000).....................................................................14

*Skinner v. U.S. Bank Home Mort.,*
    365 P.3d 398 (Idaho 2015).....................................................................13

*State ex rel. Kidwell v. Master Distributors, Inc.,*
    615 P.2d 116 (Idaho 1980)................................................................17, 18

*Stouffer Corp. v. Itasca Hotel Co.,*
    119 U.S. Dist. LEXIS 18166 (N.D. Ill. Dec. 30, 1991).........................14

*Tusch Enters. v. Coffin,*
    740 P.2d 1022 (Idaho 1987)............................................................14, 15

*U.S. Welding, Inc. v. Battelle Energy Alliance, LLC,*
    728 F. Supp. 2d 1110 (D. Idaho 2010) ...................................................9

*W.O. Kepler v. WHW Mgmt., Inc.,*
    825 P.2d 1122 (Idaho Ct. App. 1992).....................................................15

*Women's Fed. Sav. & Loan Ass'n v. Nev. Nat'l Bank,*
    811 F.2d 1255 (9th Cir. 1987) ..........................................................13, 17

## STATUTES

Idaho Code § 48-603...................................................................................15

## OTHER AUTHORITIES

17 Am. Jur. 2d Contracts § 255 (2d ed. 1964).........................................11

Restatement (3d) of Restitution § 51 .........................................................17

## I.    INTRODUCTION

Universal Underwriters Service Corporation ("Universal") and Zurich American Insurance Company ("Zurich") (collectively the "Insurers") misled Edmark Auto ("Edmark") and Chalfant Corp. ("Chalfant") (collectively the "Dealers") into selling the Insurers' finance and insurance products since 1996.  For nearly two decades, the Insurers made repeated misrepresentations and knowingly breached their obligations to the Dealers while at the same time enjoying approximately $15 million in net profits owing directly to their wrongful actions.

The Insurers gained and maintained their long-term lucrative relationship with the Dealers by fraudulently promising a No Chargeback Program.  The No Chargeback Program promised to cover Dealer "Chargebacks," or what would otherwise have been the Dealers' portion of refunds to car-buying customers who made the decision to cancel their vehicle service contract or "VSC" after 90 days into its term.  The Insurers promised to implement the No Chargeback Program because they knew the Dealers had many of options in choosing whose finance and insurance products to sell, and that providing the No Chargeback Program would keep the Dealers' finance and insurance portfolio with the Insurers.

The Insurers' plan worked.  The concept of the No Chargeback Program was a significant carrot for the Insurers to hold out to the Dealers.  This is because the Dealers admittedly lacked the expertise to accurately anticipate future Chargebacks liabilities.  The Dealers looked to the industry experts—the insurance companies—to use their specialized knowledge and skill to eliminate the risk of the unknown future Chargeback liability.

Under the parties' written Agreement,[1] the Insurers took responsibility for paying the Dealers' Chargeback liabilities.  To cover the cost of the Chargeback liabilities, the Insurers were

---

[1] For ease of reference, the "Agreement" refers to both Edmark's and Chalfant's Agreement with Universal.  Edmark's contract with Universal consists of the Agreement found at Dkt. 72-3 and

**PLAINTIFFS' TRIAL BRIEF -1**

supposed to set up a Refund Account, a custodial account.  The Insurers were supposed to set, and periodically review, an appropriate fee to be paid by the Dealers into the Refund Account for each VSC sold ("Refund Payment").  The Insurers were supposed to manage the Refund Payments collected from the Dealers for the Dealers' benefit and for the exclusive purpose of paying Chargebacks.  The Insurers were supposed to accurately monitor the Refund Account and they were supposed to provide accurate and regular statements to the Dealers.  The Insurers did none of those things.

The evidence and testimony at trial will show the Insurers violated their obligations to the Dealers at every turn.  The Insurers did not set up a Refund Account.  The Insurers did not periodically review the Refund Payment made by the Dealers for each VSC sold.  The Insurers did not manage the funds they held in trust for the Dealers—instead, the Insurers took the Dealers' money and invested it for their own benefit.  For nearly two decades the Insurers provided no statements to the Dealers leaving the Dealers to believe they received what they had bargained for—a *No Chargeback* Program.  That the Insurers did nothing to provide the Dealers what they promised demonstrates a clear intent to never actually perform their Agreement with the Dealers.

It will be demonstrated that the Dealers received no benefit from the nonexistent No Chargeback Program.  But the Insurers received what they intended—decades of continuing and highly profitable business because the Dealers were convinced by the Insurers to continue to sell the Insurers' finance and insurance products.  The evidence will show that at the same time the

---

the letter agreement (Dkt. 72-7) adding the new Edmark Kia dealership to the No Chargeback Program ("Edmark Agreement").  Chalfant's contract with Universal consists of the Agreement found at Dkt. 72-4 and the letter agreement (Dkt. 72-6) allowing Chalfant's VW and Audi dealerships to participate in the No Chargeback Program ("Chalfant Agreement").  The Edmark Agreement and the Chalfant Agreement have identical language.   This Trial Brief will cite Dkt. 72-3 for language in both Agreements.

**PLAINTIFFS' TRIAL BRIEF -2**

Insurers were misrepresenting the existence of the No Chargeback Program, they used the charade to reap millions of dollars in profit.

