UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| EDMARK AUTO, INC., an Idaho corporation; and CHALFANT CORP., an Idaho corporation,<br><br>    Plaintiffs,<br><br>    v.<br><br>ZURICH AMERICAN INSURANCE COMPANY, a New York corporation; and UNIVERSAL UNDERWRITERS SERVICE CORPORATION, a Delaware corporation,<br><br>    Defendants. | Case No. 1:15-cv-00520-BLW<br><br>**MEMORANDUM DECISION AND ORDER** |
| AND RELATED CROSS-ACTION | |

## INTRODUCTION

There are currently two motions before the Court: Defendants Zurich

American Insurance Company ("Zurich") and Universal Underwriters Service

Corporation ("Universal") (collectively, "Insurers")'s Motion for Judgment as a

Matter of Law and Rule 59 Motion for New Trial (Dkt. 347) and Plaintiffs Edmark

Auto, Inc. ("Edmark") and Chalfant Corp. ("Chalfant") (collectively, "Dealers")'s

Motion to Amend/Correct the Judgment (Dkt. 350). For the reasons that follow, Insurers' Motion for Judgment as a Matter of Law and Rule 59 Motion for New Trial is DENIED and Dealers' Motion to Amend/Correct the Judgment is GRANTED.

## LEGAL STANDARD

### 1. Judgment as a Matter of Law

Federal Rule of Civil Procedure 50 governs a request for judgment as a matter of law. Under Rule 50(a), a party must first move for judgment as a matter of law before the case is submitted to the jury and "specify ... the law and facts that entitle the movant to the judgment." Fed. R. Civ. P. 50(a)(2). Under Rule 50(b), if the court denies the pre-verdict motion, "the movant may file a renewed motion for judgment as a matter of law and may include an alternative or joint request for a new trial under Rule 59." Fed. R. Civ. P. 50(b). The failure to make a Rule 50(a) motion before the case is submitted to the jury forecloses the possibility of the Court later considering a Rule 50(b) motion. *Tortu v. Las Vegas Metropolitan Police Dep't.*, 556 F.3d 1075, 1083 (9th Cir. 2009). Furthermore, "[a] post-trial motion for judgment can be granted only on grounds advanced in the pre-verdict motion." Fed. R. Civ. P. 50(b), advisory committee's note to 1991 amendment.

A court may grant a Rule 50 motion for judgment as a matter of law only if "there is no legally sufficient basis for a reasonable jury to find for that party on

that issue." *Krechman v. County of Riverside*, 723 F.3d 1104, 1109 (9th Cir. 2013) (internal citations omitted). "A jury's verdict must be upheld if it is supported by substantial evidence…even if it is also possible to draw a contrary conclusion from the same evidence." *Wallace v. City of San Diego*, 479 F.3d 616, 624 (9th Cir. 2007). "[I]n entertaining a motion for judgment as a matter of law, the court…may not make credibility determinations or weigh the evidence." *E.E.O.C. v. Go Daddy Software, Inc.*, 581 F.3d 951, 961 (quoting *Reeves*, 530 U.S. at 150). Rather, "[t]he evidence must be viewed in the light most favorable to the nonmoving party, and all reasonable inferences must be drawn in favor of that party." *Id*.

### 2. New Trial Pursuant to Rule 59(d)

Rule 59(d) provides that "[n]o later than 28 days after the entry of judgment, the court, on its own, may order a new trial for any reason that would justify granting one on a party's motion." A trial court has not only the right but "indeed the duty…to weigh the evidence as he [or she] saw it…and to set aside the verdict of the jury, even though supported by substantial evidence, where, in his [or her] conscientious opinion, the verdict is contrary to the clear weight of the evidence, or is based upon evidence which is false, or to prevent, in the sound discretion of the trial judge, a miscarriage of justice." *Moist Cold Refrigerator Co. v. Lou Johnson Co.*, 249 F.2d 246, 256 (9th Cir. 1957).

"Although a court need not consider the evidence in a manner that favors the prevailing party and it may grant a new trial even if there is some evidence in support of the prior decision, it should not grant a new trial unless it more than simply disagree[s] with the verdict." *Gates v. Boyle*, No. CV 05-59-M-DWM, 2007 WL 9710298, at *1 (D. Mont. Mar. 15, 2007) (Molloy, J.) (internal quotation omitted). "[A] decent respect for the collective wisdom of the jury, and for the function entrusted to it in our system, certainly suggests that in most cases the judge should accept the findings of the jury, regardless of his own doubts in the matter." *Landes Const. Co. v. Royal Bank of Canada*, 833 F.2d 1365, 1371 (9th Cir. 1987) (citation omitted). "Nonetheless, a new trial is appropriate where the court has a firm conviction of the jury's error and an attendant miscarriage of justice." *Gates*, 2007 WL 9710298, at *1 (internal quotations omitted). Unlike a Rule 50 motion, under Rule 59 the trial court may assess the credibility of the witnesses. *See Kode v. Carlson*, 596 F.3d 608, 612 (9th Cir. 2010) (per curiam). A new trial may also be granted if the Court concludes that a party was prejudiced by erroneous evidentiary decisions or by some other unfairness in the trial. *See Gilbrook v. City of Westminster*, 177 F.3d 839, 858 (9th Cir. 1999).

### 3. Remittitur

Rule 59 also allows the trial court to "grant a defendant's motion for a new trial or conditionally deny the motion, provided the plaintiff accepts a remittitur."

*J.N. v. Hendrickson*, No. 214CV02428DDPPLAX, 2017 WL 2539390, at *3 (C.D. Cal. June 12, 2017) (citing *Fenner v. Dependable Trucking Co., Inc.*, 716 F.2d 598, 603 (9th Cir. 1983)). The reduced award "must reflect the maximum amount sustainable by the proof." *Oracle Corp. v. SAP AG*, 765 F.3d 1081, 1094 (9th Cir. 2014) (internal quotation and citation omitted). "The plaintiff may choose either to accept the reduced damage award or to submit to a new trial." *Hendrickson*, 2017 WL 2539390, at *3. Broadly, remittitur is appropriate when the damages are "grossly excessive or monstrous, clearly not supported by the evidence, or only based on speculation or guesswork." *Los Angeles Memorial Coliseum Comm'n v. Nat'l Football League*, 791 F.2d 1356, 1360 (9th Cir. 1986).

## ANALYSIS

Defendants move for judgment as a matter of law under Rule 50(b), for a new trial under Rule 59, or alternatively, for remittitur. Under Rule 50, Defendants ask the Court for judgment as a matter of law on Plaintiffs' breach of fiduciary duty, fraud (in all its variations), and unfair business practices claims. Defendants further request that the Court vacate the jury's award of punitive damages. In the alternative, Defendants ask the Court for a new trial on the Dealers' breach-of-contract claim, or remittitur on the jury's compensatory and punitive damages awards.

## 1. Fiduciary Duty

### a. Waiver

Under Rule 50(a)(2), a pre-verdict motion for judgment as a matter of law must "specify…the law and facts that entitle the movant to the judgment." And, "[b]ecause it is a renewed motion, a proper post-verdict Rule 50(b) motion is limited to the grounds asserted in the pre-deliberation Rule 50(a) motion. Thus, a party cannot properly raise arguments in its post-trial motion for judgment as a matter of law under Rule 50(b) that it did not raise in its pre-verdict Rule 50(a) motion." *E.E.O.C. v. Go Daddy Software, Inc.*, 581 F.3d 951, 961 (9th Cir. 2009); *see also* Fed. R. Civ. P. 50(b) Adv. Comm. Notes 2006.