In the Fall of 2014 the Dealers began to ask the Insurers some legitimate questions when one of the Insurers' competitors (JM&A) called into question some of the excessive taxes and fees the Insurers were charging the Dealers. For example, the Insurers were charging the Dealers a "tax" at double the tax rate provided by Idaho law. The Insurers had no good answers. Internally, the Insurers scrambled knowing they would have to come clean. But, instead of disclosing the years of inaction and deceit, the Insurers doubled-down on withholding information from the Dealers in the hopes of maintaining the lucrative business relationship. At the direction of Insurers' sales staff—with the express blessing of Vice President-level employees—the Insurers continued to withhold vital information from the Dealers until the Insurers concluded there was absolutely no chance left to salvage the profitable relationship.

At that time, on May 5, 2015, the Insurers sent a notice which purported to "terminate" the No Chargeback Program—a program which never actually existed. The Insurers asserted that the non-existent "account" had been in deficit for years and asserted—for the first time ever—that the Dealers were solely responsible for all future Chargeback liability. And it was not enough that the Insurers made nearly $15 million in profit at the expense of the Dealers. Now, through their Counterclaims, the Insurers seek to hold the Dealers responsible for hundreds of thousands of dollars in Chargebacks that the "No Chargeback Program" was meant to eliminate. After all, the name of the program—routinely used and championed by the Insurers over the life of the relationship—was the "*No Chargeback* Program."

## II.   THE DEALERS' THEORIES OF RECOVERY

The Dealers expect to prevail at trial on the following claims: (1) Breach of Contract; (2) Breach of the Implied Covenant of Good Faith and Fair Dealing; (3) Unjust Enrichment;

**PLAINTIFFS' TRIAL BRIEF -3**

(4) Breach of Fiduciary Duty; (5) Fraud by Misrepresentation; (6) Fraud by Non-Disclosure; and
(7) Unfair Business Practices.

    **A.**    **THE DEALERS WILL PROVE THEIR BREACH OF CONTRACT CLAIMS AGAINST UNIVERSAL.**

The Dealers must prove: (1) each had a contract with Universal, (2) Universal breached the contract, (3) the breach caused the Dealers damage, and (4) the amount of those damages. *See Path to Health, LLP v. Long*, 383 P.3d 1220, 1227 (Idaho 2016).

The Court has previously held that the Agreement between Universal and the Dealers "as a whole is reasonably subject to conflicting interpretations and is ambiguous on its face." Dkt. 145 at 8.  Given the ambiguity, extrinsic evidence is admissible to determine the intent of the parties' and the meaning of the Agreement.  *Bonner County v. Panhandle Rodeo Ass'n, Inc.*, 620 P.2d 1102, 1107 (Idaho 1980).

Applying accepted contract interpretation principles to the evidence, the Dealers' interpretation of the Agreement will prevail.  First, the express written intent of the Agreement supports the Dealers' interpretation.  Second, the language of the Agreement—appropriately read as a whole—supports the Dealers' position.  Third, the context and negotiations that led to the execution of the Agreement supports the Dealers' reading.  Fourth, the course of conduct of the Insurers, including their internal documentation, written and oral communications to the Dealers, and nearly two decades of paying *all* Chargebacks, supports the Dealers' understanding of the Agreement.  In contrast, the Insurers' tortured reading of the Agreement leads to the absurd result that the *No Chargeback* Program was meant to provide no benefit to the Dealers and was actually a *Dealer Pays for Chargebacks* Program.

**PLAINTIFFS' TRIAL BRIEF -4**

1.      **The Express Written Intent of the Agreement Should Control.**

It is a basic tenet of Idaho law that a contract should be construed to further the purpose of the agreement, not to frustrate the purpose.  *See Devereaux Mortg. Co. v. Walker*, 268 P. 37, 40 (Idaho 1928).  Here, the Agreement states its purpose—the No Chargeback Program is meant to pay for the Dealers' future Chargeback liabilities.  Dkt. 72-3 at ¶ 1 ("It is the intent of Company and Dealer that the total of all fees in Dealer's Designated Refund Account accurately reflect the amount of Dealer's future liabilities for refunds under Section (2b) of this program and are being transferred to Company specifically for this purpose.").

2.      **The Language of the Agreement, Read as a Whole, Supports Dealers' Interpretation.**

"A contract must be construed as a whole, rather than focusing on a particular isolated provision."  *Moss v. Mid-Am. Fire & Marine Ins. Co.*, 647 P.2d 754, 758 (Idaho 1982); *Margaret H. Wayne Tr. v. Lipsky*, 846 P.2d 904, 908 (Idaho 1993) ("we must consider it as a whole and give meaning to all its provisions to the extent possible").

The language of the Agreement, read as a whole, supports the Dealers' position.  The Agreement mandates that Universal will pay for all Chargebacks for VSC cancellations after 90 days.  *See* Dkt. 72-3 at ¶ 1 ("*payment by Company*") (emphasis added); Dkt. 72-3 at ¶ 2(b) ("Dealer and Company agree that in the event of cancellation of a Service Contract after the first 90 days of the term of the contract, *refunds shall be paid by Company*.") (emphasis added).