The Ninth Circuit strictly construes this limitation. *See Freund v. Nycomed Amersham*, 347 F.3d 752, 761 (9th Cir. 2003) (finding the district court erred in granting Rule 50(b) relief on punitive damages where defendant failed to raise the argument in its Rule 50(a) motion). In fact, courts generally require sufficiency-of-the-evidence arguments to be made at the level of a claim's specific elements or sub-elements. *See id.; accord Gierlinger v. Gleason*, 160 F.3d 858 (2d Cir. 1998) ("The JMOL motion must at least identify the specific element that the defendant contends is insufficiently supported. A generalized challenge is inadequate.") (internal quotations and citations omitted).

During trial, Defendants properly raised objections to Plaintiffs' Breach of Fiduciary Duty claims in their Rule 50(a) motion. Dkt. 298-1 at 13-14. But, Defendants limited their challenge to whether the parties enjoyed a "fiduciary relationship." *Id*. Defendants did not raise any arguments related to breach or Idaho's economic loss doctrine. *See id*. Defendants now raise these claims in their renewed motion for judgment as a matter of law under Rule 50(b). Dkt. 347-1 at 19-22. Because Defendants failed to raise these issues in their Rule 50(a) motion, they are barred from raising them for the first time now. Therefore, the Court will consider only whether there was sufficient evidence to find, as a matter of Idaho law, that a fiduciary duty existed between Plaintiffs and Defendants to support a claim for breach of fiduciary duty.

### b. Fiduciary Duty

The Court concludes there was sufficient evidence to support its earlier finding that a fiduciary relationship existed between Plaintiffs and Defendants. *See* Dkt. 335 at 165, Tr. at 1817:2-5. Accordingly, the Court will deny Defendants' Rule 50(b) motion on these grounds.

As Defendants correctly note at the outset of their argument, business relationships do not automatically create fiduciary duties. Dkt. 347-1 at 10. Idaho law establishes that "no fiduciary duty ordinarily arises between parties to an arm's length business transaction," but this does not end the Court's analysis. *City of*

*Meridian v. Petra Inc.*, 154 Idaho 425, 441 (2013) (internal citations omitted). But, "[g]enerally speaking, where one party is 'under a duty to act or to give advice for the benefit of the other upon a matter within the scope of the relation,' a fiduciary relationship exists." *Id.* (internal citations omitted).

Instead of stopping at the fact the parties were in a contractual relationship, the Court looks to whether, as part of that relationship, "the one reposing the trust has foundation for his belief that the one giving advice or presenting arguments is acting not in his own behalf, but in the interests of the other party." *Petra*, 154 Idaho at 442; *Doe v. Boy Scouts of Am.*, 159 Idaho 103, 109 (2015). "Examples of relationships from which the law will impose fiduciary obligations on the parties include when the parties are: members of the same family, partners, attorney and client, executor and beneficiary of an estate, principal and agent, insurer and insured, or close friends." *Doe*, 159 Idaho at 109. Therefore, to determine the sufficiency of the evidence supporting a finding that a fiduciary duty existed, the Court will assess whether the parties' relationship was similar to those relationships described in *Doe* and *Petra*.

Here, the evidence presented at trial established that the parties had formed something more than an arm's length business relationship, and that Defendants owed Plaintiffs a fiduciary duty under Idaho law. At trial, the Court relied upon two factors to find that Defendants owed Dealers a fiduciary duty, or "agreed to

put the other business's interests above its own," at least with respect to management of the Dealers' Dedicated Refund Account ("DDRA") funds described in the several contracts[1] between the two sides: first, that Dealers gave funds to Insurers to manage in Dealers' best interest, and second, that Insurers enjoyed a relationship of trust and confidence with Dealers, because they possessed more technical information about how to manage an insurance fund like the one at issue here. Trial Tr. 1817-1818. Because the evidence at trial bore out this pretrial determination, the Court reaffirms here that Defendants owed Plaintiffs a fiduciary duty.

First, Plaintiffs presented significant evidence at trial that they gave funds to Defendants to manage in Plaintiffs' best interest. This foundation of the fiduciary relationship comes from vehicle service contracts providing that Dealers pay Insurers $80 for every long-term insurance contract they sold to customers, which Insurers would hold and manage in a fund to cover Dealers' future liability for those contracts. Trial Tr. 159:15-18. The Insurers' representatives confirmed the structure of this relationship. *Id.* 444:12-15, 1070:14-1071:3. And, Plaintiffs put on evidence that the Defendants guaranteed the account would bear interest, Trial Tr. 631:11-631:17, and that the interest would redound to Dealers' benefit. Dkt. 302,

---

[1] There were several of contracts at issue in this case. For the sake of clarity, when the Court refer to "contracts," it is referring to the parties' vehicle service contracts and their addenda at the heart of the matter (Exs. 1-4, 6, 7, 507, 1001).

29:17-31:4. The evidence at trial also showed Insurers had an obligation to report to Dealers about the health of the funds, and to "monitor" and "manage" the funds to ensure they would cover future insurance liabilities. Trial Tr. 1381:17-20, 1382:23-1383:21. It was Insurers' "responsibility to advise that there needed to be a modification in the per-contract fee" to make sure the Dealers were covered on the long-term insurance contracts. *Id.* 1070:16-19.

Second, Plaintiffs put on significant evidence of the parties' special relationship and Insurers' expertise, which further strengthens the finding that a fiduciary relationship existed. For example, Jim Chalfant testified that "the dealer's obligation would be to pay an $80 fee for every contract that we would sell; and for that, Universal Underwriters would protect us against future liability of a chargeback" *Id.* 159: 15-18; *see also* 1070:14-1071:3 (Insurers responsible for "set[ting] the fees"). The evidence also shows Dealers relied on Insurers to manage the funds. *Id.* Insurers held themselves out as experts in this area to Dealers. Ex. 670; 493:6-493:9. Evidence of the parties' special relationship and Insurers' expertise was legion, and the Court will not recount it all here. *See, e.g.,* Ex. 519 (describing advice and legal compliance duties for Edmark's benefit). The bulk of the evidence at trial that Insurers managed the funds generated for long-term insurance contracts, held themselves out as experts in the area, and Dealers' relied

on that expertise, overwhelmingly supports the finding that a fiduciary relationship existed between the two sides.

Because there was more than sufficient evidence for a reasonable factfinder to conclude that a fiduciary relationship existed, the Court denies Defendants' motion on these grounds.

## 2. Fraud

Defendants also move for judgment as a matter of law, or for a new trial, on Plaintiffs' various fraud claims. The jury found in Dealers' favor on all three (inducement, misrepresentation, and concealment), and found that each one independently supported the $1.5 million verdict for Chalfant, and the $2.5 million verdict for Edmark. *See* Dkts. 321, 322. Defendants argue that Plaintiffs failed to prove their fraud claims because they did not establish the two prerequisites for fraud in Idaho law: (1) justifiable reliance and (2) actionable injury. As discussed in detail below, the record evidence supports the jury's verdict on these elements. Defendants also make several arguments specific to each of the specific fraud claims. Because these arguments are likewise without merit the Court will deny Defendants' motion on these bases.