The Dealers' had one obligation under the Agreement—they were required to make the predetermined Refund Payment to Universal for each VSC sold.  Dkt. 72-3 at ¶ 1.  Universal set the predetermined Refund Payment at "$80.00," but reserved itself the sole right to adjust the Refund Payment as it saw fit to cover the Dealers' future Chargeback liability.  Dkt. 72-3 at ¶ 4 ("The amount . . . may be increased or decreased by Company at any time.").  It was Universal's

obligation to monitor and manage the Refund Account and to report periodically to the Dealers on the status of the Refund Account.  Dkt. 72-3 at ¶¶ 1, 3-5.

      **3.**     **The Context and Negotiation That Led to the Execution of the Agreement Supports Dealers' Reading.**

In 1996, Edmark and Universal were negotiating an arrangement whereby Edmark would sell Universal's VSCs.  Edmark's CEO, Jim Chalfant, told the Universal representative, Greg Powell, that he wanted a "no chargeback program" to fully cover Edmark's liability for chargebacks on VSCs cancelled after 90 days into their term.  Mr. Chalfant wanted certainty and desired to eliminate exposure for this future liability that Edmark itself was not able to accurately calculate or anticipate.

Universal, through Mr. Powell, wanting to keep Edmark's lucrative finance and insurance business, responded to Mr. Chalfant's request by presenting Edmark with the Agreement. Mr. Powell told Mr. Chalfant that, "[t]his is the agreement that you asked for" and stated "it would satisfy [Mr. Chalfant's] request" that there be no further liability for Chargebacks on VSCs cancelled after 90 days into their term.  The evidence will show that Mr. Chalfant relied on Mr. Powell's statements and executed the Agreement.

      **4.**     **The Course of Conduct of the Insurers, Including Their Internal Documentation and Written and Oral Communications to the Dealers Supports the Dealers' Understanding of the Agreement.**

How the Insurers referred to the Agreement and conducted themselves after execution of the Agreement supports Dealers' understanding of the Agreement.  *See Pocatello Hosp., LLC v. Quail Ridge Med. Inv., LLC*, 330 P.3d 1067 (Idaho 2014) (contracting parties' subsequent conduct evidences intent for contract interpretation purposes); *Elec. Wholesale Supply Co., Inc. v. Nielson*, 41 P.3d 242, 251 (Idaho 2001) (interpreting "time and materials" to include markup on materials when contractor had paid markup under the contract).

**PLAINTIFFS' TRIAL BRIEF -6**

Immediately after Mr. Powell presented Mr. Chalfant the Agreement for execution in 1996, Universal documented the Agreement in its internal records as a "90 Day No Chargeback Account" and a "90 Day NCB", and further made electronic and handwritten notations in its file referring to "No Chargeback" and "NCB."  Then, for the next 19 years, the Insurers' employees referred to the Agreement as the "No Chargeback Agreement" and the resulting program as the "No Chargeback Program."  Indeed, many of the express representations by the Insurers could not have been clearer.  For example, the Zurich employee responsible for the Dealers' relationship described the No Chargeback Program to one of the Dealers as follows:

> If within first 90 days, the contract is cancelled minus the cancellation fee ($50) and the cancellation is pro rated on time or miles whichever is greater.  Zurich pays its portion of refund, Edmark refunds its portion of dealer profit.  THE CANCELLATION IS ALSO MINUS THE DEALER PACK.  So, cancellations in the first 90 days will look like they are short an additional $200, but that is not true because you have already been paid that over remit amount separately.
>
> **If after 90 days, the contract is cancelled minus cancellation fee ($50) and cancellation is pro rated on time or miles whichever is greater <u>BUT ZURICH PAYS BOTH DEALER PROFIT AND ZURICH REFUND. Edmark doesn't bear any expense to the cancellation</u>.**

(Capitalization in the original, emphasis added).

### 5.    The Agreement Should be Construed Against the Insurers as the Drafter.

Where an ambiguity exists in a contract, Idaho law requires the contract to be construed against the drafter.  *J.R. Simplot Co. v. Bosen*, 167 P.3d 748, 753 (Idaho 2007); *Big Butte Ranch, Inc. v. Grasmick*, 415 P.2d 48, 51 (Idaho 1966) ("The rule is clear, that a contract should be construed most strongly against the party preparing it or employing the words concerning which doubt arises.").  The Insurers prepared the Agreement, and any ambiguity in the Agreement should be construed in favor of the Dealers and against the Insurers.

**PLAINTIFFS' TRIAL BRIEF -7**

6. **The Insurers' Interpretation of the Agreement Leads to Absurd Results and Must be Rejected.**

If one party's interpretation creates an absurd result, it is not reasonable and cannot be correct. *Idaho v. Coeur d'Alene Tribe*, No. 2:14-cv-000170-BLW, 2014 WL 2818682, at *2-4 (D. Idaho June 23, 2014); *see also Bright Harvest Sweet Potato Co., Inc. v. H.J. Heinz Co., L.P.*, No 1:13-cv-00296-BLW, 2016 WL 552455, at *5 (D. Idaho Feb. 10, 2016).