### a. Justifiable Reliance

Defendants first argue that Plaintiffs' fraud claims are deficient because they failed to put on evidence that the Dealers justifiably relied on statements or

omissions by the Insurers. One of the elements of a fraud claim under Idaho law is "justifiable reliance" on the part of the claimant. *Gray v. Tri-Way Const. Servs., Inc.*, 147 Idaho 378, 386 (2009). Insurers argue that Dealers' reliance was not justifiable because it was based on a subjective understanding of imprecise contract language. Dkt. 347-1 at 22-23. As they did at trial, Defendants again seek safe harbor in the Court's pretrial holding that the contract was "was ambiguous and subject to reasonable conflicting readings." Dkt. 91 at 13. Defendants argue this must mean Plaintiffs' reliance on contract language could not have been reasonable. Dkt. 347-1 at 23. But trial offered Defendants their opportunity to present their interpretation of the contract, and the argument that they were at least reasonable in their misinterpretation of the language; the jury heard this argument and rejected it. The Court will not overturn the jury's determination.

The Court declines to upend the jury's finding because there was significant evidence of justifiable reliance presented at trial. For example, the jury heard that had Insurers disclosed their lack of administration of the No Chargeback Program, Dealers would have "terminated the relationship and gone to another provider." Trial Tr. 204:15-204:20; 235:21-235:22. Likewise, Jim Chalfant testified that Dealers were not shopping their F&I provider in reliance on the existence of the No Chargeback Program. *Id.* 205:18-206:9. John Chalfant testified to the same. *See e.g.*, *id.* 1210:22-1211:10; 1227:20 (testifying that Insurers' representations about

the supposed value of the No Chargeback Program "was the glue that kept the relationship together"). In short, Insurers' argument fails because it is simply reasserts the rejected proposition that the Court preliminarily finding the contract "ambiguous" somehow bars Dealers' non-contract claims. *See* Dkt. 145 at 7-8. Plaintiffs presented a host of evidence to the jury that supported its finding that the Dealers justifiably relied on Insurers' account management and their promises of "no chargebacks." As a result, the Court finds that the jury's findings on Plaintiffs' fraud claims were supported by the evidence.

> b. *Actionable Injury*

Defendants also argue Plaintiffs failed to establish another prerequisite for fraud in Idaho—actionable injury. The Idaho Supreme Court has clearly stated that "resultant injury" is an element of state-law fraud claims. *Gray,* 147 Idaho at 386. Insurers argue that "Dealers failed to put on any evidence of any damages arising from the alleged fraud." Dkt. 347-1 at 18. For support they cite *Bryant Motors, Inc. American States Insurance Cos.*, where an Idaho Court of Appeals found that "to show a loss suffered as a consequence of [Defendant]'s false statement, [Plaintiff] was required to demonstrate that it suffered harm beyond the fact of non-payment" under the terms of the parties' contract. 800 P.2d 683, 686-87 (Idaho Ct. App. 1990); *see also April Beguesse, Inc. v. Rammell*, 328 P.3d 480, 490 (Idaho 2014)

(citing *Bryant*). Following the logic of *Bryant,* if Plaintiffs failed to show harm beyond direct contractual losses, fraud would not lie.

At trial, Plaintiffs presented the jury with sufficient evidence of harm to make out a fraud claim. Relevant here, either a plaintiff's loss or the wrongdoer's unjust profits are evidence of harm sufficient to support a jury's verdict on fraud. *See Jordan v. Hunter*, 865 P.2d 990, 999 (Idaho Ct. App. 1993) (reversing the district court's granting of a directed verdict motion because proof of "unjust profits" to the defendant was sufficient to prove "damage" element of fraud). Dealers put on substantial evidence that Insurers' wrongdoing allowed them to reap significant profits during the life of the DDRA contracts. Trial Tr. 1549:23-1551:20. That fact alone is sufficient to support the harm element of the Dealer's fraud claim.

The record also contains competent evidence that Dealers would have been better off switching their business to one of Insurers' direct competitors. For example, Dave Edmark testified that since switching Edmark Auto's business to a competitor—JM&A—the dealership has been better off economically, and that most of Edmark Auto's "key metrics have improved." *Id.* 1298:5-19, 20; 1299:11; 1302:18-1303:5 (describing that the dealership's VSC business is "far more profitable with JM&A than with Zurich"). John Chalfant also testified that Ally Financial submitted a competitive bid for Edmark Auto's F&I business in 2011,

only to be denied because of the repeated representations from Insurers that Edmark Auto would continue to have "zero liability after 90 days on a chargeback." *Id.* 1212:8-1213:8. Jim Chalfant's testimony was the same. *Id.* 212:4-18.

As to Chalfant Corp., John Chalfant testified that the switch from Insurers to JM&A "improved [Chalfant Corp.'s] F&I performance." *Id.* 1220:6-9. He also testified that instead of giving Chalfant Corp.'s money to Insurers to invest for Insurers' own benefit, Chalfant Corp. is now placing funds to cover VSC chargebacks in an account that bears "3 to 4 percent a year." *Id.* 1220:16-19.

As indicated above, Plaintiffs submitted significant evidence to the jury that both Edmark Auto and Chalfant Corp would have been better off with one of Insurers' competitors during the life of their contracts, and that Defendants made significant profits from their contracts with Dealers over this period. Since both types of evidence gave the jury grounds to infer that Plaintiffs had suffered injuries as a result of the Defendants' fraudulent behavior, Plaintiffs satisfied the "actionable injury" element of fraud.

### c. Fraud by Concealment

Fraud by concealment may be established if one is silent although he has a duty to speak. *Tusch Enters. v. Coffin*, 740 P.2d 1022, 1027 (Idaho 1987). A duty to speak arises if there is a fiduciary relationship, which the Court held existed here

in the Insurers' "administering the No Chargeback Program." Dkt. 319, Instr. 25; *see also infra* § 1(b). Plaintiffs put on evidence that, starting in 1996, Insurers failed to disclose material information relating to their administration of that program. *See, e.g.* Trial Tr. 204:24- 205:8; *see also* Exs. 501 (describing effort to "avoid scrutiny"), 524 (instructing not to share program balance spreadsheet), 543 (planning to not bring up subject of the program while proposal process ongoing). Because Plaintiffs met the evidentiary prerequisites for bringing a fraud by concealment claim under Idaho law, the Court finds the jury had reasonable grounds to make its finding on Plaintiffs' claim.

### i. Jury Instruction 25

Because the Court found there was sufficient evidence to support the finding that Dealers owed Insurers a fiduciary duty, it will proceed to address Defendants argument that there was "confusion created by Instructions 22 and 25." Dkt. 347-1 at 29. Defendants believe these instructions were both legally deficient and confusing, which should entitle them to a new trial on Plaintiffs' fraud claims. Because the Court finds there was no error in its Instructions 22 and 25, it will deny Defendants' Rule 59 motion for a new trial on this basis.

First, Defendants argue Instruction 25 was legally insufficient because it did not describe for the jury the scope of the previously-identified fiduciary duty as required by Idaho law. But Idaho law does not require such an instruction.