Universal's interpretation of the Agreement does not consider the whole document, is not in line with the Agreement's express written intent, is contrary to the language of the Agreement, is inapposite to notations in its own files and its representations to the Dealers, and would lead to an absurd result—a *No Chargeback* Program whereby the Dealers pay for Chargebacks.

Throughout this litigation, Universal has contended that the Agreement should be interpreted as follows:

- The Dealers must pay the Insurers a fee of $80 per VSC sold;

- The Insurers are then to use the fees for the Insurers' own benefit;

- The Insurers paid Chargebacks only if the aggregate of the fees paid by the Dealers were more than the amounts of the Chargebacks;

- The Insurers were allowed to keep for their sole use and benefit any income or interest generated by the millions of dollars in fees paid by the Dealers;

- The Insurers' obligation to set up an "account" was met if the Insurers merely had a record of the number of VSCs sold by the Dealers;

- The Insurers had no obligation to monitor and report to the Dealers on the "account";

- The Insurers had no obligation to calculate anticipated future Chargeback liabilities;

**PLAINTIFFS' TRIAL BRIEF -8**

- While the Insurers had sole and complete discretion to modify the amount of the fee the Dealers were required to pay for each VSC sold, the Insurers had no obligation to modify the amount of the fee to keep the "account" solvent;

- The Insurers could use the fees paid by Edmark to pay Chargebacks relating to the sale of a VSC sold by Chalfant, and vice versa, without ever informing the Dealers of their commingling of the funds or "accounts";

- The Insurers had no obligation to keep accurate records or any records at all; and

- The Insurers had no obligation to inform the Dealers when or if there was no longer enough money in the "account" to cover Chargebacks.

Universal's construction completely defeats the purpose of the Agreement and the No Chargeback Program it was meant to create.  *See Devereaux*, 268 P. at 40 (rejecting construing contract against purpose of agreement and holding one party's interpretation would violate the purpose of the agreement and would not be applied).  The Dealers would have forgone the use of millions of dollars of their own money so that the Insurers could profit from the investment of those funds.  Indeed, there is no benefit to the Dealers under that construction, but there would be plenty of detriments: (1) reducing the Dealers' wealth by having them forgo years of the use of their own funds, (2) hopelessly commingling the funds of separate corporate entities with separate ownership structures, (3) not providing the Dealers with any insight regarding how much future liability is estimated, (4) blinding the Dealers as to how much remains in a commingled "account" for which the Dealers are responsible for any deficit, and (5) doing nothing to reduce the Dealers' administrative burden or costs.

As construed by the Insurers the Agreement would provide no benefit to the Dealers; the Agreement would fail entirely for lack of consideration.  *See U.S. Welding, Inc. v. Battelle Energy Alliance, LLC*, 728 F. Supp. 2d 1110, 1122 (D. Idaho 2010).

**PLAINTIFFS' TRIAL BRIEF -9**

**7.      Any Obligation to Pay a "Deficiency" was Discharged by Universal's Prior Breach of the Agreement.**

The Insurers have previously relied, and will likely rely at trial, on ¶ 2(c) of the Agreement and its reference to a "deficiency."  What the Insurers fail to acknowledge, however, is that ¶ 2(c) refers directly to a "Dealers obligation as determined in Section 2(b)" and there is no Dealer Obligation found in ¶ 2(b).  Instead, ¶ 2(b) states expressly "that in the event of cancellation of a Service Contracts (sic) after the first 90 days of the term of the contract, refunds shall be paid by the Company."  Dkt. 72-3 at ¶ 2(b).

Setting aside that issue, no "deficiency" would have existed if the Insurers fulfilled their obligations under the Agreement.  The evidence at trial will show that the Insurers' prior breach discharged any duty on the part of the Dealers to pay a "deficiency."  *In re Bailey*, 518 B.R. 594, 598 (D. Idaho 2014) ("If one party materially breaches an agreement, the other party is excused from further performance."); *see also J.P. Stravens Planning Assocs., Inc. v. City of Wallace*, 129 Idaho 542, 545-46 (Ct. App. 1996) (duty to pay defendant discharged when defendant breached prior duty).  Like the defendant in *J.P. Stravens*, the Insurers failed to perform their duties (no reasonable updates or balance statements, no fee adjustment, no investment of funds for Refund Account's benefit, only two future liability assessments in 19 years) entirely defeating the object of the Agreement—which was to protect the Dealers from future Chargeback liability.

**B.      THE DEALERS WILL PROVE THEIR BREACH OF THE COVENANT OF GOOD FAITH AND FAIR DEALING CLAIMS.**

The Dealers will prove (1) Universal had a contract with the Dealers, (2) the implied covenant of good faith and fair dealing required Universal to not violate, nullify, or significantly impair any benefit of the contract, (3) Universal violated, nullified, or significantly impaired the benefit of the contract, and (4) the Dealers suffered damages.  *Obendorf v. FDIC*, 667 F. Supp.

**PLAINTIFFS' TRIAL BRIEF -10**

2d 1223, 1231 (D. Idaho 2009).  "This implied covenant places a good faith obligation on each

party to a contract to take reasonable measures to ensure that the other party obtains the benefits

of the agreement."  *Ferguson v. City of Orofino*, 953 P.2d 630, 634 (Idaho Ct. App. 1998).