Defendants cite a South Dakota case for the principle that the "scope" of a fiduciary duty to disclose is a matter of law the Court must determine. Dkt. 347-1 at 30, citing *High Plains Genetics Research, Inc. v. J K Mill- Iron Ranch*, 535 N.W.2d 839, 842 (S.D. 1995). The Idaho Supreme Court, however, has simply held that there is a duty to disclose where "there is a fiduciary or other similar relationship of trust and confidence." *Humphries v. Becker*, 159 Idaho 728, 736, (2016). The Court found a fiduciary duty existed and instructed the jury on the existence of that duty as required by Idaho law. The Court therefore does not find its instruction was in error.

Second, Defendants argue that Instruction 25 confused the jury because it failed to describe the scope of the fiduciary duty. But as Defendants themselves point out, the Court instructed the jury that the fiduciary duty amounted to "administering the No Chargeback Program described in the 1996 DDRA Addendums and subsequent agreements," and later, "regarding the administration of the DDRA Accounts." Dkt. 319, Instr. No. 25. These are both definitions of the scope of Defendants' duty, phrased slightly differently. The Court clearly instructed the jury to determine whether Defendants had failed to disclose information as required by their status as fiduciaries within the scope of the relationships created by the DDRA accounts, as discussed repeatedly with the jury. *See, e.g.,* Trial Tr. 1862:13-18. Therefore, even if Defendants are correct that Idaho

law requires a court to instruct the jury on the scope of a fiduciary duty, the Court did so in Instruction 25. That the Court referred to the "administration" of the contracts at issue in slightly differently terms did not make the instruction confusing.

Finally, Defendants argue the Court improperly bolstered Plaintiffs' view of the evidence in its instructions – specifically in Instruction 25. Defendants argue the Court's use of capital letters to describe the "No Chargeback Program" and the reference to "DDRA Accounts" improperly suggested a conclusion to the jurors that the contracts at issue required segregated accounts. Dkt. 347-1 at 32. Defendants also argue that the phrase "I have found" and "as a matter of law" highlighted the fact that the Court was on Dealers' side of the issue." Dkt. 347-1 at 32. Neither argument has any merit.  To begin with, it was Defendants who asked the Court to make the fiduciary duty finding; a ruling that one existed "as a matter of law" was the result of that request and accurately described the Court's ruling. Likewise, the Court finds that the record speaks clearly—through testimony from witnesses on both sides—that the parties both referred to their contractual relationship as a "no chargeback" agreement, and that the contract itself referred to a "Dealer's Designated Refund [or "DDRA"] Account." Dkt. 72-2, at 4. Instructing the jury using these terms did not suggest any bias, or imply an outcome in the matter. Therefore, the Court will deny Defendants' motion on this basis as well

### d. Fraud by Inducement

Defendants also argue they are entitled to judgment under Rule 50 on Plaintiffs' fraud by inducement claim because there was no evidence that Defendants made misrepresentations or omissions with respect to non-DDRA contracts between the parties. Dkt. 347-1 at 32. Specifically, Insurers point to several deals where Dealers "accepted full responsibility for their own chargebacks in the contracts." *Id*. Defendants argue there was no evidence that dealers relied on false information or lack of information when entering into these ancillary contracts, a necessary component of an inducement claim. But Plaintiffs only need to put on evidence that they entered into further contracts in reliance on earlier omissions and misrepresentations, not that those omissions or misrepresentations pertain to the terms of the new contract. Here, Plaintiffs presented evidence to show that the Dealers entered into non-DDRA Program contracts (e.g., a "maintenance plan contract," Ex. 609), relying on the Defendants' earlier statements that the DDRA program was healthy and profitable. *See, e.g.* Trial Tr. 442:20-21. This is sufficient evidence for a reasonable juror to conclude the Dealers entered into these contracts on the basis of fraud. As a result, the Court will deny Defendants' Rule 50 motion on Plaintiffs' fraud by inducement claim.

### e. Fraud by Misrepresentation

To prove fraud by misrepresentation in Idaho, a Plaintiff must establish that the Defendant made a false statement, and "the speaker's knowledge of the statement's 'falsity or ignorance of its truth.'" *Jenkins v. Boise Cascade Corp.*, 108 P.3d 380, 386 (Idaho 2005). Insurers challenge the jury's fraud by misrepresentation verdict, arguing there was insufficient evidence presented at trial to support: (1) that Defendants made a false statement (Dkt. 347-1 at 19-20); and (2) the speaker's knowledge of the statement's falsity or ignorance of its truth (Dkt. 347-1 at 20-21). Because the record supports the jury's determination that Defendants made false statements, and that the speakers were at least "ignorant of [the statement]'s truth," the Court will deny Defendants' motion on these grounds.

### i.  False Statements

The evidence supports the jury's finding that Insurers never implemented the "no chargeback" arrangement and never undertook their obligations to protect Dealers from future liabilities for long-term insurance contracts. And later in the relationship, when there was concern that Dealers might move to a different VSC partner, Insurers misrepresented facts surrounding the DDRA account. In 2009, for example, account executives for Zurich, Sam D'Arc and Roland Heubach, misrepresented that Dealers were protected from future liabilities, stating the no chargeback program would work "exactly how it sounds . . . after 90 days there would be no liability to the dealer if a customer asked for a refund on a warranty."

Trial Tr. 1205:25-1206:25. And in 2011, when Edmark Auto was considering a competitive pitch from Ally Financial, Mr. D'Arc again represented that the No Chargeback Program would result in Dealerships having "zero liability after 90 days on a chargeback." *Id.* 1211:14- 1213:8. The next year Mr. D'Arc would emphasize again that "ZURICH PAYS BOTH DEALER PROFIT AND ZURICH REFUND. Edmark doesn't bear any expense to the cancellation." Ex. 616 (capitalization in original). These specific statements, that "there was zero liability after 90 days" came from multiple of Insurers' representatives during the long relationship between Insurers and Dealers. 1227:10-20.

The jury, therefore, heard evidence to suggest Insurers made repeated false statements about the "no chargeback" program. In fact, the program was not a valuable program; the funds were being used for Insurers' benefit, and the Insurer had not undertaken the needed steps to protect Dealers from future liabilities. Moreover, the statements falsely represented Insurers' position at the termination of the Program in May of 2015 that Dealers owed the Insured for a deficit. *Compare* Ex. 616 ("Edmark doesn't bear any expense to the cancellation") *with* Ex. 591 ("Zurich fully reserves its right to pursue the deficit balance in the account."). Viewing the evidence in the light most favorable to Dealers, there was substantial evidence from which the jury could conclude false statements were made.

ii. Knowledge of Falsity or Ignorance of Truth

The jury also heard substantial evidence that Insurers knew these statements were false or, at least, were ignorant of the truth when the statements were made. *See Samuel v. Helpworth, Nungester & Lezamiz, Inc.*, 996 P.2d 303, 308 (Idaho 2000) (element satisfied by either knowledge of falsity or ignorance of the truth). Here, the jury could reasonably conclude Insurers knew they had not put the promised No Chargeback Program in place, were using the $80 fees for their benefit, and that, owing to their failings, Dealers were not protected from liability. The jury heard evidence that Insurers' employees knew Dealers were not protected from future liability, and that certain dealerships were in deficit positions and were being funded by fees from other dealerships. *See, e.g.* Trial Tr. 471:4-10, 646:10-647:20, 648:1-11, 672:7- 673:4, 1078:5-17. Further, the jury heard that Insurers knew or were at least ignorant of the truth of the representations made to Dealers. The evidence showed that in 2009 Insurers knew that the No Chargeback Program was not in place and Dealers were exposed to liability, but sent a short letter agreement to sign up Chalfant Corp. and additional Edmark dealerships in order to "avoid scrutiny." Trial Tr. 451:10-452:5; Ex. 501 at 6. The jury could reasonably conclude from this evidence that Insurers knew the promised No Chargeback Program was not in place, and that Dealers were not being protected from future

liabilities. Therefore, the Court finds there was sufficient evidence for the jury to find this second element of fraud by misrepresentation.