The Insurers have taken the untenable position that they had no obligation to the Dealers

unless the obligation was set out in express detail in the Agreement.  But terms of an agreement

are implied when "they are necessarily involved in the contractual relationship so that the parties

must have intended them and have only failed to express them because of sheer inadvertence or

because they are too obvious to need expression."  *Archer v. Mtn. Fuel Supply. Co.*, 642 P.2d

943, 948-49 (Idaho 1982) (quoting 17 Am. Jur. 2d Contracts § 255 at 651 (2d ed. 1964))

(holding that defendant accounting firm turning over ledgers was implied term for effecting

termination provision, as it would allow plaintiff to transfer its business to another accountant).

When the express intent of the Agreement was that the total of all fees in the Refund

Account "accurately reflect the amount of the Dealer's future liabilities" (Dkt. 72-3 at ¶ 1), and

when Universal—an insurance company—is the contracting party with the skill and expertise to

calculate future liabilities, it is untenable for Universal to assert it had no duties to act.  *Archer*,

102 Idaho at 857-58.

A successful claim for breach of the implied covenant (like the situation here) often

involves a defendant who "relies upon a hyper-technical interpretation of an express contract

term in a way that impairs or undermines another provision of the agreement, or the overarching

purpose of the agreement."  *Long Rockwood VII, LLC v. Rockwood Lodge, LLC*, No. 2:14-CV-

00318-REB, 2016 WL 335853, at *7 (D. Idaho Jan. 26, 2016).  The *Ferguson* case is illustrative

of a "hyper-technical interpretation" and instructive here.  *See* 953 P.2d 630, 634.  There the

court held a triable issue existed whether employer deprived an employee of the contractual

benefit of personal leave.  Defendant refused to cash out 515 hours of plaintiff employee's

**PLAINTIFFS' TRIAL BRIEF -11**

unused personal leave upon his retirement. *Id.* Plaintiff's employment contract stated he was "entitled to cash payment for unliquidated leave, not to exceed one (1) month's current salary," which defendant argued capped plaintiff's cash payment at the equivalent of 160 hours. *Id.* Plaintiff argued defendant employer had deprived him of the benefit of its personal leave policy by understaffing his department such that plaintiff could not use his personal leave during his employment. *Id.* This argument prevailed, notwithstanding the employment contract's express reservation of defendant's discretion to schedule employee use of personal leave. *Id.*

*Obendorf* provides another good example of implied covenant breach. *See* 667 F. Supp. 2d at 1231. There the court denied defendant summary judgment on plaintiff's implied covenant claim where defendant had sold non-irrigable land to plaintiff, who contended the benefit of the contract was obtaining land capable of producing crops. *Id.*

The evidence will show Universal denied the Dealers the benefit of the Agreement (coverage for future Chargeback liability) when Universal failed to set up the No Chargeback Program to monitor or manage the Refund Payments Dealers made to Universal. Even more clear than in *Obendorf* where the plaintiff asserted the contractual benefit was farmable land, here the Agreement expressly states the contractual benefit: "It is the intent of Company and Dealer that the total of all fees in Dealer's Designated Refund Account accurately reflect the amount of Dealer's future liabilities for refunds under Section (2b) of this program and are being transferred to Company specifically for this purpose." Dkt. 72-3, ¶ 1.

Universal has breached the implied covenant by failing to "take reasonable measures to ensure that the other party obtains the benefits of the agreement." *Ferguson*, 953 P.2d at 634. Similar to the defendant in *Ferguson*, Universal has taken a hyper-technical position on the No Chargeback Agreements, based on a single clause (Section 2(c)). According to Universal, Section 2(c) shifts to the Dealers all liability for 90-day chargebacks on VSCs sold pursuant to

the Agreement that exceeds the sum of the $80 Refund Payments the Dealers made.  Universal

takes this position while concurrently denying it had any obligation to take steps to create the No

Chargeback Program or keep the Program solvent, despite Paragraphs 3, 5, and 6 of the

Agreement (describing duties to manage) and despite Paragraph 1's expressly stated purpose of

the Agreement, the coverage of future Chargeback liability.  Dkt. 72-3, ¶¶ 1, 3-5.

### C.   THE DEALERS WILL PROVE THEIR UNJUST ENRICHMENT CLAIMS.

The Dealers will prove (1) they provided a benefit to Insurers, (2) Insurers accepted the

benefit, and (3) it would be unjust under the circumstances for Insurers to retain the benefit

without compensating the Dealers for the value.  *Countrywide Home Loans, Inc. v. Sheets*, 371

P.3d 322, 326 (Idaho 2015).

The evidence will show the Dealers provided a benefit to the Insurers—the profitable

finance and insurance product relationship, and the $80 Refund Payments, which the Insurers

invested for their own benefit.[2]  The Insurers accepted these benefits from the Dealers since

1996.  It would be unjust for the Insurers to retain these benefits when they were the direct result

of the Insurers' leverage of the nonexistent No Chargeback Program to obtain the benefits.