### 3. Unfair Business Practices

Defendants further argue they are entitled to judgment as a matter of law, or in the alternative a new trial, on Plaintiffs' unfair business practices claim. Insurers argue that the Court should enter judgment as a matter of law on these claims because (1) Dealers are not "consumers" under the Idaho Consumer Protection Act ("ICPA"), and (2) Idaho Code § 48-608 does not permit disgorgement; they alternatively request a new trial because Jury Instruction 24 was erroneous. Dkt. 347-1 at 25-27. The first two arguments are procedurally barred because Insurers did not raise them in their Rule 50(a) motion. *Freund*, 347 F.3d at 761.

Insurers also assert, for the first time, that the Court erred in giving Instruction No. 24, contending it failed to require "conscious wrongdoing," and "clear and convincing evidence." Dkt. 347-1 at 25-27. As Insurers failed to raise either objection pre-verdict, *see* Trial Tr. 1836:17-1837:8, the objections are reviewed solely for plain error. *Hunter*, 652 F.3d at 1230.

There was no plain error in Instruction 24. First, the Court appropriately instructed the jury that it must find "Universal/Zurich knew, or in the exercise of due care should have known, that it was engaging in acts or practices which were misleading, false, or deceptive to Dealer." Dkt. 319 at Instr. 24. This is consistent

with the state-of-mind standard in Idaho Code § 48-603—"where a person knows, or in the exercise of due care should know." The Instruction accurately captured this rule of law, and was therefore not plain error.

Second, the "preponderance of the evidence" standard the Court referenced in its Jury Instructions is correct. In civil cases generally, the quantum of proof required is a preponderance. *In re Exxon Valdez*, 270 F.3d 1215, 1232 (9th Cir. 2001); see also *Herman & MacLean v. Huddleston*, 459 U.S. 375, 387 (1983). Insurers offer no authority to support a heightened burden. *See* Dkt. 347-1 at 34. Where a party presents no authority for a higher standard, a court doesn't abuse its discretion by instructing on the preponderance-of-evidence standard. *In re Exxon Valdez*, 270 F.3d at 1232. Moreover, given the jury's findings of Insurers' "conscious wrongdoing" under the clear and convincing evidence standard applied to the fraud claims, it appears the jury would have reached the same conclusion on the Unfair Business Practice claim, even if the higher burden had been applied. *See Mockler v. Multnomah Cnty.*, 140 F.3d 808, 812-14 (9th Cir.1998) (instruction applying incorrect burden of proof held harmless when evidence supported verdict). Defendants' motion for judgment as a matter of law or for a new trial on Plaintiffs' Unfair Business Practices Claim is therefore denied.[2]

---

[2] During the course of trial, the Court indicated it would treat the jury's verdict on Plaintiffs' unfair business practices claim as "advisory only." Trial Tr. 1832:8-14. Because the Court finds the jury properly determined Defendants had violated Idaho's unfair business practices statute in
(Continued)

### 4. Remittitur

In the alternative, Defendants argue they are entitled to remittitur on the jury's compensatory damages award because it was the product of "unabashed speculation" and is not supported by the evidence. Dkt. 347-1 at 35. At issue are the $750,000 the jury awarded Edmark and the $250,000 awarded to Chalfant. Dkt. 321, at 5. For the reasons that follow, the Court will deny Defendants' motion for remittitur or a new trial on compensatory damages.

The jury's award "must be upheld unless the amount is clearly not supported by the evidence and is grossly excessive, monstrous, or shocking to the conscience." *Gilchrist v. Jim Slemons Imp., Inc.*, 803 F.2d 1488, 1501 (9th Cir. 1986). And where there are damages, difficulty in determining amounts does not bar recovery. *Griffith v. Clear Lakes Trout Co.*, 152 P.3d 604, 612 (Idaho 2007). Prospective loss is inherently uncertain; wrongdoers bear the risk of uncertainty. *Smith v. Mitton*, 104 P.3d 367, 374 (Idaho 2004). "'[T]he jury may make a just and reasonable estimate of the damages based upon relevant data[.]'" *Id*. The Court need not engage in forensic recalculation of the jury's award, only determine whether it is "supported by substantial evidence." *See Community House, Inc. v. City of Boise*, 2014 WL 345630, at *12 (D. Idaho Jan. 30, 2014) (denying

---

their relationship with Plaintiffs, the Court adopts the jury's verdict in full, including the finding that the unfair business practices claim completely supports the restitutionary verdicts. *See* Dkts. 321, 322.

remittitur when witness testified service provided was worth $1.15 million, and jury awarded $1 million). In considering the motion for remittitur, the Court must view the evidence in the light most favorable to the non-moving party. *See Fenner v. Dependable Trucking Co.*, 716 F.2d 598, 603 (9th Cir.1983).

In seeking remittitur on the jury's compensatory damages award, Insurers argue that the only substantive evidence Dealers placed before the jury about current or future liability on "vehicle service contract chargebacks" was the testimony Dennis Reinstein provided regarding Exhibit 1231. *See* Trial Tr. 1546:14-1548:9. That evidence showed that Edmark had paid $359,545 in chargebacks as of May 31, 2018, and that Chalfant had paid $152,069 in chargebacks as of August 31, 2018. *Id*. 1548:7-8. But Plaintiffs put on other significant evidence that could have led the jury to their ultimate award. For example, Plaintiffs presented Exhibit 657, a live Excel spreadsheet showing, contract-by-contract, chargebacks paid, dealer gross profit, and cancellation date. That Exhibit reflects $402,806.59 in chargebacks paid after May 15, 2015, for Edmark and $251,343.70 for Chalfant. The jury could sort Exhibit 657 to double-check these numbers. Zurich's 30(b)(6) representative Ms. Ingham demonstrated sorting and identified the highlighted columns reflecting chargebacks. Trial Tr. 1148:3-1149:22, 1152:7-14. Further testimony from Jim Chalfant and Dave Edmark described losses of "about $550,000" for Chalfant and potential

chargebacks outstanding as of March 2015 of about $1 million for Edmark Auto. *Id.* 286:11-286:14; 1287:23-1288:3. John Chalfant added that Chalfant Corp. had paid $181,115 in chargebacks since program termination. *Id.* 1220:20-1221:1. Plaintiffs' expert Christopher Money added that Edmark and Chalfant had paid "almost 598,000 dollars" since cancellation of the program. *Id.* 1699:12-20.