### D.   THE DEALERS WILL PROVE THEIR BREACH OF FIDUCIARY DUTY CLAIMS.

The Dealers will prove (1) Insurers owed them fiduciary duties, (2) which Insurers

breached.  *See Bushi v. Sage Health Care, PLLC*, 203 P.3d 694, 699 (Idaho 2009).  A fiduciary

duty arises where one party places property or authority in the hands of another, advises for the

benefit of another, or manages funds for another.  *Skinner v. U.S. Bank Home Mort.*, 365 P.3d

398, 403 (Idaho 2015); *Hydroblend, Inc. v. Nothum Mfg. Co.*, No. 1:13-CV-00445-EJL, 2014

WL 3446088, at *5 (D. Idaho 2014); *Women's Fed. Sav. & Loan Ass'n v. Nev. Nat'l Bank*, 811

---

[2] The Dealers' Unjust Enrichment claim against Universal is made in the alternative to their
contract claims against Universal.

**PLAINTIFFS' TRIAL BRIEF -13**

F.2d 1255, 1257 (9th Cir. 1987); *Stouffer Corp. v. Itasca Hotel Co.*, 119 U.S. Dist. LEXIS

18166, at *34 (N.D. Ill. Dec. 30, 1991).  Here, the Dealers placed their money in the Insurers'

hands, the Insurers were required to advise the Dealers, and Insurers were required to manage the

Dealers funds.

The Dealers will prove the Insurers breached fiduciary duties from the outset of the

relationship in 1996, because Universal (and later Zurich) never set up an account or managed

the Refund Payments made by the Dealers to the Insurers.  The Insurers did not segregate or

account for the Refund Payments.  The Insurers used the Refund Payments for the Insurers' own

benefit, taking the time-value benefit of those funds for themselves instead of managing the

funds to pay for the Dealers' future Chargeback liability.  The Insurers did not keep the Dealers

informed about the status of the No Chargeback Program, its balance, trends, investment, or

future liability projections.  The Insurers breached their duties by advising the Dealers to

increase their VSC pricing, while at the same time the Insurers were uniquely positioned to know

such increases would drain the No Chargeback Program and send it into deeper insolvency, for

which the Insurers would later assert the Dealers must pay.

## E.    THE DEALERS WILL PROVE THEIR FRAUD CLAIMS.

The Dealers assert fraud claims based on misrepresentation and nondisclosure.  Fraud

elements are: (1) statement of fact; (2) its falsity; (3) its materiality; (4) speaker's knowledge of

its falsity or ignorance of its truth; (5) speaker's intent that there be reliance; (6) hearer's

ignorance of the falsity of the statement; (7) reliance by the hearer; (8) justifiable reliance; and

(9) resultant injury.  *Samuel v. Helpworth, Nungester & Lezamiz, Inc.*, 996 P.2d 303, 308 (Idaho

2000).  Fraud by nondisclosure may be established if the Insurers were silent although they had a

duty to speak.  *Tusch Enters. v. Coffin*, 740 P.2d 1022, 1027 (Idaho 1987).  A duty to speak

exists (1) if there is a fiduciary relationship, (2) to prevent a partial statement of facts from being

**PLAINTIFFS' TRIAL BRIEF -14**

misleading, or (3) if a fact known to one party and not the other is so vital that if the mistake were mutual the contract would be voidable, and the party knowing the fact also knows the other does not know it. *Id.*; *Long v. Rockwood VII, LLC v. Rockwood Lodge, LLC*, No. 2:14-cv-00318-REB, 2017 WL 10765197, at *10 (D. Idaho Sept. 29, 2017).

The evidence will show Universal misrepresented that it would provide a No Chargeback Program to the Dealers from the outset. Universal never intended to perform the promise made; no action was taken to set up the No Chargeback Program, demonstrating this lack of intent to perform. *See W.O. Kepler v. WHW Mgmt., Inc.*, 825 P.2d 1122, 1134 (Idaho Ct. App. 1992) (misrepresentation is proved if a party had no intent to perform a promise at the time the promise was made). And throughout the 19-year finance and insurance product relationship, the Insurers continued to conceal that there was no Program. The Insurers told the Dealers in their frequent interactions that the No Chargeback Program was a rare and valuable benefit and the reason why the Dealers should maintain their finance and insurance business with the Insurers. As a result, the Dealers did stay with the Insurers, on the misguided belief that the Insurers would anticipate and pay for future Chargeback liability for all VSCs sold under the No Chargeback Program.

### F.   THE DEALERS WILL PROVE THEIR UNFAIR BUSINESS PRACTICES CLAIMS.

The evidence will show (1) the Insurers engaged in unfair or deceptive acts or practices in the conduct commerce, (2) which they knew or reasonably should have known they were engaging in, and (3) the acts or practices resulted in damage to the Dealers. Idaho Code § 48-603.