Defendants also argue that Plaintiffs failed to present evidence that they would suffer any future liabilities as a result of the breach of contract. But Dealers did provide the jury with a method for estimating future liability. Jim Chalfant testified the amount of chargebacks, as a percentage of VSC gross profit, "run[s] roughly somewhere around 10 percent[.]" *Id.* 375:3-375:8. Dave Edmark agreed that chargebacks come in "remarkably regularly." *Id.* 1231:2-1231:22. Exhibit 626 showed the jury Dealers' average dealer markup, or gross profit, per VSC by year. By 2014, this average was about $1200 per contract. *Id.* As Mr. Jenkins explained, VSC future liability estimates are based on dealership contract sale and cancellation data, (562:15- 563:18, 635:7-15), further supporting Jim Chalfant's testimony that future liability could be estimated using Dealers' data. *See* Exs. 650, 654, 657. And future liability will continue for about five years. *Id.* 286:9-18. There were about 6,500 active Edmark and Chalfant VSCs when Insurers terminated the program in May 2015, and an estimated 2,000 to 3,000 VSCs active as of trial. 294:20-295:1. Chalfant had 531 active VSCs as of trial. 1221:2-8.

Exhibit 654 reflects 4,951 active VSCs. All this evidence was presented to the jury, and could have been reasonably included in their ultimate calculation.

The Dealers present numerous plausible methods for the jury to have reached its compensatory damages award, which is not grossly excessive, monstrous, or shocking to the conscience. For example, the jury could have awarded Chalfant $250,000 by starting with Exhibit 657, which shows $251,343.70 as the total chargeback payments for Chalfant, and making a small adjustment downward. It could have awarded Edmark $750,000 by starting with Edmark's testimony that as of March 2015, exposure for chargebacks was around $1 million, and adjusting to reflect Insurers' payments until May 15, 2015. It also could have relied on Exhibit 657 for chargeback totals Edmark and Chalfant paid and then added future liability by multiplying the number of remaining active contracts by 10% average gross dealer profit and adjusting downward. The Court is satisfied that the jury was armed with the information to reach their compensatory damages awards, and to do so reasonably. Therefore, Defendants' motion for remittitur on these damages is denied.

### 5. Disgorgement

#### a. *Availability of Disgorgement Remedy Under Idaho Code § 48-608*

Defendants first argue that the Court should vacate the jury's disgorgement remedy for violation of Idaho's unfair business practices statute, I.C. § 48-608,

because that statute only allows for restitution, not disgorgement. Under that section, an aggrieved party may "seek restitution," or "any other appropriate relief which the court in its discretion may deem just and necessary." Idaho Code § 48-608(1). Defendants cite Third Circuit and California case law for the proposition that, they believe, separates disgorgement from restitution. Dkt. 347-1 at 34. But precedent controlling on this Court has held otherwise. *Kokesh v. S.E.C.*, 137 S.Ct. 1635, 1640 (2017) (describing disgorgement as "a form of '[r]estitution measured by the defendant's wrongful gain'"); *see also U.S. Commodity Futures Trading Comm'n v. Crombie,* 914 F.3d 1208, 1216 (9th Cir. 2019)("Restitution is a remedy designed to prevent a defendant from unjustly enriching himself at another's expense."). The Restatement also includes disgorgement as a potential restitutionary remedy. Rest. (3d) of Restitution § 51, cmt. a (2011) ("Restitution measured by the defendant's wrongful gain is frequently called 'disgorgement.'"). Because the Supreme Court, the Ninth Circuit, and, persuasively, the Restatement, all agree that disgorgement falls within the realm of potential "restitution" remedies, the Court likewise finds it is available under Idaho Code § 48-608, which allows a plaintiff to "seek restitution" for a defendant's unfair business practices.

*b. Whether Evidence Supports Disgorgement Remedy*

Defendants also argue that the evidence does not support an award of disgorgement. Dkt. 347-1 at 37. Dealers sought disgorgement on their claims for breach of fiduciary duty, unfair business practices, and fraud. The jury found in Dealers' favor on all three, and awarded $1.5 million in damages to Chalfant, and $2.5 million to Edmark. Dkt. 321. The jury further found that each of the claims independently supported the award of damages. Dkt. 322. Defendants argue that because disgorgement required proof of conscious wrongdoing and causation, and "the record does not support either showing," the Court should vacate the jury's disgorgement award.

First, the Court instructed the jury that conscious wrongdoing is an element Dealers had to prove to support a disgorgement award for their three fraud claims. Dkt. 319 at 29, 30, 32. And the Court stated the standard in its instruction: "'Conscious wrongdoing' is either (a) acting with knowledge of the underlying wrong, or (b) acting despite a known risk that the action violates the rights of Dealers.")(quoting Rest. (3d) of Restitution § 51(3)).[3] Defendants argue that while there may have been evidence of "bad math," *see, e.g.* Trial Tr. 448:20-449:4, and "internal discussions about when and how to communicate these issues to

---

[3] Conscious wrongdoing is not a prerequisite for disgorgement damages for a breach of fiduciary duty, (Rest. (3d) of Restitution § 51(4), cmt. a.), or unfair business practices.

Dealers", *e.g.*, Exs. 524, 543 624, these fall short of the kind of conscious wrongdoing required for disgorgement.

But Dealers put on enough evidence at trial for the jury to conclude that Insurers had acted with conscious wrongdoing. First, starting in 1996, Insurers failed to implement or administer the promised No Chargeback Program. Trial Tr. 1388:5-20. Second, they concealed that wrongdoing for 19 years. See *id.* Third, since at least 2009, Insurers made material misrepresentations and signed Dealers on to new contracts knowing that the No Chargeback Program was not in place. The jury found this behavior constituted "conscious wrongdoing," as reflected by their verdict against Insurers on the Dealers' three fraud claims.

Moreover, the jury could reasonably conclude these were conscious decisions given how central they were to the parties' contractual relationship. Insurers made these choices despite a known risk that the choices violated Dealers' rights. *See e.g.*, Trial Tr. 711:3-7, 443:22-444:15, 606:20-607:16, 1070:14- 1071:3 (Insurers' admissions they were responsible to manage for future liability). Plaintiffs' expert Mr. Anderson further testified that "it didn't appear [Insurers] were actually trying to meet the objective" of the Program "which is to have the right amount of money there for future liabilities at any point in time." *Id.* 1387:9-12. That failure began in 1996, and Insurers continually failed to make Dealers aware of their failure to comply. *Id.* 204:24-205:8. The jury also considered

evidence of Insurers' misrepresentations. For example, Mr. D'Arc reviewed a copy of the DDRA Addendum and had a "specific understanding" of the program. *Id.* 1624:8-24. With that understanding, Mr. D'Arc repeatedly stated Dealers faced zero liability from VSC cancellations for chargebacks after 90 days. *Id.* 1205:25-1206:25; *see also* Ex. 501 (effort to "avoid scrutiny"). Mr. D'Arc also made written statements that were false given that Insurers were not acting for Dealers' benefit. Ex. 616.[4] In all, the jury heard significant evidence that could support its finding that Defendants were well aware of their failure to abide by the contract. Because there was sufficient evidence to support the jury's determination, the Defendants' motion will be denied on these grounds.

### 6. Proof of Restitution Amount

In addition to compensatory damages, the jury awarded significant restitution damages to Plaintiffs based on the profits Defendants earned as a result of their wrongful conduct. The Court instructed the jury that "Dealers have the burden of producing evidence permitting at least a reasonable approximation of the amount of the wrongful gain. The risk of uncertainty in calculating net profit is assigned to Universal/Zurich." Dkt 319 at 39. As described in further detail above,

---

[4] The Defendants also resuscitate their argument that the ambiguity of the contract somehow immunizes them from "conscious wrongdoing." But a properly-instructed jury found in favor of Plaintiffs on all counts, essentially punishing Defendants for their interpretation of the contract they themselves drafted.