The evidence will show the Insurers' pattern of misrepresentation and fraudulent concealment (*supra* Section II.E) was worse than instances of unfair or deceptive acts found cognizable in the case law. *See, e.g.*, *Duspiva v. Fillmore*, 293 P.3d 651, 656 (2013) (affirming trial court's determination defendant engaged in misleading or deceptive behavior in

**PLAINTIFFS' TRIAL BRIEF -15**

representing to plaintiffs the necessity of a course of action and its regulatory and other consequences); *DBSI Signature Place, LLC v. BL Greensboro, L.P.*, No. CV 05-051-SLMB, 2006 WL 1275394, at *17 (D. Idaho May 9, 2006), *on reconsideration in part*, No. CV 05-051-S-LMB, 2006 WL 3422177 (D. Idaho Nov. 28, 2006) (denying summary judgment on plaintiff's claim that defendant engaged in "misleading, false, or deceptive" acts by representing it would pay certain costs when it failed to do so and did not intend to do so); *Moto Tech, LLC v. KTM N. Am., Inc.*, No. 1:13-CV-00165-BLW, 2014 WL 4793904, at *8 (D. Idaho Sept. 25, 2014) (finding that plaintiff successfully pleaded a claim for "misleading, false, or deceptive" acts under the ICPA where it alleged defendant promised to make plaintiff a dealer, but had no intention of keeping that promise); *Bafus v. Aspen Realty, Inc.*, No. CV-04-121-S-BLW, 2006 WL 318779, at *4 (D. Idaho Feb. 8, 2006) (denying motion to dismiss claim alleging defendants represented they would charge marketing fee, when they were actually charging a real estate broker's fee); *In re Edwards*, 233 B.R. 461, 471 (Bankr. D. Idaho 1999) (finding violations of the ICPA for, among other things, informing a purchaser that a deposit was not refundable only after the deposit was made and concealing material information related to a sale of goods).

The evidence at trial will show the Insurers knew they engaged in these practices.  For example, account executive Sam D'Arc told underwriting that he wanted to contract through "an addendum letter referencing the document signed in 1996 in order to avoid scrutiny over a new contract." Dkt. 88-18 at 103435.  When the Insurers knew that the Program was not insolvent and in a negative balance, the Insurers' internal emails demonstrate an intent to hide that fact until after they closed new business with the Dealers.  *See, e.g.* Dkt. 88-26 ("We would like to have this agreement in place prior to delivering the bad news on the old program.").  Finally, the evidence will show the Dealers were damaged by the Insurers' conduct.

**PLAINTIFFS' TRIAL BRIEF -16**

### III.     REMEDIES

**A.     THE DEALERS SEEK BENEFIT OF THE BARGAIN DAMAGES FOR THEIR CLAIMS OF BREACH OF CONTRACT AND BREACH OF THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING.**

The Dealers seek the benefit of the bargain under the Agreement through their breach of contract and breach of the implied covenant of good faith and fair dealing claims.  *See Nora v. Safeco Ins. Co.*, 577 P.2d 347, 354 (Idaho 1978) (benefit of bargain damages for contract claims).  The Dealers seek their out-of-pocket losses—the amount of Chargebacks the Dealers have paid to date, and the future Chargeback liability for which the No Chargeback Program was meant to pay.  The Dealers anticipate a stipulation as to these amounts in advance of trial.

**B.     FOR CLAIMS OF UNJUST ENRICHMENT, BREACH OF FIDUCIARY DUTY, FRAUD, AND UNFAIR BUSINESS PRACTICES, DEALERS SEEK RESTITUTION DAMAGES/DISGORGEMENT OF PROFITS.**

For their non-contract claims, the Dealers seek disgorgement of the Insurers' net profits procured through leveraging the nonexistent No Chargeback Program to gain and maintain the Dealers' finance and insurance business.  "Where a party seeks disgorgement as a remedy, the unjust enrichment of a conscious wrongdoer . . . is the net profit attributable to the underlying wrong."  Dkt. 249 at 10 (quoting Restatement (3d) of Restitution § 51).

"'We do not deter indulgence in fraudulent practices if we permit wrongdoers to retain the considerable benefits of their unlawful conduct.'"  *State ex rel. Kidwell v. Master Distributors, Inc.*, 615 P.2d 116, 124 (Idaho 1980) (quoting *Albemarle Paper Co. v. Moody*, 422 U.S. 405 (1975)).  Disgorgement of profits is likewise the appropriate measure of damages for non-fraudulent conscious misconduct.  *See, e.g.*, *Eckard Brandes, Inc. v. Riley*, 338 F.3d 1082, 1086 (9th Cir. 2003) (affirming award of defendant's profits to plaintiff where defendant breached fiduciary duties); *Holladay v. Lindsay*, 152 P.3d 638, 641 (Idaho 2006) (recognizing plaintiff may recover breaching fiduciary's profits); *Women's Fed. Sav. & Loan Ass'n v. Nev.*

**PLAINTIFFS' TRIAL BRIEF -17**

*Nat'l Bank*, 811 F.2d 1255, 1260 (9th Cir. 1987) (same); *Kidwell*, 615 P.2d at 124-25 (vacating denial of restitution damages for violation of the ICPA); *Nelson v. Serwold*, 576 F.2d 1332, 1339 (9th Cir. 1978) (awarding fraudulent defendant's profits to plaintiff).

The evidence will show the Insurers used the nonexistent No Chargeback Program to induce the Dealers to sell the Insurers' finance and insurance products, even though the Insurers never set up the Program in violation of their contractual, statutory, and fiduciary duties.  The No Chargeback Program was the carrot the Insurers used to stand out among their many competitors to gain and maintain the Dealers' finance and insurance product business.  The Dealers would not have kept their business with the Insurers had they known the Insurers never set up the No Chargeback Program and had no intent to honor their obligations under the Agreement. Accordingly, the Insurers' net profit on the finance and insurance product relationship with the Dealers is attributable to the Insurers' underlying wrongs and subject to disgorgement.  The Dealers will introduce evidence at trial that the Insurers' net profits from their conscious misconduct was approximately $15 million.