"if a tort is of such a nature that the amount of damages may not be proven with certainty, it is enough if the evidence shows 'the extent of the damages as a matter of just and reasonable inference, although the result be only approximate.'" *Community House*, 2014 WL 345630, at *13.

Dealers presented substantial evidence of Insurers' wrongful gain using two methods, both of which provided a year-by-year profit analysis for the jury's review. Because Defendants do not meaningfully challenge either of these methods, and because each method independently supports a restitution award exceeding the $4 million verdict, the Court will not recount that calculation method here. *See* Dkt. 364 at 41-44 (explaining support for $4m restitution award).

Defendants also argue that Plaintiffs failed to present evidence that would connect restitution awards to each Plaintiff corporation, and therefore ask for a new trial on the claims supporting disgorgement. Dkt. 347-1 at 39. Defendants believe that Plaintiffs "gave the jury zero basis to make a separate disgorgement award to Chalfant versus Edmark" (Dkt. 347-1 at 39), combining the profits they requested in closing statements (Trial Tr. 1897:9-10), and presenting only demonstrative exhibits to substantiate the two plaintiff-corporations' separate disgorgement claims (Dkt. 366 at 23-24). They argue this is particularly so because Plaintiffs only introduced this evidence with demonstrative exhibits that were not admitted substantively as evidence.

But Plaintiffs' expert Dennis Reinstein, who *described* those demonstratives for the jury, did the work of "break[ing] these [disgorgement] numbers down by the Edmark corporation, the Chalfant Corporations." Trial Tr. 1513 3-4. Exhibits 1223 and 1230, which Mr. Reinstein described in his testimony, provided the jury with evidence that Insurers' VSC and non-VSC F&I profit without reinvestment amounted to $3,283,017 from Edmark and $1,668,902 from Chalfant. Dkt. 364 at 45. Because these amounts support the jury's disgorgement award, Plaintiffs carried their burden of putting on evidence that gave the jury a chance to make a "reasonable approximation" of Defendants' profits with respect to each individual Plaintiff corporation.

The Court also finds that it was proper to instruct the jury on both contract and non-contract damages available to the Plaintiffs. Defendants argue the Dealers should only be able to collect on one theory of damages—disgorgement or contract damages—"what Dealers cannot do is collect both." Dkt. 347-1 at 41 (citing *Gunter v. Murphy's Lounge, LLC*, 105 P.3d 676, 691 (Idaho 2005). But as Plaintiffs point out, the two measures correspond to different injuries. *See Martinez v. Shinn*, 992 F.2d 997, 1001 (9th Cir. 1993) (affirming statutory and actual damages addressing different harms). Dealers' contract damages consisted of chargebacks paid and future liability for paying chargebacks Universal was obligated by contract to pay. Dkt. 319 at 37. Dealers' non-contract claims address a

distinct injury: due to Insurers' conduct, Dealers sold Insurers' products for 19 years, generating profits for Insurers and foregoing better opportunities. *See, e.g.,* Ex. 1026; Trial Tr. 828:14-829:7. Unlike in *Gunter*, here there was evidence of distinct harms and no indication that the jury's special verdict attempted to compensate Dealers twice for the same harm. Further, a breaching fiduciary must pay plaintiff's losses *and* defendant's wrongful gain. *See Rockefeller*, 39 P.3d at 586 (plaintiff entitled to lost profits and broker's commissions). Therefore, because the jury's award was supported by the evidence and pointed to two distinct harms, I will deny Defendants' motion for a new trial on the availability, or extent, of disgorgement damages.

### 7.  Punitive Damages

Finally, Defendants challenge the jury's award of punitive damages. Dkt. 347-1 at 42. Under § 6-1604 of the Idaho Code, a party is not entitled to punitive damages unless that party can prove, "by clear and convincing evidence," that the other party has engaged in "oppressive, fraudulent, malicious or outrageous conduct." The Court so instructed the jury. Dkt. 319, Inst. 31. In reviewing a jury's punitive damages award, a court determines not whether it "would have awarded punitive damages, but instead whether the jury could have awarded punitive damages." *Gunter*, 105 P.3d at 689. Whether punitive damages are awarded, and

how much, are jury questions. *Cheney v. Palos Verdes Corp.*, 665 P.2d 661, 668 (Idaho 1983).

Defendants argue there was insufficient evidence of "outrageous conduct" or "malice," and no evidence that a managing agent of Zurich or Universal engaged in or ratified such conduct. Defendants further argue the punitive damages award is untethered from the actual damages in violation of I.C. § 6-1604(3). For the reasons that follow, the Court will uphold the jury's award of punitive damages in full.

### a. Evidence of Outrageous Conduct

Defendants first argue that Plaintiffs failed to introduce sufficient evidence of "outrageous" conduct for the jury to appropriately award punitive damages. Defendants argue that Plaintiffs' expert Robert Anderson was not qualified to offer opinions on the reasonableness of their behavior, and that his testimony should be rejected because of ambiguous language in the No Chargeback Agreement. Dkt. 347-1 at 34-36. The Court found that Anderson's "forty years of experience in the insurance industry . . . make him well qualified to testify as an expert in this matter," and that his experience "'direct[ing] and negotiat[ing] a variety of specialty insurance programs' for major casualty underwriters is particularly relevant in this case, given Insurers' insistence that the arrangement between the Parties was an atypical bespoke agreement." Dkt. 249 at 18. The jury was entitled

to give Anderson's opinion that Insurers engaged in an extreme deviation from the standards of care the weight it deemed appropriate. *See Sabo v. Fiskars Brands, Inc.*, 2014 WL 4365319, at *3 (D. Idaho Sept. 2, 2014) (weight and credibility of an expert's opinion is a jury question). As to Defendants' second argument, whatever ambiguities existed in the contract did not undermine Mr. Anderson's testimony that when one entity holds funds for the purpose of paying future liabilities of another, certain standards of care apply, and that Defendants violated those standards. Trial Tr. 1382:23-1383:21. Through Plaintiffs' expert Robert Anderson's testimony, the jury was presented with sufficient evidence to find that Defendants' behavior was "outrageous" to warrant punitive damages.

### b. High-Level Participation or Ratification

Plaintiffs also presented substantial evidence that the "outrageous" conduct was ratified by Defendants' high-level employees. As the parties both agree, "a principal is liable for punitive damages based upon the acts of his agents only in which the principal participated or which he authorized or ratified." *Griff, Inc. v. Curry Bean Co., Inc.*, 63 P.3d 441, 447 (Idaho 2003). "[A] wooden application of this rule, which we reject, would effectively insulate all corporations from punitive damage liability, for a corporation can act only through its agents." *Boise Dodge, Inc. v. Clark*, 453 P.2d 551, 554 (Idaho 1969). Thus, "a principal may be liable for punitive damages for the acts of its agent upon 'a clear showing that the agent had

managerial status or that the principal ordered or ratified the acts in question.'"
*Hatrock v. Edward D. Jones & Co.*, 750 F.2d 767, 771 (9th Cir. 1984) (applying
Idaho law).