### C.  THE DEALERS SEEK PUNITIVE DAMAGES.

The Court granted the Dealers' Motion to Amend to Allege Punitive Damages.  Dkt. 145 at 19-21; *see also* Dkt. 135 (Report and Recommendation) at 26-29.  The Dealers will introduce testimony and evidence consistent with evidence cited in their briefing on that Motion (Dkt. 112-1; Dkt. 128), and consistent with the evidence referenced herein.

## IV.    UNIVERSAL'S COUNTERCLAIMS[3]

### A.    UNIVERSAL'S BREACH OF CONTRACT AND BREACH OF THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING CLAIMS FAIL.

First, these claims fail because they are inconsistent with the express written intent of the Agreement, are contrary to the language of the Agreement, are inapposite to notations in the Insurers' own files and the Insurers' representations to the Dealers and would lead to an absurd result—a *No Chargeback* Program whereby the Dealers pay for Chargebacks.  *See* Section II.A.

Even if the Insurers could somehow establish liability for funds, the Dealers' affirmative defenses bar recovery. *See Davis v. First Interstate Bank of Idaho, N.A.*, 765 P.2d 680, 681 (Idaho 1988).  As demonstrated by the Insurers' internal emails in September 2014 the Insurers knew the "account" was running out of money, yet they did not disclose this fact to the Dealers and continued to write VSC contracts.  Indeed, the Insurers concealed this fact from the Dealers because "[w]e would like to have this agreement in place prior to delivering the bad news on the old program."  Dkt. 88-26.

Third, laches bars the claim because Universal failed to pursue any "deficiency" for four years.  *See Battelle Energy Alliance, LLC v. Southfork Sec., Inc.*, 3 F. Supp. 3d 852 (D. Idaho 2014).  The evidence will show that Universal delayed in asserting its (alleged) rights to the payment of the "deficiency," during which time the Dealers did not, and could not, know Universal would demand payment for the asserted "deficiency."  The Dealers would be injured and/or prejudiced in the event relief is accorded Universal because Universal's concealment prevented the Dealers from addressing the situation earlier.

---

[3] Universal asserts a Counterclaim for "Accounting."  Dkt. 56, ¶¶ 27-29.  Insurers have been provided the Dealers' records in the course of discovery.  Therefore, this claim is moot.  Moreover, all the relevant records regarding the "No Chargeback Program" and the accounting of the Program are in the possession and custody of the Insurers.

**PLAINTIFFS' TRIAL BRIEF -19**

Fourth, waiver by estoppel bars these claims because Universal changed its position, which caused a disadvantage to the Dealers.  IDJI 6.22.2.  Universal changed its position on whether it would cover future liability or claim entitlement to the negative balance of the "account," thereby benefitting itself and causing a disadvantage to the Dealers.  Universal's change in position prevented the Dealers from addressing the purported liability.

### B. UNIVERSAL'S UNJUST ENRICHMENT CLAIM FAILS.

Universal asserts it is entitled to a "deficiency" for some Chargebacks paid on Dealers behalf, and for the expected future liability of Chargebacks sold under the Agreement.  The Dealers will prove the "deficiency" consists solely of Chargeback liability that the Insurers were required to pay pursuant to the Agreement, Universal's implied duty of good faith and fair dealing, Universal's statutory and fiduciary duties, and/or Insurers' other promises and representations to the Dealers.

### V. OBJECTIONS TO THE INSURERS' PRE-TRAIL SUBMISSIONS

The Dealers reserve the right, consistent with District Local Rule Civ 16.3 (Civil), to file objections to the admissibility of any evidence identified by the Insurers in their pre-trial submissions to the Court.

DATED this 9th day of May, 2019.

HOLLAND & HART LLP

By:   */s/ Erik F. Stidham*
      Erik F. Stidham, of the firm
      A. Dean Bennett
      Jennifer M. Jensen
      Attorneys for Plaintiffs

**PLAINTIFFS' TRIAL BRIEF -20**

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on the 9th day of May, 2019, I filed the foregoing electronically through the CM/ECF system, which caused the following parties or counsel to be served by electronic means, as more fully reflected on the Notice of Electronic Filing:

Richard H. Greener                     rgreener@parsonsbehle.com
Christopher Burke                      cburke@parsonsbehle.com
Slade Sokol                            ssokol@parsonsbehle.com
Parsons Behle & Latimer
800 W. Main Street, Ste. 1300
Boise, ID  83702
Telephone: (208) 562-4900
Facsimile: (208) 562-4901

John R. Lund (Admitted *Pro Hac Vice*)     jlund@parsonsbehle.com
Parsons Behle & Latimer
201 S. Main Street, Suite 1800
Salt Lake City, UT 84111
Telephone: (801) 536-6872
Facsimile: (801) 536-6111

*/s/ Erik F. Stidham* _____
Erik F. Stidham for HOLLAND & HART LLP

11507619_v5

**PLAINTIFFS' TRIAL BRIEF - 21**