The evidence of ratification showed Kathy Ingham, Vice President and Head
of F&I Profit Center, Ex. 549; Duke Ziegelmeier, Vice President, Ex. 525; Todd
Kaminski, Vice President, Sales and Distribution, Ex. 582; and Troy Linafelter,
F&I Executive were all in a position and had the knowledge to have ratified the
wrongful conduct as required by Idaho law. "A principal ratifies the transaction
only when it adopts the benefits of the unauthorized transaction with knowledge of
all material facts." *Gilmore v. Bonner Cnty. Sch. Dist. No. 82*, 971 P.2d 323,327
(Idaho 1999). Plaintiffs put on evidence that Ms. Ingham knew the program did
nothing to protect Dealers from future liability, even though that was the purpose
of the program and Insurers' responsibility. *See, e.g.,* Trial Tr. 445:19- 446:18. The
jury also heard evidence that she, Mr. Ziegelmeier and Mr. Kaminski all ratified
the September 2014 reinsurance proposal to Edmark, which included hiding
information about the DDRA accounts from Edmark in order to keep its business.
*Id*. 489:17-490:13, 496:25-497:15 1280:9-1281:15. Concerned about losing
Dealers' business, which amounted to $2,732,176 in F&I premiums in 2014 alone,
Mr. Kaminski approved withholding information on the negative balance of the
program. Exs. 589, 588, 582, 1061. This, along with evidence of how Defendants'

principals failed to fulfill their obligations to Dealers during the life of the parties'

contracts suffices to support the jury's award of punitive damages against the

Defendants.

   *c.  Reasonableness of Punitive Damages Amount*

Finally, Defendants challenge the reasonableness of the amount of the

punitive damages award. Idaho Code § 6-1604(3) states, "[n]o judgment for

punitive damages shall exceed the greater of two hundred fifty thousand dollars

($250,000) or an amount which is three (3) times the compensatory damages

contained in such judgment." Here, the cap would be $3,250,000 x 3 = $9,750,000

for Edmark and $1,750,000 x 3 = $5,250,000 for Chalfant. *See* Dkt. 324. Because

The jury awarded $3,000,000 to each plaintiff, amounts well below the statutory

cap, the Court finds the amounts reasonable under Idaho law, and that a reduction

is unnecessary.

### 8. Pre-and Post-Judgment Interest

The Plaintiffs have also moved to amend the judgment to include pre-

judgment and post-judgment interest. Dkt. 350. The parties do not dispute that

post-judgment interest is mandatory, and shall be due pursuant to 28 U.S.C. § 1961

beginning July 10, 2019. *See* Dkts. 350-1 at 6, 361 at 2. Defendants challenge

Plaintiffs' request for pre-judgment interest, however, on the grounds that (1) it is

based on undisclosed expert testimony that conflicts with the evidence presented at

trial and requires speculation about the verdict, and (2) Idaho law does not allow

pre-judgment interest for disputed damages not capable of pre-trial determination.

Dkt. 361. For the reasons that follow, Plaintiffs' motion is granted.

Defendants first argue pre-judgment interest is not justified because

Plaintiffs used "undisclosed expert testimony" to arrive at their calculation of

contract damages. To enumerate pre-judgment interest, Plaintiffs called upon an

accountant—Michael Huter—to analyze Trial Exhibit 657's final tab, called "VSC

Split Out," which lists contract detail, including which dealership sold the contract,

the date cancellation was processed, and the amount of the chargeback on the

cancelled contract.[5] *See generally* Dkt. 349. Defendants argue Mr. Huter's analysis

"lacks foundation under Federal Rule of Evidence 703" and was "not timely

disclosed." Dkt. 361 at 3. But Mr. Huter is not a trial expert whose opinions are

subject to the expert disclosure rules of Rule 26. *See* Fed. R. Civ. P. 26(a)(2). And

though they may be tedious, Mr. Huter's calculation of contract-related damages is

simple addition, which does not require specific foundation under Rule 703. *See,*

*e.g., United States v. Hamaker*, 455 F.3d 1316, 1331-32 (11th Cir. 2006)

(conclusions based on simple arithmetic calculations not expert testimony). The

---

[5] Mr. Huter's also analyzed Trial Exhibit 2037, which identifies the chargebacks Defendants paid unintentionally, which can in turn be identified by contract number in Trial Exhibit 657 and were excluded from the analysis of pre-judgment interest.

Court will not strike Mr. Huter's declaration on these bases, nor deny Plaintiffs' motion because they hired a third party to calculate pre-judgment interest.

Defendants also argue the motion should be denied because Plaintiffs' calculations do not match up with the jury's verdict at trial. For contract damages, the jury awarded Edmark $750,000, and Chalfant $250,000. Dkt. 321. The parties agree that these damages correspond to both the chargebacks Plaintiffs paid out of pocket since May 15, 2015, and future liability for chargebacks on vehicle service contracts that are still outstanding. Dkts. 350-1 at 2, 361 at 5. Although the jury Verdict Form did not separate out elements of contract damages, one is ascertainable (chargebacks already paid), while the other is not (future chargeback liability). Because Plaintiffs seek pre-judgment interest on this ascertainable portion, and because that amount is readily apparent from the record, Defendants argument lacks merit.

Idaho law guides the Court's hand in calculating pre-judgment interest. Idaho Code § 28-22-104 "provides for the award of pre-judgment interest on "'[m]oney after the same becomes due.'" *Doolittle By and Through Doolittle v. Meridian Joint Sch. Dist. No. 2*, 919 P.2d 334, 343 (Idaho 1996) (citing Idaho Code § 28-22-104(2)). The applicable interest rate is 12%, not compounded. Idaho Code § 28-22-104(2); *Doolittle*, 919 P.2d at 343 (holding compounding of interest erroneous). And pre-judgment interest should be awarded if the amount of liability

is liquidated or was capable of ascertainment by a mere mathematical calculation. *Doolittle*, 919 P.2d at 343. Here, there is no dispute over the amount of damages attributable to chargebacks already paid, which comes from an exhibit prepared by Defendants that tracks chargebacks Edmark and Chalfant have paid since program termination, with each respective cancellation processing date. Ex. 657. Each chargeback "came due" for purposes of pre-judgment interest when the respective contract's cancellation was processed. *Id*. And calculating 12% simple interest from the respective cancellation processing date of each chargeback until entry of judgment results in a total of $141,150.57 in pre-judgment interest for Edmark and $85,764.93 in pre-judgment interest for Chalfant. *See* Huter Decl., ¶ 2. Because Defendants do not dispute the accuracy of Exhibit 657, or the method by which Mr. Huter calculated the interest from these chargebacks, the Court finds the amounts "ascertainable by mere mathematical process," and appropriately derived from the evidence presented at trial.

For the foregoing reasons, the Court finds pre-judgment interest is merited in the amounts of $141,150.57 for Edmark and $85,764.93 for Chalfant. The Court, therefore, grants Plaintiffs' motion to amend the judgment and will enter a separate judgment to reflect these additional awards.

# ORDER

**IT IS ORDERED:**

1. Defendants' Motion for Judgment as a Matter of Law and Rule 59 Motion for a New Trial (Dkt. 347) is **DENIED**.

2. Plaintiffs' Motion to Amend/Correct the Judgment (Dkt. 350) is **GRANTED**. The Court will issue a separate judgment awarding pre-judgment interest in the sum of $141,150.57 for Edmark and $85,764.93 for Chalfant against Defendants, and post-judgment interest pursuant to 28 U.S.C. § 1961, calculated beginning July 10, 2019.

DATED: January 9, 2020

B. Lynn Winmill
U.S. District Court Judge